## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Samuel Wharton, being duly sworn, depose and state the following:

### INTRODUCTION

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and I have been an agent since September 2017. I am presently assigned to the FBI's field office in New Haven, Connecticut.  My training has included training at the FBI academy at Quantico, Virginia, for investigating many crimes, including espionage, terrorism, drug trafficking, and financial fraud.  Prior to joining the FBI, I served as a Military Police officer in the United States Army for 5 years where I regularly participated in investigations for a wide variety of criminal offenses. Before joining the military, I studied Arabic and Islamic culture for 2 semesters while attending the United States Military Academy at West Point.  As an FBI Special Agent, I have investigated several criminal violations, including narcotics trafficking, homicide, and international terrorism.  I also have served as the affiant for search warrants, including search warrants for electronic evidence. I have been assigned to the Joint Terrorism Task Force since September 2019.

2.      I make this affidavit in support of an application for a search warrant for a Gateway laptop computer ("Target Computer") belonging to Kevin Iman McCormick ("McCormick").  As described in Attachment A, the computer is a Gateway model S/N: LXWZG020041432371B1601.  The Target Computer is located at the FBI's New Haven, Connecticut, field office, which is within the District of Connecticut.

3.      Based on my training and experience, and the facts as set forth in this affidavit, I submit that there is probable cause to believe that violations of 18 U.S.C. § 2339B (attempting to provide material support and resources to a foreign terrorist organization) have been committed

by McCormick, and that there is probable cause to believe that evidence, fruits, and instrumentalities of these violations, as described more particularly in Attachment B, are present on the Target Computer.  The applied-for warrant would authorize the forensic examination of the Target Computer for the purpose of identifying electronically stored data particularly described in Attachment B.  Based on my training and experience, I know that the Target Computer has been stored in a manner in which its contents are in substantially the same state as when the Target Computer first came into the possession of law-enforcement personnel.

4.      The information contained in this affidavit is from my personal participation in the investigation, information provided by two reliable Confidential Human Sources ("CHS-1" and "CHS-2," individually, and "CHSs" collectively[1]), consensual recordings of conversations between the two CHSs and McCormick, and information provided to me by other law-enforcement officers.[2]  Due to the fact this affidavit is being made to establish probable cause, I have not listed each item and every fact known by me regarding the investigation.

5.      In this affidavit, the FBI has provided translations of certain Arabic words or phrases. These translations are based on information provided to me by an FBI linguist and from my training and experience.[3]  I have indicated the translations by bracketing the English translations that came from Arabic recordings and documents.

---

[1] The CHSs are paid informants for the FBI.  Both CHSs have been found to be reliable sources for the FBI.  CHS-1 has worked as a paid informant for the FBI since April 2013, though CHS-1 only has worked as a paid informant on limited occasions.  CHS-2 has worked as paid informant for the FBI since May 2006.

[2] McCormack likely has mental-health issues.  I understand this based on information from local police reports, which include statements from his family.

[3] The transcriptions and translations are in preliminary form and have not been finalized.

## SUMMARY OF PROBABLE CAUSE

6.      From my participation in the investigation, including my review of FBI reports and recordings, I have learned the following:

7.      Based on my training and experience as a Special Agent with the FBI, as well as the facts set forth in this affidavit, there is probable cause to believe that beginning in or about September 2019, and continuing to about October 21, 2019, McCormick attempted to provide material support and resources to a foreign terrorist organization—that is, the Islamic State of Iraq and Al-Sham ("ISIS")—in violation of Title 18, United States Code, Section 2339B. Specifically, McCormick attempted to provide material support and resources, as that term is defined in Title 18, United States Code, Section 2339(a), including personnel (himself), to ISIS.

8.      On or about October 19, 2019, McCormick made a "bayat" video during which he pledged allegiance to ISIS and its leader, Abu Bakr Al-Baghdadi. Based on my training and experience, I understand some individuals attempting to join ISIS pledge their allegiance to ISIS and Al-Baghdadi through video messages.  I also understand the term "bayat" to mean making a solemn promise.

9.      On or about October 19, 2019, McCormick purchased a plane ticket from Toronto, Canada, to Amman, Jordan.  Based on prior meetings between CHS-1, CHS-2, and McCormick, McCormick believed that CHS-2 was an ISIS facilitator and would be able to smuggle him out of the United States to Toronto, and that his flight from Toronto to Amman would enable him to connect with ISIS members overseas, who, in turn, would assist McCormick with traveling to ISIS within Syria.

## THE ISLAMIC STATE OF IRAQ AND AL-SHAM

10.     On October 15, 2004, the United States Secretary of State designated al-Qaeda in

Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as an FTO under Section 219 of the

Immigration and Nationality Act and as a Specifically Designated Global Terrorist entity under

section 1(b) of Executive Order 13224.

11.     On or about May 15, 2014, the Secretary of State amended the designation of AQI

as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially

Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias

Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary of State also

added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham ("ISIS"—

which is how the FTO will be referenced herein), The Islamic State of Iraq and Syria, ad-Dawla

al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for

Media Production. On September 21, 2015, the Secretary of State added the following aliases to

the FTO listing: Islamic State, ISIL and ISIS. To date, ISIS remains a designated FTO.

12.     Based on my training and experience, I understand Abu Bakr al-Baghdadi to be

the leader of ISIS.[4]

## PROBABLE CAUSE

**A. Concerned individuals reported McCormick to the FBI.**

13.     On October 4, 2019, a concerned individual who attends an Islamic Center in

another State reported to the FBI that he/she encountered McCormick on or about September 1,

2019. The concerned individual reported that McCormick expressed a desire to travel to Syria to

"fight for Allah."

14.     According to the concerned individual, McCormick attempted to justify his

reasons to fight by quoting and citing religious doctrine, but he did so incorrectly. McCormick

---

[4] I understand from recent public news reports that al-Baghdadi may be deceased.

4

agreed with the concerned individual that innocent people should not be attacked and McCormick further stated that is why his fight has to take place in Syria.

15.     The concerned individual was shown a picture of McCormick from his Connecticut Driver's License, and that individual identified McCormick as the individual who expressed a desire to travel overseas to Syria for the purpose of fighting.

16.     McCormick worked as a contract driver for a large company and was fired on or about September 15, 2019.  After being fired, McCormick entered a large store in Washington State and attempted to purchase a firearm and knife. The sales associates at the store did not know McCormick had just been fired. McCormick behaved strangely and told the sales associates that the purchase of the firearm was "not for an animal."  The associate declined to sell McCormick the firearm.

17.     On or about August 24, 2019, members of the local Muslim community center in yet another State reported McCormick because he made concerning statements. McCormick was reported to have said to community members that "we should support ISIS," and "Jihad is the way to go." McCormick also inquired about circumcision and wanted a doctor that could help him with the procedure.

18.     On or about September 4, 2019, law-enforcement personnel reviewed McCormick's public Facebook page, which revealed, among other things, ISIS-related videos and videos of McCormick shooting what appeared to be a Glock pistol at a firearms range.

19.     On or about September 26, 2019, McCormick was brought back to his employer's headquarters in Arkansas and formally terminated, at which time McCormick reacted angrily. The police were called, and McCormick yelled and kicked open a door. McCormick was charged with disorderly conduct and spent one-and-one-half weeks in jail.  Sometime thereafter,

McCormick traveled from Arkansas to Connecticut, where he resides with family.

**B. McCormick attempted to travel to Jamaica for the purpose of talking with pro-ISIS individuals he believed to be located in that country.**

20.     On or about October 12, 2019, McCormick attempted to board a flight from Bradley International Airport in Hartford, Connecticut, to Jamaica.  The Department of Homeland Security ("DHS"), however, prevented McCormick from boarding the flight.

21.     After DHS prevented McCormick from boarding the flight to Jamaica, CHS-1 met with McCormick. During their conversation, McCormick told CHS-1 that he wanted to travel to Jamaica, and then onward to Syria in order to join ISIS.[5] McCormick also stated that he had asked about buying a shotgun, but he really wanted an AK-47. McCormick told CHS-1 multiple times that he wanted to kill people, specifically people from DHS, because DHS prevented McCormick from boarding the flight to Jamaica.  McCormick also stated he had friends who were gang members who had access to firearms and could get him a firearm.

**C. McCormick wanted to purchase a weapon while in Connecticut.**

22.     On or about October 12, 2019, at approximately 5:00 p.m., CHS-1 picked up McCormick from his residence in Hamden, Connecticut. McCormick stated he had a lot of connections in Jamaica with access to firearms.  McCormick also claimed to have a local friend who has access to firearms and who may be willing to sell him a gun.

23.     McCormick told CHS-1 that he thought someone he knew had stolen his truck. McCormick did not want to call the police on the individual, and McCormick stated, "Prison is worse than death bro, I would rather kill him bro honestly, or knock him out or something." Later in the evening, McCormick requested CHS-1 purchase a machete for him. McCormick

---

[5] CHS-1 attempted to record this conversation, but the recording device did not record any content.  All other communications between McCormick and CHS-1 (as well as CHS-2)

wanted the machete for use against the individual who, according to McCormick, stole his truck.
CHS-1 refused to purchase the machete for McCormick.

24.     On or about October 18, 2019, CHS-1 met with McCormick for the purpose of
introducing CHS-2.  On the way to meet CHS-2, McCormick told CHS-1, "No but it's like, it's
like they're just – it's like they just want to stay like this, their little comfort zone, bro people are
afraid to die bro. That's what they are, they are afraid to fight and die bro. I would, bro first of
all, it's going to be very hard to kill me bro. I'm telling you, it's going to be very hard. If I have a
weapon, if I have a rifle, and I have people with me, it's going to be very hard to kill me, if I
have like an army."

**D. McCormick meets CHS-2 and tells CHS-2 that he wants to travel overseas for the
purpose of joining ISIS and fighting with ISIS.**

25.     CHS-2 was introduced to McCormick as a person CHS-1 knew when CHS-1
fought overseas.  When CHS-1 and McCormick met with CHS-2, CHS-2 asked McCormick
about his background and where he wanted to go.  McCormick told CHS-2, "I've been ready for
quite a long time now, I just need help to get out of here. I just, if I could get to the Muslim
country."

26.     CHS-2 asked McCormick where he wanted to go, and McCormick responded "I
gotta fight bro, because those people, Abu Masa and ISIL, they fought for me bro, I know it, I
can feel it, in my heart. So it's my time to fight . . . It just is what it is bro, it's just my – it's just
my time to go bro."  CHS-2 asked McCormick if he was sure that he wanted to travel to a
Muslim country, and McCormick replied, "I have to go."

27.     McCormick further stated he traveled to Jamaica and spoke with people there in
order to "see if I could find anybody there that was going over there so I could get some help to

were recorded.

go over there." McCormick also stated he went to Jamaica because of a particular person there who "believed in jihad too." McCormick elaborated, "and then there was this guy in Trinidad who believes in Jihad too that had – and Trinidad had like an ISIS problem too so I was trying to make my way over there, but no one was trying to help bro." McCormick continued "No one was trying to help, I couldn't, like, I couldn't even believe it. Like no one even cared, I'm like – I'm like bro they killed one million people in Iraq bro like what are we doing bro? Two hundred and twenty thousand in Afghanistan and 80,000 in …, like what are we doing?... And we're living in this horrible place, like I can't do it- I have to go fight. Because I got brothers dying, I can feel it like, the [unintelligible "UI")] is one. The true Muslims are one. I can like feel it in my arm, my heart, like because I know how well I can fight. You understand? So like I know that they need my help bro. I know I need to go over there, and if I die [UI] like, whatever bro. It's not like – it's not the end of the world."

28.     McCormick explained to CHS-2 how he was stopped from traveling at Bradley International Airport, and how he suspected that his mother might have called the authorities in order to block his travel. McCormick described an incident with his uncle, which resulted in a physical altercation. McCormick explained, "So I ended up fighting him and knocking him out, and I was going to kill him when he was knocked out, I was going to take a knife and stab him in his neck because [UI] anyway under [UI] is death bro. But like, but like I'm saying like I ended up calling the cops to break it up because I was going to kill him bro."

29.     CHS-2 asked McCormick to elaborate on where he would like to travel, and McCormick responded, "I don't know, I don't know bro – it's gotta be like Syria. Where ISIL is at." McCormick continued " . . .whichever place is easiest, whichever place I can get there the fastest, the quickest, the easiest, and where I can have a rifle and I can have some people bro.

That's what I need, I need a rifle and I need some people, I need Islamic law, I need, that's what I need, because if I have these things, it's going to be very hard to kill me."

30.     McCormick told CHS-2 "Yeah, fighting, it's uh – fighting in the – I mean the Quran says fight those who fight you . . . But don't transgress the limits." When CHS-2 asked who is fighting, McCormick responded, "The whole world bro." When CHS-2 inquired about McCormick's understanding of jihad, McCormick advised there are two ways jihad will end: "Death" and "Islamic Law."  McCormick further stated, "I mean death bro, death or – I mean like I said bro, it's going to be very hard to kill me – alright, like I said again, [UI] when something is important, say it three times, I'm telling you. It's going to be very hard to kill me. But I'll probably die, you know who knows, I'll probably die, because it's a lot of them, they have a lot of weapons, but at least I can die fighting. At least, please … Please, at least I – but it's also fighting, it's fighting for the Quran [UI] it's fighting for Allah, it's fighting for what was revealed, it's fighting for also the other Muslim people that maybe don't have the courage to fight, you know what I mean?"  McCormick explained "Killing someone for Allah, it – and the Quran and [UI] especially with a gun bro, with a gun, I could just 'pah!' And kill someone, it's so easy."

**E. McCormick told CHS-2 about his desire to kill people and join ISIS.**

31.     McCormick explained his willingness to kill another human being in jihad, ". . . you're supposed to fear God, you're supposed to have fear of Allah, so the fear of Allah gives me the strength to kill. That's what gives me the strength to kill. It's not that I want to kill, you understand? It's like, it's perfect, the Quran is perfect in what it says, it's a perfect book it says fighting has been ordained for you. You may not like something which is good for you, and you may like something which is bad for you, so it's not like I want to kill bro, it's I have to bro.

It's this I have to do it bro."

32.    McCormick continued to express his support for ISIS: "I do like, I do like ISIS because Abu Musa was like my hero, I cry when I watch that video." McCormick explained that he had funds to travel.  "I got like $700 and like $400 in my wallet."  McCormick continued to express his desire to travel: "I can't even, oh my god. Bro, I'm ready bro, I'm so ready. I'm so ready, I – I don't know what to – you – you wonder what I wanna do? I wanna like cut my arm off and give it to you bro, so you can feel what I feel in my heart bro."

33.    McCormick showed CHS-2 a video of McCormick shooting a firearm at range. McCormick explained, "Because the thing is – when you're – when you're in the range, and when you're holding the gun, you can just look around and aim the gun at somebody, and I was in a shalwar kameez [Islamic clothing]. So they were nervous . . . They were looking at me nervous, because I – I could've moved the round I could've shot them."

**F. McCormick purchases a secure communications application for texting CHS-2.**

34.    CHS-2 provided McCormick with his UserID for a secure communications application, which charges a nominal download fee.  CHS-2 told McCormick to be patient and to only download the application if he has made the decision to fight jihad.  McCormick told CHS-2 that "I already made my decision," but CHS-2 replied that CHS-2 would not accept McCormack's decision at that time.  CHS-2 again stressed not to download the application while he was with CHS-1 in order to avoid influencing CHS-1 in his/her decision to fight jihad.  CHS-2 told McCormick that if he decided he was ready, the he should contact CHS-2 using the application by sending a message with McCormick's name and the phrase "I'm ready."

35.    After CHS-2 departed the meeting, McCormick told CHS-1, "I'm more than ready bro, I don't even want to say it anymore, I don't want to talk about it anymore to be totally

honest." "I'm gonna message him as soon as I get to the house. I don't even want to go back to the house, that's why I'm so upset like."

**G. McCormick tells CHS-2 that he is ready to leave the United States and join ISIS.**

36.     Later that evening, McCormick contacted CHS-2 on the application.  McCormick created the username "ImanMadman^" and sent the following message to CHS-2:

- "Asalam Alaaykum Kevin Iman McCormick here"

- "I'm ready."

37.     On or about October 19, 2019, McCormick met with CHS-1 and CHS-2. McCormick again stated that he was "ready" and was "ready now." CHS-2 told McCormick the earliest they would be able to travel would be October 21, 2019. CHS-2 asked McCormick what his plan had been, and McCormick responded, "My plan was to go to Jamaica" and then affirmed to CHS-2 that his plan had been to travel to the Middle East after arriving in Jamaica.

38.     CHS-2 explained to McCormick that since he could not travel from the United States on his U.S. passport, they would need to smuggle him out of the United States. CHS-2 told McCormick that he would need to purchase a ticket on a specific airline from Toronto, Canada, to either Istanbul, Turkey, Beirut, Lebanon, or Amman, Jordan.  CHS-2 explained the advantages and disadvantages regarding each of the three locations.

39.     CHS-2 told McCormick, "If you cannot get the ticket, I cannot start anything," and McCormick offered to "get the ticket right now."  McCormick brought up the website of the airlines and CHS-2 showed McCormick the process of searching for the airline ticket.  CHS-2 told McCormick to send him the airline ticket on the previously used application once he decided to purchase the ticket.

40.     CHS-2 began speaking with McCormick about being kind to his parents, even

though they are non-believers. McCormick responded that "I am nice, they are not nice," and "If I wasn't nice, I would have killed them already, both of them."

**H. McCormick pledges bayat to ISIS and Baghdadi.**

41.     CHS-2 and McCormick discussed the meaning and purpose of bayat to the Islamic State. CHS-2 explained that it was a pledge, and that once bayat is given to ISIS, you cannot leave ISIS. McCormick decided that he would pledge bayat to "Baghdadi."

42.     Before making the pledge, McCormick asked why there were so many ISIS fighters in prison, and why they "just gave up."  McCormick went on, "because when I've got a rifle, and I've got a couple people with me at least, like a little army, I'm not gonna, they're not gonna bring me to prison, bro.  That's what I'm sayin, bro. I'm not going to jail, bro. You know what I mean? Like, this country different, like, I don't have a weapon on me, and you can't go anywhere, like, why are so many people in jail? Why did so many people give up bro? Like where's their Imam?" McCormick continued, "But we have guns now.  I could kill people from so far away . . . I can't give up . . . they'll have to kill me."

43.     CHS-2 asked if McCormick wanted to make his pledge with his face covered with a scarf or uncovered. McCormick decided to have his face showing during the pledge. CHS-2 asked McCormick if he knew what he was going to say, and McCormick explained that he was going to pledge to "fight for the Khalifa, fight when he tells me to fight, stop when he tells me to stop . . . and to establish an Islamic State and implement the Sharia." CHS-2 asked for the name of the Khalifa, and McCormick responded "Baghdadi."

44.     McCormick practiced the bayat pledge. CHS-2 attempted to videotape McCormick from the CHS's phone, but the video recording did not work due to technical issues with the device. CHS-2 recorded McCormick making his bayat pledge on McCormick's phone.

McCormick said, "I pledge allegiance to Abu Bakr Al-Baghdadi, I pledge allegiance to the Islamic State, to fight for the Sunna, the Sharia, and the Quran." CHS-2 then videotaped a second bayat pledge by McCormick, at McCormack's request. McCormick stated, "I pledge allegiance to Abu Bakr Al-Baghdadi, Islamic State, and I will fight for the Quran, the Sunna, and the Sharia." The video was then played back from the phone, and McCormick stated, "it doesn't sound good in English." McCormick then asked CHS-2 to do the video again so he could do it "in my native language." CHS-2 then recorded another bayat video from McCormick's phone, again at McCormick's request, where McCormick stated "I pledge allegiance to Abu Bakr Al-Baghdadi, ISIS, ISIL, and I will fight for the Quran, the Sunna, and the Sharia, Inshallah." This video was done in Patois—McCormick's native language. McCormick sent CHS-2 the two bayat videos via the secure communications application.

45.      McCormick then stated, "when I fight, Inshallah, I want them to come close, like I need them to be close, like . . . (UI) I want them to know who it is . . . I want them to send their best people, like, and if they want to, I'll fight them one-on-one with a sword, if they wanna do that."

**I. McCormick purchases a plane ticket from Canada to Jordan.**

46.      Later that evening, McCormick sent a picture of his ticket confirmation to CHS-2 on the secure communications application. The picture showed the airline confirmation and included details for the airline ticket. McCormick intended to fly from Connecticut to Toronto, Canada, where he would travel on the following flights: (1) from Lester B. Pearson International Airport to Cairo International Airport on October 22, 2019 (EgyptAir Flight MS 996) and (2) from Cairo International Airport to Queen Alia International Airport (Amman, Jordan) on October 22, 2019 (EgyptAir Flight MS 719). McCormick paid $504.76 for the ticket and

received a reservation number.  The ticket was issued to "Kevin Mccormick" and listed contact

information (telephone number and email account) for McCormick that is consistent with

information I know to have been used by McCormick when communicating with the CHSs.

**J. McCormick travels from his residence to the airport, where he planned to leave the United States, join ISIS, and fight for ISIS under the leadership of Baghdadi.**

47.     On or about October 21, 2019, at approximately 3:35 a.m., McCormick left his

residence and traveled in a car service from his residence to the train station located at 50 Union

Avenue, New Haven, Connecticut, where he waited until approximately 6:00 a.m.  While

waiting in the train station, McCormick was observed watching his cellphone from which sounds

of gunfire could be heard.   At approximately 6:00 a.m., McCormick met up with CHS-1 and

CHS-2.  Then, the CHSs and McCormick traveled from the train station to local small private

airport.[6]  McCormick exited the vehicle with the CHSs and proceeded to walk towards the plane.

After walking through a gate that separates the tarmac from any buildings and roads, McCormick

continued walking with CHS-1 towards a plane outside a hanger appearing to go through

predeparture routines.  As McCormick and CHS-1 approached the plane, law-enforcement

officers arrested McCormick.  Law-enforcement officers advised McCormick of his Miranda

rights soon after his arrest.

**K.  McCormick's laptop was provided to the FBI by his mother.**

48.     On October 22, 2019, law-enforcement personnel conducted a voluntary

interview with McCormick's mother at her home.  During the voluntary interview, McCormick's

mother provided law-enforcement personnel with the Target Computer, which was located in a

---

[6] The airport is a small airport primarily used by hobby flyers who pay to rent planes, store their own planes, and are allowed open access to the planes and flight line.

common area of the home.  McCormick's mother informed law-enforcement personnel that

McCormick used the Target Computer, and that no other individuals used the Target Computer.

## JURISDICTION

49.     This court has jurisdiction to issue the requested warrant because it is "a court of

competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) &

(c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that—has

jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PERTINENT FEDERAL STATUTES AND DESIGNATIONS

50.     Title 18, United States Code, Section 2339B, prohibits, in pertinent part, a person

from knowingly providing "material support or resources to a foreign terrorist organization," or

attempting or conspiring to do the same.

51.     The term "material support or resources" means any property, tangible or

intangible, or service, including currency or monetary instruments or financial securities,

financial services, lodging, training, expert advice or assistance, safehouses, false documentation

or identification, communications equipment, facilities, weapons, lethal substances, explosives,

personnel..., and transportation, except medicine or religious materials." 18 U.S.C. Section

2339A(b)(1) and Section 2339B(g)(4).  Section 2339B(h) provides that "[n]o person may be

prosecuted under this section in connection with the term 'personnel' unless that person has

knowingly provided, attempted to provide, or conspired to provide a foreign terrorist

organization with 1 or more individuals (who may be or include himself) to work under that

terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct

that operation of that organization.  Individuals who act entirely independent of the foreign

terrorist organization to advance its goals or objectives shall not be considered to be working

under the foreign terrorist organization's direction and control."

## TECHNICAL TERMS

52.     Based on my training and experience, I use the following technical terms to convey the following meanings:

    a.  **IP Address**: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

    b.  **Internet**: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

53.     Based on my training, experience, and research, I know that the Target Computer has capabilities that allow it to connect to the Internet.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

54.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

55.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence will be on the Device because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.     Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information

17

stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.      Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

      f.      I know that when an individual uses an electronic device, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type will contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

      56.      *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

      57.      *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

58.     Based on my training and experience, and the facts as set forth in this affidavit, I submit that there is probable cause to believe that violations of 18 U.S.C. § 2339B (attempting to provide material support and resources to a foreign-terrorist organization) have been committed by McCormick, and that there is probable cause to believe that the Target Computer, as described more particularly in Attachment A, has evidence, fruits, and instrumentalities of these violations, as described more particularly in Attachment B.

59.     Therefore, I respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

60.     Because the warrant for the Target Computer described in Attachment A relates to a device already in the possession of the FBI, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

Special Agent Samuel Wharton
Federal Bureau of Investigation


SUBSCRIBED and SWORN before me this 6TH day of November 2019.


    /s/ Sarah A. L. Merriam, USMJ
SARAH A.L. MERRIAM
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

The property to be searched is a Gateway laptop computer with model number S/N: LXWZG020041432371B1601 (the "Target Computer"). The Target Computer is located at the FBI's field office in New Haven, Connecticut. The Target Computer also is depicted in the photographs below.

This warrant authorizes the forensic examination of the Target Computer for the purpose of identifying the electronically stored information described in Attachment B.





**ATTACHMENT B**

1.      All information on the Target Computer described in Attachment A where the information relates to violations of 18 U.S.C. § 2339B and refer, relate, and involve Kevin Iman McCormick, including information from January 1, 2018, to the present:

1.  Email, text, and other messages, photos, videos, contacts and contact lists, addresses and address books, voicemail messages, dialed calls, incoming calls, received calls, outgoing calls, location data, calendar, applications and application data, settings;

2.  Any photographs, videos, or other information referring or relating to firearms, or any weapons;

3.  Any communications, or other information, referring or relating to firearms, or any weapons;

4.  Records and information relating to ISIS or other foreign terrorist organizations;

5.  Records and information relating to the attempted provision of material support or resources to ISIS, or other foreign terrorist organizations;

6.  Records and information relating to travel, including travel plans, itineraries, reservations, bookings, tickets, and the means and sources of payment for travel;

7.  Records and information relating to plans to commit a terrorist attack, or to fight with ISIS or other foreign terrorist organizations, including funding, materials needed, maps, disguises, aliases, weapons, or the other materials that may assist with such an attack;

1

8. Records and information relating to communications with others relating to ISIS or other foreign terrorist organizations, or potential terrorist attacks on the United States or in other countries;

9. Records and information relating to McCormick's use of YouTube, Facebook, WhatsApp, Hotmail, and other forms of social media, use of the internet, and communication methods, including private messaging;

10. Records and information relating to videos or other content created, publicly posted, or viewed by McCormick on the internet relating to ISIS or other foreign terrorist organizations;

11. The methods and techniques used in attempting to provide material support or resources to a foreign-terrorist organization;

12. Arrangements for travel and meetings;

13. The distribution of videos and photographs evidencing the work, accomplishments, or propaganda of a foreign-terrorist organization;

14. The recruitment of supporters and financial or other support for a foreign-terrorist organization;

15. Communication between McCormick and other individuals, including potential co-conspirators, accomplices, associates, and other individuals relating to ISIS or other foreign terrorist organizations, or attempting to provide material support or resources for such organizations;

16. Identifying information and contact information of potential co-conspirators, accomplices, associates, and other individuals engaged or otherwise involved in attempting to provide material support or resources to ISIS or other foreign

2

terrorist organizations;

17. Records and information indicating McCormick's state of mind as it relates to the attempted provision of material support or resources to ISIS or other foreign terrorist organizations;

18. records of Internet Protocol addresses used;

19. records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

20. Evidence of user attribution showing who used or owned the Target Computer at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

3

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS
## PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct.  I am employed by Microsoft, Inc., and my official title is _____.  I am a custodian of records for Microsoft, Inc.  I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Microsoft, Inc., and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

b.      such records were kept in the ordinary course of a regularly conducted business activity of Microsoft, Inc.; and

c.      such records were made by Microsoft, Inc., as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____        _____
Date                                              Signature