## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Samuel Wharton, being duly sworn, depose and state the following:

## INTRODUCTION

1.       I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and I have been an agent since September 2017. I am presently assigned to the FBI's field office in New Haven, Connecticut.  My training has included training at the FBI academy at Quantico, Virginia, for investigating many crimes, including espionage, terrorism, drug trafficking, and financial fraud.  Prior to joining the FBI, I served as a Military Police officer in the United States Army for 5 years where I regularly participated in investigations for a wide variety of criminal offenses. Before joining the military, I studied Arabic and Islamic culture for 2 semesters while attending the United States Military Academy at West Point.  As an FBI Special Agent, I have investigated several criminal violations, including narcotics trafficking, homicide, and international terrorism.  I also have served as the affiant for search warrants, including search warrants for electronic evidence. I have been assigned to the Joint Terrorism Task Force since September 2019.

2.       I make this affidavit in support of an application for a search warrant for information associated with the Facebook user **ID1851605303** ("Facebook Account 1") and **ID 100042222456800** ("Facebook Account 2") (collectively, the "Subject Accounts"), as more fully described in Attachment A, which is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.

3.       Based on my training and experience, and the facts as set forth in this affidavit, I submit that there is probable cause to believe that violations of 18 U.S.C. § 2339B (attempting to

1

provide material support and resources to a foreign terrorist organization) have been committed by Kevin Iman McCormick ("McCormick"), and that there is probable cause to believe that evidence, fruits, and instrumentalities of these violations, as described more particularly in Attachment B, are present within the information associated with the Subject Accounts.

4.      The information contained in this affidavit is from my personal participation in the investigation, information provided by two reliable Confidential Human Sources ("CHS-1" and "CHS-2," individually, and "CHSs" collectively[1]), consensual recordings of conversations between the two CHSs and McCormick, and information provided to me by other law-enforcement officers.[2]  Due to the fact this affidavit is being made to establish probable cause, I have not listed each item and every fact known by me regarding the investigation.

5.      In this affidavit, the FBI has provided translations of certain Arabic words or phrases. These translations are based on information provided to me by an FBI linguist and from my training and experience.[3]  I have indicated the translations by bracketing the English translations that came from Arabic recordings and documents.

## SUMMARY OF THE CRIMINAL ACTIVITY

6.      From my participation in the investigation, including my review of FBI reports and recordings, I have learned the following:

---

[1] The CHSs are paid informants for the FBI.  Both CHSs have been found to be reliable sources for the FBI.  CHS-1 has worked as a paid informant for the FBI since April 2013, though CHS-1 only has worked as a paid informant on limited occasions.  CHS-2 has worked as paid informant for the FBI since May 2006.

[2] McCormick likely has mental-health issues.  I understand this based on information from local police reports, which include statements from his family.

[3] The transcriptions and translations are in preliminary form and have not been finalized.

7.      Based on my training and experience as a Special Agent with the FBI, as well as the facts set forth in this affidavit, there is probable cause to believe that beginning in or about September 2019, and continuing to about October 21, 2019, McCormick attempted to provide material support and resources to a foreign terrorist organization—that is, the Islamic State of Iraq and Al-Sham ("ISIS")—in violation of Title 18, United States Code, Section 2339B. Specifically, McCormick attempted to provide material support and resources, as that term is defined in Title 18, United States Code, Section 2339(a), including personnel (himself), to ISIS.

8.      On or about October 19, 2019, McCormick made a "bayat" video during which he pledged allegiance to ISIS and its leader, Abu Bakr Al-Baghdadi. Based on my training and experience, I understand some individuals attempting to join ISIS pledge their allegiance to ISIS and Al-Baghdadi through video messages.  I also understand the term "bayat" to mean making a solemn promise.

9.      On or about October 19, 2019, McCormick purchased a plane ticket from Toronto, Canada, to Amman, Jordan.  Based on prior meetings between CHS-1, CHS-2, and McCormick, McCormick believed that CHS-2 was an ISIS facilitator and would be able to smuggle him out of the United States to Toronto, and that his flight from Toronto to Amman would enable him to connect with ISIS members overseas, who, in turn, would assist McCormick with traveling to ISIS within Syria.

## THE ISLAMIC STATE OF IRAQ AND AL-SHAM

10.     On October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as an FTO under Section 219 of the Immigration and Nationality Act and as a Specifically Designated Global Terrorist entity under section 1(b) of Executive Order 13224.

11.     On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham ("ISIS"— which is how the FTO will be referenced herein), The Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. On September 21, 2015, the Secretary of State added the following aliases to the FTO listing: Islamic State, ISIL and ISIS. To date, ISIS remains a designated FTO.

12.     Based on my training and experience, I understand Abu Bakr al-Baghdadi to be the leader of ISIS.[4]

## PROBABLE CAUSE

**A. Concerned individuals reported McCormick to the FBI.**

13.     On October 4, 2019, a concerned individual who attends an Islamic Center in another State reported to the FBI that he/she encountered McCormick on or about September 1, 2019. The concerned individual reported that McCormick expressed a desire to travel to Syria to "fight for Allah."

14.     According to the concerned individual, McCormick attempted to justify his reasons to fight by quoting and citing religious doctrine, but he did so incorrectly. McCormick agreed with the concerned individual that innocent people should not be attacked and McCormick further stated that is why his fight has to take place in Syria.

---

[4] I understand from recent public news reports that al-Baghdadi may be deceased.

15.     The concerned individual was shown a picture of McCormick from his Connecticut Driver's License, and that individual identified McCormick as the individual who expressed a desire to travel overseas to Syria for the purpose of fighting.

16.     McCormick worked as a contract driver for a large company and was fired on or about September 15, 2019.  After being fired, McCormick entered a large store in Washington State and attempted to purchase a firearm and knife. The sales associates at the store did not know McCormick had just been fired. McCormick behaved strangely and told the sales associates that the purchase of the firearm was "not for an animal."  The associate declined to sell McCormick the firearm.

17.     On or about August 24, 2019, members of the local Muslim community center in yet another State reported McCormick because he made concerning statements. McCormick was reported to have said to community members that "we should support ISIS," and "Jihad is the way to go." McCormick also inquired about circumcision and wanted a doctor that could help him with the procedure.

18.     On or about September 4, 2019, law-enforcement personnel reviewed McCormick's public Facebook page, which revealed, among other things, ISIS-related videos and videos of McCormick shooting what appeared to be a Glock pistol at a firearms range.

19.     On or about September 26, 2019, McCormick was brought back to his employer's headquarters in Arkansas and formally terminated, at which time McCormick reacted angrily. The police were called, and McCormick yelled and kicked open a door. McCormick was charged with disorderly conduct and spent one-and-one-half weeks in jail.  Sometime thereafter, McCormick traveled from Arkansas to Connecticut, where he resides with family.

**B. McCormick attempted to travel to Jamaica for the purpose of talking with pro-ISIS individuals he believed to be located in that country.**

20.     On or about October 12, 2019, McCormick attempted to board a flight from Bradley International Airport in Hartford, Connecticut, to Jamaica.  The Department of Homeland Security ("DHS"), however, prevented McCormick from boarding the flight.

21.     After DHS prevented McCormick from boarding the flight to Jamaica, CHS-1 met with McCormick. During their conversation, McCormick told CHS-1 that he wanted to travel to Jamaica, and then onward to Syria in order to join ISIS.[5] McCormick also stated that he had asked about buying a shotgun, but he really wanted an AK-47. McCormick told CHS-1 multiple times that he wanted to kill people, specifically people from DHS, because DHS prevented McCormick from boarding the flight to Jamaica.  McCormick also stated he had friends who were gang members who had access to firearms and could get him a firearm.

**C. McCormick wanted to purchase a weapon while in Connecticut.**

22.     On or about October 12, 2019, at approximately 5:00 p.m., CHS-1 picked up McCormick from his residence in Hamden, Connecticut. McCormick stated he had a lot of connections in Jamaica with access to firearms.  McCormick also claimed to have a local friend who has access to firearms and who may be willing to sell him a gun.

23.     McCormick told CHS-1 that he thought someone he knew had stolen his truck. McCormick did not want to call the police on the individual, and McCormick stated, "Prison is worse than death bro, I would rather kill him bro honestly, or knock him out or something." Later in the evening, McCormick requested CHS-1 purchase a machete for him. McCormick

---

[5] CHS-1 attempted to record this conversation, but the recording device did not record any content.  All other communications between McCormick and CHS-1 (as well as CHS-2) were recorded.

wanted the machete for use against the individual who, according to McCormick, stole his truck. CHS-1 refused to purchase the machete for McCormick.

24.     On or about October 18, 2019, CHS-1 met with McCormick for the purpose of introducing CHS-2.  On the way to meet CHS-2, McCormick told CHS-1, "No but it's like, it's like they're just -- it's like they just want to stay like this, their little comfort zone, bro people are afraid to die bro. That's what they are, they are afraid to fight and die bro. I would, bro first of all, it's going to be very hard to kill me bro. I'm telling you, it's going to be very hard. If I have a weapon, if I have a rifle, and I have people with me, it's going to be very hard to kill me, if I have like an army."

**D. McCormick meets CHS-2 and tells CHS-2 that he wants to travel overseas for the purpose of joining ISIS and fighting with ISIS.**

25.     CHS-2 was introduced to McCormick as a person CHS-1 knew when CHS-1 fought overseas.  When CHS-1 and McCormick met with CHS-2, CHS-2 asked McCormick about his background and where he wanted to go.  McCormick told CHS-2, "I've been ready for quite a long time now, I just need help to get out of here. I just, if I could get to the Muslim country."

26.     CHS-2 asked McCormick where he wanted to go, and McCormick responded "I gotta fight bro, because those people, Abu Masa and ISIL, they fought for me bro, I know it, I can feel it, in my heart. So it's my time to fight . . . It just is what it is bro, it's just my – it's just my time to go bro."  CHS-2 asked McCormick if he was sure that he wanted to travel to a Muslim country, and McCormick replied, "I have to go."

27.     McCormick further stated he traveled to Jamaica and spoke with people there in order to "see if I could find anybody there that was going over there so I could get some help to

go over there." McCormick also stated he went to Jamaica because of a particular person there who "believed in jihad too." McCormick elaborated, "and then there was this guy in Trinidad who believes in Jihad too that had – and Trinidad had like an ISIS problem too so I was trying to make my way over there, but no one was trying to help bro." McCormick continued "No one was trying to help, I couldn't, like, I couldn't even believe it. Like no one even cared, I'm like – I'm like bro they killed one million people in Iraq bro like what are we doing bro? Two hundred and twenty thousand in Afghanistan and 80,000 in …, like what are we doing?... And we're living in this horrible place, like I can't do it- I have to go fight. Because I got brothers dying, I can feel it like, the [unintelligible "UI")] is one. The true Muslims are one. I can like feel it in my arm, my heart, like because I know how well I can fight. You understand? So like I know that they need my help bro. I know I need to go over there, and if I die [UI] like, whatever bro. It's not like – it's not the end of the world."

28.     McCormick explained to CHS-2 how he was stopped from traveling at Bradley International Airport, and how he suspected that his mother might have called the authorities in order to block his travel. McCormick described an incident with his uncle, which resulted in a physical altercation. McCormick explained, "So I ended up fighting him and knocking him out, and I was going to kill him when he was knocked out, I was going to take a knife and stab him in his neck because [UI] anyway under [UI] is death bro. But like, but like I'm saying like I ended up calling the cops to break it up because I was going to kill him bro."

29.     CHS-2 asked McCormick to elaborate on where he would like to travel, and McCormick responded, "I don't know, I don't know bro – it's gotta be like Syria. Where ISIL is at." McCormick continued " . . .whichever place is easiest, whichever place I can get there the fastest, the quickest, the easiest, and where I can have a rifle and I can have some people bro.

8

That's what I need, I need a rifle and I need some people, I need Islamic law, I need, that's what I need, because if I have these things, it's going to be very hard to kill me."

30.     McCormick told CHS-2 "Yeah, fighting, it's uh – fighting in the – I mean the Quran says fight those who fight you . . . But don't transgress the limits." When CHS-2 asked who is fighting, McCormick responded, "The whole world bro." When CHS-2 inquired about McCormick's understanding of jihad, McCormick advised there are two ways jihad will end: "Death" and "Islamic Law." McCormick further stated, "I mean death bro, death or – I mean like I said bro, it's going to be very hard to kill me – alright, like I said again, [UI] when something is important, say it three times, I'm telling you. It's going to be very hard to kill me. But I'll probably die, you know who knows, I'll probably die, because it's a lot of them, they have a lot of weapons, but at least I can die fighting. At least, please … Please, at least I – but it's also fighting, it's fighting for the Quran [UI] it's fighting for Allah, it's fighting for what was revealed, it's fighting for also the other Muslim people that maybe don't have the courage to fight, you know what I mean?" McCormick explained "Killing someone for Allah, it – and the Quran and [UI] especially with a gun bro, with a gun, I could just 'pah!' And kill someone, it's so easy."

**E. McCormick told CHS-2 about his desire to kill people and join ISIS.**

31.     McCormick explained his willingness to kill another human being in jihad, ". . . you're supposed to fear God, you're supposed to have fear of Allah, so the fear of Allah gives me the strength to kill. That's what gives me the strength to kill. It's not that I want to kill, you understand? It's like, it's perfect, the Quran is perfect in what it says, it's a perfect book it says fighting has been ordained for you. You may not like something which is good for you, and you may like something which is bad for you, so it's not like I want to kill bro, it's I have to bro.

It's this I have to do it bro."

32.     McCormick continued to express his support for ISIS: "I do like, I do like ISIS because Abu Musa was like my hero, I cry when I watch that video." McCormick explained that he had funds to travel.  "I got like $700 and like $400 in my wallet."  McCormick continued to express his desire to travel: "I can't even, oh my god. Bro, I'm ready bro, I'm so ready. I'm so ready, I – I don't know what to – you – you wonder what I wanna do? I wanna like cut my arm off and give it to you bro, so you can feel what I feel in my heart bro."

33.     McCormick showed CHS-2 a video of McCormick shooting a firearm at range. McCormick explained, "Because the thing is – when you're – when you're in the range, and when you're holding the gun, you can just look around and aim the gun at somebody, and I was in a shalwar kameez [Islamic clothing]. So they were nervous . . . They were looking at me nervous, because I – I could've moved the round I could've shot them."

**F. McCormick purchases a secure communications application for texting CHS-2.**

34.     CHS-2 provided McCormick with his UserID for a secure communications application, which charges a nominal download fee.  CHS-2 told McCormick to be patient and to only download the application if he has made the decision to fight jihad.  McCormick told CHS-2 that "I already made my decision," but CHS-2 replied that CHS-2 would not accept McCormack's decision at that time.  CHS-2 again stressed not to download the application while he was with CHS-1 in order to avoid influencing CHS-1 in his/her decision to fight jihad.  CHS-2 told McCormick that if he decided he was ready, the he should contact CHS-2 using the application by sending a message with McCormick's name and the phrase "I'm ready."

35.     After CHS-2 departed the meeting, McCormick told CHS-1, "I'm more than ready bro, I don't even want to say it anymore, I don't want to talk about it anymore to be totally

honest." "I'm gonna message him as soon as I get to the house. I don't even want to go back to the house, that's why I'm so upset like."

**G. McCormick tells CHS-2 that he is ready to leave the United States and join ISIS.**

36.     Later that evening, McCormick contacted CHS-2 on the application.  McCormick created the username "ImanMadman^" and sent the following message to CHS-2:

- "Asalam Alaaykum Kevin Iman McCormick here"

- "I'm ready."

37.     On or about October 19, 2019, McCormick met with CHS-1 and CHS-2. McCormick again stated that he was "ready" and was "ready now." CHS-2 told McCormick the earliest they would be able to travel would be October 21, 2019. CHS-2 asked McCormick what his plan had been, and McCormick responded, "My plan was to go to Jamaica" and then affirmed to CHS-2 that his plan had been to travel to the Middle East after arriving in Jamaica.

38.     CHS-2 explained to McCormick that since he could not travel from the United States on his U.S. passport, they would need to smuggle him out of the United States. CHS-2 told McCormick that he would need to purchase a ticket on a specific airline from Toronto, Canada, to either Istanbul, Turkey, Beirut, Lebanon, or Amman, Jordan.  CHS-2 explained the advantages and disadvantages regarding each of the three locations.

39.     CHS-2 told McCormick, "If you cannot get the ticket, I cannot start anything," and McCormick offered to "get the ticket right now."  McCormick brought up the website of the airlines and CHS-2 showed McCormick the process of searching for the airline ticket.  CHS-2 told McCormick to send him the airline ticket on the previously used application once he decided to purchase the ticket.

40.     CHS-2 began speaking with McCormick about being kind to his parents, even

though they are non-believers. McCormick responded that "I am nice, they are not nice," and "If I wasn't nice, I would have killed them already, both of them."

**H. McCormick pledges bayat to ISIS and Baghdadi.**

41.     CHS-2 and McCormick discussed the meaning and purpose of bayat to the Islamic State. CHS-2 explained that it was a pledge, and that once bayat is given to ISIS, you cannot leave ISIS. McCormick decided that he would pledge bayat to "Baghdadi."

42.     Before making the pledge, McCormick asked why there were so many ISIS fighters in prison, and why they "just gave up."  McCormick went on, "because when I've got a rifle, and I've got a couple people with me at least, like a little army, I'm not gonna, they're not gonna bring me to prison, bro.  That's what I'm sayin, bro. I'm not going to jail, bro. You know what I mean? Like, this country different, like, I don't have a weapon on me, and you can't go anywhere, like, why are so many people in jail? Why did so many people give up bro? Like where's their Imam?" McCormick continued, "But we have guns now.  I could kill people from so far away . . . I can't give up . . . they'll have to kill me."

43.     CHS-2 asked if McCormick wanted to make his pledge with his face covered with a scarf or uncovered. McCormick decided to have his face showing during the pledge. CHS-2 asked McCormick if he knew what he was going to say, and McCormick explained that he was going to pledge to "fight for the Khalifa, fight when he tells me to fight, stop when he tells me to stop . . . and to establish an Islamic State and implement the Sharia." CHS-2 asked for the name of the Khalifa, and McCormick responded "Baghdadi."

44.     McCormick practiced the bayat pledge. CHS-2 attempted to videotape McCormick from the CHS's phone, but the video recording did not work due to technical issues with the device. CHS-2 recorded McCormick making his bayat pledge on McCormick's phone.

McCormick said, "I pledge allegiance to Abu Bakr Al-Baghdadi, I pledge allegiance to the Islamic State, to fight for the Sunna, the Sharia, and the Quran." CHS-2 then videotaped a second bayat pledge by McCormick, at McCormack's request. McCormick stated, "I pledge allegiance to Abu Bakr Al-Baghdadi, Islamic State, and I will fight for the Quran, the Sunna, and the Sharia." The video was then played back from the phone, and McCormick stated, "it doesn't sound good in English." McCormick then asked CHS-2 to do the video again so he could do it "in my native language." CHS-2 then recorded another bayat video from McCormick's phone, again at McCormick's request, where McCormick stated "I pledge allegiance to Abu Bakr Al-Baghdadi, ISIS, ISIL, and I will fight for the Quran, the Sunna, and the Sharia, Inshallah." This video was done in Patois—McCormick's native language. McCormick sent CHS-2 the two bayat videos via the secure communications application.

45.     McCormick then stated, "when I fight, Inshallah, I want them to come close, like I need them to be close, like . . . (UI) I want them to know who it is . . . I want them to send their best people, like, and if they want to, I'll fight them one-on-one with a sword, if they wanna do that."

**I. McCormick purchases a plane ticket from Canada to Jordan.**

46.     Later that evening, McCormick sent a picture of his ticket confirmation to CHS-2 on the secure communications application. The picture showed the airline confirmation and included details for the airline ticket. McCormick intended to fly from Connecticut to Toronto, Canada, where he would travel on the following flights: (1) from Lester B. Pearson International Airport to Cairo International Airport on October 22, 2019 (EgyptAir Flight MS 996) and (2) from Cairo International Airport to Queen Alia International Airport (Amman, Jordan) on October 22, 2019 (EgyptAir Flight MS 719). McCormick paid $504.76 for the ticket and

received a reservation number.  The ticket was issued to "Kevin Mccormick" and listed contact

information (telephone number and email account) for McCormick that is consistent with

information I know to have been used by McCormick when communicating with the CHSs.

**J. McCormick travels from his residence to the airport, where he planned to leave the United States, join ISIS, and fight for ISIS under the leadership of Baghdadi.**

47.     On or about October 21, 2019, at approximately 3:35 a.m., McCormick left his

residence and traveled in a car service from his residence to the train station located at 50 Union

Avenue, New Haven, Connecticut, where he waited until approximately 6:00 a.m.  While

waiting in the train station, McCormick was observed watching his cellphone from which sounds

of gunfire could be heard.   At approximately 6:00 a.m., McCormick met up with CHS-1 and

CHS-2.  Then, the CHSs and McCormick traveled from the train station to local small private

airport.[6]  McCormick exited the vehicle with the CHSs and proceeded to walk towards the plane.

After walking through a gate that separates the tarmac from any buildings and roads, McCormick

continued walking with CHS-1 towards a plane outside a hanger appearing to go through

predeparture routines.  As McCormick and CHS-1 approached the plane, law-enforcement

officers arrested McCormick.  Law-enforcement officers advised McCormick of his Miranda

rights soon after his arrest.

**K.  The FBI submitted a 2702 request to Facebook when McCormick wanted to kill people.**

48.     On or about October 14, 2019, I submitted an emergency 2702 request to

Facebook for information relating to McCormick's accounts.  Facebook agreed to provide

limited, responsive information so that the FBI could prevent the potential killing of individuals

by McCormick.  The information provided by Facebook showed that McCormick used an

---

[6] The airport is a small airport primarily used by hobby flyers who pay to rent planes, store their own planes, and are allowed open access to the planes and flight line.

account with the unique Facebook user **ID 1851605303** (Facebook Account 1), through which McCormick communicated with another individual about McCormick's intentions to travel overseas. McCormick and that other individual shared pictures of ticket prices from the United States to Doha, Qatar, and they discussed how to acquire a visa once McCormick arrived overseas.

49.     McCormick also communicated with another individual on Facebook. In these other communications, McCormick and the other individual sent screenshots of threatening messages. Those threatening messages came from from an account with the name "Konk," which had the unique Facebook user **ID 100042222456800** (Facebook Account 2). The name "Konk" closely resembles McCormick's username for his Microsoft Hotmail account (*i.e.*, konk10101@hotmail.com). I submitted an emergency 2702 request for Facebook Account 2, which showed the account to be associated with a phone number known to be used by McCormick. The phone number that is known to be used by McCormick also is associated with Facebook Account 1.

50.     Based on my training and experience, I am aware that individuals involved in attempting to provide material support and resources to foreign-terrorist organizations often communicate with others involved in similar conduct via e-mail and social-media accounts such as Facebook. I also know based on my training and experience that individuals associated with such activities use Facebook to watch videos and images relating to ISIS and other foreign-terrorist organizations. Those individuals obtain and share ISIS-related videos and images with each other via a variety of means, including email, social-media accounts, and online-chat programs. Based on my training and experience, I know that individuals involved in material-support offenses often use multiple accounts, aliases, and means to communicate. These

multiple accounts or aliases are used as a means to avoid detection from law enforcement.

51.     Based on my training and experience, I know that many social-media accounts and Internet websites require users to provide their email account when registering for the accounts.  The social-media account providers and Internet providers then send the users various notifications regarding messages from other users, information accessed by users, information available by the websites, and other information.  These messages can provide evidence in cases involving material support offenses because they help in identifying what social media and Internet accounts were utilized by the subjects to communicate with other subjects.  In addition, the messages help in identifying the identities of other subjects.

52.     Also, as noted above, email providers maintain various subscriber and user information that its users provide when registering for its accounts.  Some email providers also require payment for certain services or features.  Such information is materially important in cases where online accounts are used in connection with providing, attempting to provide, and conspiring to provide material support to a foreign-terrorist organization, as this information can help in confirming the identity of the individuals using the accounts and committing the offenses. Email providers maintain various logs of IP addresses utilized to access the accounts.  The IP information is again materially important in material support investigations.  This information helps in identifying the subjects and the locations where their computer devices are located.

## JURISDICTION

53.     This court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that—has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

16

## PERTINENT FEDERAL STATUTES AND DESIGNATIONS

54.     Title 18, United States Code, Section 2339B, prohibits, in pertinent part, a person

from knowingly providing "material support or resources to a foreign terrorist organization," or

attempting or conspiring to do the same.

55.     The term "material support or resources" means any property, tangible or

intangible, or service, including currency or monetary instruments or financial securities,

financial services, lodging, training, expert advice or assistance, safehouses, false documentation

or identification, communications equipment, facilities, weapons, lethal substances, explosives,

personnel…, and transportation, except medicine or religious materials." 18 U.S.C. Section

2339A(b)(1) and Section 2339B(g)(4).  Section 2339B(h) provides that "[n]o person may be

prosecuted under this section in connection with the term 'personnel' unless that person has

knowingly provided, attempted to provide, or conspired to provide a foreign terrorist

organization with 1 or more individuals (who may be or include himself) to work under that

terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct

that operation of that organization.  Individuals who act entirely independent of the foreign

terrorist organization to advance its goals or objectives shall not be considered to be working

under the foreign terrorist organization's direction and control."

## FACEBOOK

56.     Facebook owns and operates a free-access social networking website of the same

name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish

accounts with Facebook, and users can then use their accounts to share written news,

photographs, videos, and other information with other Facebook users, and sometimes with the

general public.

57.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

58.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

59.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

60.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items

available elsewhere on the Internet.  Facebook users can also post information about upcoming

"events," such as social occasions, by listing the event's time, location, host, and guest list.  In

addition, Facebook users can "check in" to particular locations or add their geographic locations

to their Facebook posts, thereby revealing their geographic locations at particular dates and

times.  A particular user's profile page also includes a "Wall," which is a space where the user

and his or her "Friends" can post messages, attachments, and links that will typically be visible

to anyone who can view the user's profile.

61.    Facebook allows users to upload photos and videos, which may include any

metadata such as location that the user transmitted when s/he uploaded the photo or video.  It

also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.

When a user is tagged in a photo or video, he or she receives a notification of the tag and a link

to see the photo or video.  For Facebook's purposes, the photos and videos associated with a

user's account will include all photos and videos uploaded by that user that have not been

deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

62.    Facebook users can exchange private messages on Facebook with other users.

Those messages are stored by Facebook unless deleted by the user.  Facebook users can also post

comments on the Facebook profiles of other users or on their own profiles; such comments are

typically associated with a specific posting or item on the profile.  In addition, Facebook has a

chat feature that allows users to send and receive instant messages through Facebook Messenger.

These chat communications are stored in the chat history for the account.  Facebook also has

Video and Voice Calling features, and although Facebook does not record the calls themselves, it

does keep records of the date of each call.

63.    If a Facebook user does not want to interact with another user on Facebook, the

first user can "block" the second user from seeing his or her account.

64.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

65.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

66.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

67.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

68.     In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

69.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and

would show when and from what IP address the user did so.

70.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

71.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated

with the logged IP addresses, investigators can understand the chronological and geographic

context of the account access and use relating to the crime under investigation.  Such information

allows investigators to understand the geographic and chronological context of Facebook access,

use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-

location into some of its services.  Geo-location allows, for example, users to "tag" their location

in posts and Facebook "friends" to locate each other.  This geographic and timeline information

may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account

activity may provide relevant insight into the Facebook account owner's state of mind as it

relates to the offense under investigation.  For example, information on the Facebook account

may indicate the owner's motive and intent to commit a crime (e.g., information indicating a

plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort

to conceal evidence from law enforcement).

      72.     Therefore, the computers of Facebook are likely to contain all the material

described above, including stored electronic communications and information concerning

subscribers and their use of Facebook, such as account access information, transaction

information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

      73.     I anticipate executing this warrant under the Electronic Communications Privacy

Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant

to require Facebook to disclose to the government copies of the records and other information

(including the content of communications) particularly described in Section I of Attachment B.

Upon receipt of the information described in Section I of Attachment B, government-authorized

persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

74.     Based on the forgoing, I request that the Court issue the proposed search warrant.

75.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Facebook.  Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

76.     Based on my training and experience, and the facts as set forth in this affidavit, I submit that there is probable cause to believe that violations of 18 U.S.C. § 2339B (attempting to provide material support and resources to a foreign-terrorist organization) have been committed by McCormick, and that there is probable cause to believe that the Subject Accounts, as described more particularly in Attachment A, has evidence, fruits, and instrumentalities of these violations, as described more particularly in Attachment B.

77.     Therefore, I respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

Special Agent Samuel Wharton
Federal Bureau of Investigation

SUBSCRIBED and SWORN before me this ___6___ day of November 2019.

/s/ Sarah A. L. Merriam, USMJ
SARAH A.L. MERRIAM
UNITED STATES MAGISTRATE JUDGE

23

## ATTACHMENT A

This warrant applies to information associated with Facebook user **ID 1851605303** and Facebook user **ID 100042222456800**, which is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.    Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A for the limited timeframe of January 1, 2018, to the present:

(a)    All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

(c)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)    All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which

the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)    All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)    All other records and contents of communications and messages made or received by the user, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)    All "check ins" and other location information;

(h)    All IP logs, including all records of the IP addresses that logged into the account;

(i)    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)    All information about the Facebook pages that the account is or was a "fan" of;

(k)    All past and present lists of friends created by the account;

(l)    All records of Facebook searches performed by the account;

(m)    All information about the user's access and use of Facebook Marketplace;

(n)    The types of service utilized by the user;

(o)    The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within **14 DAYS** of issuance of this warrant.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of offenses involving an attempt to provide material support and resources to a foreign-terrorist organization, in violation of 18 U.S.C. § 2339B, involving the user of the account, and occurring from January 1, 2018, to the present, for each account or identifier listed on Attachment A, information referring, relating, or pertaining to the following:

3

a. Any photographs, videos, or other information referring or relating to firearms, or any weapons;

b. Any communications, or other information, referring or relating to firearms, or any weapons;

c. Any information regarding any designated foreign-terrorist organization, including any information regarding the attempted provision of material support or resources to a foreign-terrorist organization;

d. Any information (including private messaging) referring or relating to ISIS, or other terms associated with foreign-terrorist organizations;

e. The identities of individuals engaged, or otherwise involved, in attempting to provide material support or resources to a foreign-terrorist organization,

f. The identifying and contact information of individuals engaged, or otherwise involved, in attempting to provide material support or resources to a foreign-terrorist organization;

g. The timing of communications among individuals engaged, or otherwise involved, in attempting to provide material support or resources to a foreign-terrorist organization;

h. The methods and techniques used in attempting to provide material support or resources to a foreign-terrorist organization;

i. Arrangements for travel and meetings;

j. The distribution of videos and photographs evidencing the work, accomplishments, or propaganda of a foreign-terrorist organization;

k. The recruitment of supporters and financial or other support for a foreign-

4

terrorist organization;

l.   Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the email account owner;

m.   Information indicating the email-account owner's state of mind as it relates to the attempted provision of material support or resources to a foreign-terrorist organization;

n.   The identity of the person(s) who created, used, or deleted the email account, including information that would help reveal the whereabouts of such person;

o.   The identity of any person(s) who communicated with the email account about matters relating to foreign-terrorist organizations, and any records related to the whereabouts of such persons;

p.   Records indicating that data has been deleted by the account owner, potentially to hide evidence of a crime; and

q.   Account history (including Terms of Service and any complaints) and billing records (including date, time, duration, and screen names used each time the accounts were activated);

r.   The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence,

fruits, and instrumentalities described in this warrant.  The review of this electronic data may be

conducted by any government personnel assisting in the investigation, who may include, in

addition to law enforcement officers and agents, attorneys for the government, attorney support

staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the

disclosed electronic data to the custody and control of attorneys for the government and their

support staff for their independent review.

### CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Microsoft, Inc., and my official title is _____. I am a custodian of records for Microsoft, Inc. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Microsoft, Inc., and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

    a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

    b.    such records were kept in the ordinary course of a regularly conducted business activity of Microsoft, Inc.; and

    c.    such records were made by Microsoft, Inc., as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____    _____
Date    Signature

1