

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Samuel Wharton, being duly sworn, depose and state the following:

## INTRODUCTION

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and I have

been an agent since September 2017. I am presently assigned to the FBI's field office in New

Haven, Connecticut.  My training has included training at the FBI academy at Quantico,

Virginia, for investigating many crimes, including espionage, terrorism, drug trafficking, and

financial fraud.  Prior to joining the FBI, I served as a Military Police officer in the United States

Army for 5 years where I regularly participated in investigations for a wide variety of criminal

offenses. Before joining the military, I studied Arabic and Islamic culture for 2 semesters while

attending the United States Military Academy at West Point.  As an FBI Special Agent, I have

investigated several criminal violations, including narcotics trafficking, homicide, and

international terrorism.  I also have served as the affiant for search warrants, including search

warrants for electronic evidence. I have been assigned to the Joint Terrorism Task Force since

September 2019.

2.      I make this affidavit in support of an application for a search warrant for

information associated with the account Nutsack1919@gmail.com ("Subject Account"), as more

fully described in Attachment A, which is stored at premises controlled by Google LLC,

("Google"), a company headquartered at 1600 Amphitheatre Parkway, Mountain View,

California 94043.

3.      Based on my training and experience, and the facts as set forth in this affidavit, I

submit that there is probable cause to believe that violations of 18 U.S.C. § 2339B (attempting to

provide material support and resources to a foreign terrorist organization) have been committed

by **KEVIN IMAN MCCORMICK** ("**MCCORMICK**"), and that there is probable cause to believe that evidence, fruits, and instrumentalities of these violations, as described more particularly in Attachment B, are present within the information associated with the Subject Account.

4.      The information contained in this affidavit is from my personal participation in the investigation, information provided by two reliable Confidential Human Sources ("CHS-1" and "CHS-2," individually, and "CHSs" collectively1), consensual recordings of conversations between the two CHSs and Kevin Iman McCormick ("McCormick"), and information provided to me by other law-enforcement officers.2  Due to the fact this affidavit is being made to establish probable cause, I have not listed each item and every fact known by me regarding the investigation.

5.      In this affidavit, the FBI has provided translations of certain Arabic words or phrases. These translations are based on information provided to me by an FBI linguist and from my training and experience.3 I have indicated the translations by bracketing the English translations that came from Arabic recordings and documents.

### SUMMARY OF PROBABLE CAUSE

6.      From my participation in the investigation, including my review of FBI reports and recordings, I have learned the following:

_____

1 The CHSs are paid informants for the FBI.  Both CHSs have been found to be reliable sources for the FBI.  CHS-1 has worked as a paid informant for the FBI since April 2013, though CHS-1 only has worked as a paid informant on limited occasions.  CHS-2 has worked as paid informant for the FBI since May 2006.

2 McCormack likely has mental health issues.  I understand this based on information from local police reports, which include statements from his family.

3 The transcriptions and translations are in preliminary form and have not been finalized.

7.     Based on my training and experience as a Special Agent with the FBI, as well as the facts set forth in this affidavit, there is probable cause to believe that beginning in or about September 2019, and continuing to about October 21, 2019, McCormick attempted to provide material support and resources to a foreign terrorist organization—that is, the Islamic State of Iraq and Al-Sham ("ISIS")—in violation of Title 18, United States Code, Section 2339B. Specifically, McCormick attempted to provide material support and resources, as that term is defined in Title 18, United States Code, Section 2339(a), including personnel (himself), to ISIS.

8.     On or about October 19, 2019, McCormick made a "bayat" video during which he pledged allegiance to ISIS and its leader, Abu Bakr Al-Baghdadi. Based on my training and experience, I understand some individuals attempting to join ISIS pledge their allegiance to ISIS and Al-Baghdadi through video messages.  I also understand the term "bayat" to mean making a solemn promise.

9.     On or about October 19, 2019, McCormick purchased a plane ticket from Toronto, Canada, to Amman, Jordan.  Based on prior meetings between CHS-1, CHS-2, and McCormick, McCormick believed that CHS-2 was an ISIS facilitator and would be able to smuggle him out of the United States to Toronto, and that his flight from Toronto to Amman would enable him to connect with ISIS members overseas, who, in turn, would assist McCormick with traveling to ISIS within Syria.

### THE ISLAMIC STATE OF IRAQ AND AL-SHAM

10.     On October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as an FTO under Section 219 of the Immigration and Nationality Act and as a Specifically Designated Global Terrorist entity under section 1(b) of Executive Order 13224.

11.     On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham ("ISIS"— which is how the FTO will be referenced herein), The Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. On September 21, 2015, the Secretary of State added the following aliases to the FTO listing: Islamic State, ISIL and ISIS. To date, ISIS remains a designated FTO.

12.     Based on my training and experience, I understand Abu Bakr al-Baghdadi to be the leader of ISIS.

**PROBABLE CAUSE**

**A. Concerned individuals reported McCormick to the FBI.**

13.     On October 4, 2019, a concerned individual who attends an Islamic Center in another State reported to the FBI that he/she encountered McCormick on or about September 1, 2019. The concerned individual reported that McCormick expressed a desire to travel to Syria to "fight for Allah."

14.     According to the concerned individual, McCormick attempted to justify his reasons to fight by quoting and citing religious doctrine, but he did so incorrectly. McCormick agreed with the concerned individual that innocent people should not be attacked and McCormick further stated that is why his fight has to take place in Syria.

15.     The concerned individual was shown a picture of McCormick from his Connecticut Driver's License, and that individual identified McCormick as the individual who

expressed a desire to travel overseas to Syria for the purpose of fighting.

16.    McCormick worked as a contract driver for a large company and was fired on or about September 15, 2019.  After being fired, McCormick entered a large store in Washington State and attempted to purchase a firearm and knife. The sales associates at the store did not know McCormick had just been fired. McCormick behaved strangely and told the sales associates that the purchase of the firearm was "not for an animal."  The associate declined to sell McCormick the firearm.

17.    On or about August 24, 2019, members of the local Muslim community center in yet another State reported McCormick because he made concerning statements. McCormick was reported to have said to community members that "we should support ISIS," and "Jihad is the way to go." McCormick also inquired about circumcision and wanted a doctor that could help him with the procedure.

18.    On or about September 4, 2019, law-enforcement personnel reviewed McCormick's public Facebook page, which revealed, among other things, ISIS-related videos and videos of McCormick shooting what appeared to be a Glock pistol at a firearms range.

19.    On or about September 26, 2019, McCormick was brought back to his employer's headquarters in Arkansas and formally terminated, at which time McCormick reacted angrily. The police were called, and McCormick yelled and kicked open a door. McCormick was charged with disorderly conduct and spent one-and-one-half weeks in jail.  Sometime thereafter, McCormick traveled from Arkansas to Connecticut, where he resides with family.

**B. McCormick attempted to travel to Jamaica for the purpose of talking with pro-ISIS individuals he believed to be located in that country.**

20.    On or about October 12, 2019, McCormick attempted to board a flight from

5

Bradley International Airport in Hartford, Connecticut, to Jamaica.  The Department of

Homeland Security ("DHS"), however, prevented McCormick from boarding the flight.

      21.     After DHS prevented McCormick from boarding the flight to Jamaica, CHS-1

met with McCormick. During their conversation, McCormick told CHS-1 that he wanted to

travel to Jamaica, and then onward to Syria in order to join ISIS.4 McCormick also stated that he

had asked about buying a shotgun, but he really wanted an AK-47. McCormick told CHS-1

multiple times that he wanted to kill people, specifically people from DHS, because DHS

prevented McCormick from boarding the flight to Jamaica.  McCormick also stated he had

friends who were gang members who had access to firearms and could get him a firearm.

**C. McCormick wanted to purchase a weapon while in Connecticut.**

      22.     On or about October 12, 2019, at approximately 5:00 p.m., CHS-1 picked up

McCormick from his residence in Hamden, Connecticut. McCormick stated he had a lot of

connections in Jamaica with access to firearms.  McCormick also claimed to have a local friend

who has access to firearms and who may be willing to sell him a gun.

      23.     McCormick told CHS-1 that he thought someone he knew had stolen his truck.

McCormick did not want to call the police on the individual, and McCormick stated, "Prison is

worse than death bro, I would rather kill him bro honestly, or knock him out or something."

Later in the evening, McCormick requested CHS-1 purchase a machete for him. McCormick

wanted the machete for use against the individual who, according to McCormick, stole his truck.

CHS-1 refused to purchase the machete for McCormick.

---

    [4] CHS-1 attempted to record this conversation, but the recording device did not record
any content.  All other communications between McCormick and CHS-1 (as well as CHS-2)
were recorded.

24.     On or about October 18, 2019, CHS-1 met with McCormick for the purpose of introducing CHS-2.  On the way to meet CHS-2, McCormick told CHS-1, "No but it's like, it's like they're just – it's like they just want to stay like this, their little comfort zone, bro people are afraid to die bro. That's what they are, they are afraid to fight and die bro. I would, bro first of all, it's going to be very hard to kill me bro. I'm telling you, it's going to be very hard. If I have a weapon, if I have a rifle, and I have people with me, it's going to be very hard to kill me, if I have like an army."

**D. McCormick met CHS-2 and told CHS-2 that he wanted to travel overseas for the purpose of joining ISIS and fighting with ISIS.**

25.     CHS-2 was introduced to McCormick as a person CHS-1 knew when CHS-1 fought overseas.  When CHS-1 and McCormick met with CHS-2, CHS-2 asked McCormick about his background and where he wanted to go.  McCormick told CHS-2, "I've been ready for quite a long time now, I just need help to get out of here. I just, if I could get to the Muslim country."

26.     CHS-2 asked McCormick where he wanted to go, and McCormick responded "I gotta fight bro, because those people, Abu Masa and ISIL, they fought for me bro, I know it, I can feel it, in my heart. So it's my time to fight . . . It just is what it is bro, it's just my – it's just my time to go bro."  CHS-2 asked McCormick if he was sure that he wanted to travel to a Muslim country, and McCormick replied, "I have to go."

27.     McCormick further stated he traveled to Jamaica and spoke with people there in order to "see if I could find anybody there that was going over there so I could get some help to go over there."  McCormick also stated he went to Jamaica because of a particular person there who "believed in jihad too."  McCormick elaborated, "and then there was this guy in Trinidad

who believes in Jihad too that had – and Trinidad had like an ISIS problem too so I was trying to make my way over there, but no one was trying to help bro." McCormick continued "No one was trying to help, I couldn't, like, I couldn't even believe it. Like no one even cared, I'm like – I'm like bro they killed one million people in Iraq bro like what are we doing bro? Two hundred and twenty thousand in Afghanistan and 80,000 in …, like what are we doing?... And we're living in this horrible place, like I can't do it- I have to go fight. Because I got brothers dying, I can feel it like, the [unintelligible "UI")] is one. The true Muslims are one. I can like feel it in my arm, my heart, like because I know how well I can fight. You understand? So like I know that they need my help bro. I know I need to go over there, and if I die [UI] like, whatever bro. It's not like – it's not the end of the world."

28.    McCormick explained to CHS-2 how he was stopped from traveling at Bradley International Airport, and how he suspected that his mother might have called the authorities in order to block his travel. McCormick described an incident with his uncle, which resulted in a physical altercation.  McCormick explained, "So I ended up fighting him and knocking him out, and I was going to kill him when he was knocked out, I was going to take a knife and stab him in his neck because [UI] anyway under [UI] is death bro. But like, but like I'm saying like I ended up calling the cops to break it up because I was going to kill him bro."

29.    CHS-2 asked McCormick to elaborate on where he would like to travel, and McCormick responded, "I don't know, I don't know bro – it's gotta be like Syria. Where ISIL is at." McCormick continued " . . .whichever place is easiest, whichever place I can get there the fastest, the quickest, the easiest, and where I can have a rifle and I can have some people bro. That's what I need, I need a rifle and I need some people, I need Islamic law, I need, that's what I need, because if I have these things, it's going to be very hard to kill me."

30.     McCormick told CHS-2 "Yeah, fighting, it's uh – fighting in the – I mean the Quran says fight those who fight you . . . But don't transgress the limits." When CHS-2 asked who is fighting, McCormick responded, "The whole world bro." When CHS-2 inquired about McCormick's understanding of jihad, McCormick advised there are two ways jihad will end: "Death" and "Islamic Law."  McCormick further stated, "I mean death bro, death or – I mean like I said bro, it's going to be very hard to kill me – alright, like I said again, [UI] when something is important, say it three times, I'm telling you. It's going to be very hard to kill me. But I'll probably die, you know who knows, I'll probably die, because it's a lot of them, they have a lot of weapons, but at least I can die fighting. At least, please … Please, at least I – but it's also fighting, it's fighting for the Quran [UI] it's fighting for Allah, it's fighting for what was revealed, it's fighting for also the other Muslim people that maybe don't have the courage to fight, you know what I mean?"  McCormick explained "Killing someone for Allah, it – and the Quran and [UI] especially with a gun bro, with a gun, I could just 'pah!' And kill someone, it's so easy."

**E. McCormick told CHS-2 about his desire to kill people and join ISIS.**

31.     McCormick explained his willingness to kill another human being in jihad, ". . . you're supposed to fear God, you're supposed to have fear of Allah, so the fear of Allah gives me the strength to kill. That's what gives me the strength to kill. It's not that I want to kill, you understand? It's like, it's perfect, the Quran is perfect in what it says, it's a perfect book it says fighting has been ordained for you. You may not like something which is good for you, and you may like something which is bad for you, so it's not like I want to kill bro, it's I have to bro. It's this I have to do it bro."

32.     McCormick continued to express his support for ISIS: "I do like, I do like ISIS

because Abu Musa was like my hero, I cry when I watch that video." McCormick explained that he had funds to travel. "I got like $700 and like $400 in my wallet." McCormick continued to express his desire to travel: "I can't even, oh my god. Bro, I'm ready bro, I'm so ready. I'm so ready, I – I don't know what to – you – you wonder what I wanna do? I wanna like cut my arm off and give it to you bro, so you can feel what I feel in my heart bro."

33.     McCormick showed CHS-2 a video of McCormick shooting a firearm at range. McCormick explained, "Because the thing is – when you're – when you're in the range, and when you're holding the gun, you can just look around and aim the gun at somebody, and I was in a shalwar kameez [Islamic clothing]. So they were nervous . . . They were looking at me nervous, because I – I could've moved the round I could've shot them."

**F. McCormick purchased a secure communications application for texting CHS-2.**

34.     CHS-2 provided McCormick with his UserID for a secure communications application, which charges a nominal download fee. CHS-2 told McCormick to be patient and to only download the application if he has made the decision to fight jihad. McCormick told CHS-2 that "I already made my decision," but CHS-2 replied that CHS-2 would not accept McCormack's decision at that time. CHS-2 again stressed not to download the application while he was with CHS-1 in order to avoid influencing CHS-1 in his/her decision to fight jihad. CHS-2 told McCormick that if he decided he was ready, the he should contact CHS-2 using the application by sending a message with McCormick's name and the phrase "I'm ready."

35.     After CHS-2 departed the meeting, McCormick told CHS-1, "I'm more than ready bro, I don't even want to say it anymore, I don't want to talk about it anymore to be totally honest." "I'm gonna message him as soon as I get to the house. I don't even want to go back to the house, that's why I'm so upset like."

**G. McCormick told CHS-2 that he was ready to leave the United States and join ISIS.**

36.     Later that evening, McCormick contacted CHS-2 on the application.  McCormick

created the username "ImanMadman^" and sent the following message to CHS-2:

- "Asalam Alaaykum Kevin Iman McCormick here"

- "I'm ready."

37.     On or about October 19, 2019, McCormick met with CHS-1 and CHS-2.

McCormick again stated that he was "ready" and was "ready now." CHS-2 told McCormick the

earliest they would be able to travel would be October 21, 2019. CHS-2 asked McCormick what

his plan had been, and McCormick responded, "My plan was to go to Jamaica" and then

affirmed to CHS-2 that his plan had been to travel to the Middle East after arriving in Jamaica.

38.     CHS-2 explained to McCormick that since he could not travel from the United

States on his U.S. passport, they would need to smuggle him out of the United States. CHS-2

told McCormick that he would need to purchase a ticket on a specific airline from Toronto,

Canada, to either Istanbul, Turkey, Beirut, Lebanon, or Amman, Jordan.  CHS-2 explained the

advantages and disadvantages regarding each of the three locations.

39.     CHS-2 told McCormick, "If you cannot get the ticket, I cannot start anything,"

and McCormick offered to "get the ticket right now."  McCormick brought up the website of the

airlines and CHS-2 showed McCormick the process of searching for the airline ticket.  CHS-2

told McCormick to send him the airline ticket on the previously used application once he decided

to purchase the ticket.

40.     CHS-2 began speaking with McCormick about being kind to his parents, even

though they are non-believers. McCormick responded that "I am nice, they are not nice," and "If

I wasn't nice, I would have killed them already, both of them."

**H. McCormick pledged bayat to ISIS and Baghdadi.**

41.     CHS-2 and McCormick discussed the meaning and purpose of bayat to the
Islamic State. CHS-2 explained that it was a pledge, and that once bayat is given to ISIS, you
cannot leave ISIS. McCormick decided that he would pledge bayat to "Baghdadi."

42.     Before making the pledge, McCormick asked why there were so many ISIS
fighters in prison, and why they "just gave up." McCormick went on, "because when I've got a
rifle, and I've got a couple people with me at least, like a little army, I'm not gonna, they're not
gonna bring me to prison, bro. That's what I'm sayin, bro. I'm not going to jail, bro. You know
what I mean? Like, this country different, like, I don't have a weapon on me, and you can't go
anywhere, like, why are so many people in jail? Why did so many people give up bro? Like
where's their Imam?" McCormick continued, "But we have guns now. I could kill people from
so far away . . . I can't give up . . . they'll have to kill me."

43.     CHS-2 asked if McCormick wanted to make his pledge with his face covered with
a scarf or uncovered. McCormick decided to have his face showing during the pledge. CHS-2
asked McCormick if he knew what he was going to say, and McCormick explained that he was
going to pledge to "fight for the Khalifa, fight when he tells me to fight, stop when he tells me to
stop . . . and to establish an Islamic State and implement the Sharia." CHS-2 asked for the name
of the Khalifa, and McCormick responded "Baghdadi."

44.     McCormick practiced the bayat pledge. CHS-2 attempted to videotape
McCormick from the CHS's phone, but the video recording did not work due to technical issues
with the device. CHS-2 recorded McCormick making his bayat pledge on McCormick's phone.
McCormick said, "I pledge allegiance to Abu Bakr Al-Baghdadi, I pledge allegiance to the
Islamic State, to fight for the Sunna, the Sharia, and the Quran." CHS-2 then videotaped a second

bayat pledge by McCormick, at McCormack's request.  McCormick stated, "I pledge allegiance to Abu Bakr Al-Baghdadi, Islamic State, and I will fight for the Quran, the Sunna, and the Sharia." The video was then played back, and McCormick stated, "it doesn't sound good in English." McCormick then asked CHS-2 to do the video again so he could do it "in my native language." CHS-2 then recorded another bayat video from McCormick's phone, again at McCormick's request, where McCormick stated "I pledge allegiance to Abu Bakr Al-Baghdadi, ISIS, ISIL, and I will fight for the Quran, the Sunna, and the Sharia, Inshallah." This video was done in Patois—McCormick's native language.  McCormick sent CHS-2 the two bayat videos via the secure communications application.

45.     McCormick then stated, "when I fight, Inshallah, I want them to come close, like I need them to be close, like . . . (UI) I want them to know who it is . . . I want them to send their best people, like, and if they want to, I'll fight them one-on-one with a sword, if they wanna do that."

**I. McCormick purchased a plane ticket from Canada to Jordan.**

46.     Later that evening, McCormick sent a picture of his ticket confirmation to CHS-2 on the secure communications application.  The picture showed the airline confirmation and included details for the airline ticket.  McCormick intended to fly from Connecticut to Toronto, Canada, where he would travel on the following flights: (1) from Lester B. Pearson International Airport to Cairo International Airport on October 22, 2019 (EgyptAir Flight MS 996) and (2) from Cairo International Airport to Queen Alia International Airport (Amman, Jordan) on October 22, 2019 (EgyptAir Flight MS 719).  McCormick paid $504.76 for the ticket and received a reservation number.  The ticket was issued to "Kevin Mccormick" and listed contact information (telephone number and the Subject Account) for McCormick that is consistent with

information I know to have been used by McCormick when communicating with the CHSs.

**J. McCormick traveled from his residence to the airport, where he planned to leave the United States, join ISIS, and fight for ISIS under the leadership of Baghdadi.**

47.     On or about October 21, 2019, at approximately 3:35 a.m., McCormick left his residence and traveled in a car service from his residence to the train station located at 50 Union Avenue, New Haven, Connecticut, where he waited until approximately 6:00 a.m.  While waiting in the train station, McCormick was observed watching his cellphone from which sounds of gunfire could be heard.   At approximately 6:00 a.m., McCormick met up with CHS-1 and CHS-2.  Then, the CHSs and McCormick traveled from the train station to local small private airport.5  McCormick exited the vehicle with the CHSs and proceeded to walk towards the plane. After walking through a gate that separates the tarmac from any buildings and roads, McCormick continued walking with CHS-1 towards a plane outside a hanger appearing to go through predeparture routines.  As McCormick and CHS-1 approached the plane, law-enforcement officers arrested McCormick.  Law-enforcement officers advised McCormick of his Miranda rights soon after his arrest.

**K. McCormick automatically backed up the information from his cell phone to the Subject Account.**

48.     On or about October 21, 2019, after law-enforcement officers arrested McCormick, they found the cell phone that McCormick was observed watching when at the train station.  After obtaining legal process to search the cell phone, the FBI did so and discovered that McCormick used the Subject Account from the cell phone.  The cell phone would automatically backup to the Subject Account.

---

5 The airport is a small airport primarily used by hobby flyers who pay to rent planes, store their own planes, and are allowed open access to the plains and flight line.

49.     Based on my training and experience, I am aware that individuals involved in attempting to provide material support and resources to foreign-terrorist organizations often communicate with others involved in similar conduct via e-mail, social-media accounts, and online chat programs.  I also know based on my training and experience that individuals associated with such activities use YouTube to watch videos and images relating to ISIS and other foreign-terrorist organizations.   Those individuals obtain and share such videos and images with each other via a variety of means, including email, social-media accounts, and online-chat programs.  Based on my training and experience, I know that individuals involved in material-support offenses often use multiple accounts, aliases, and means to communicate.  These multiple accounts or aliases are used as a means to avoid detection from law enforcement.

50.     Based on my training and experience, I know that many social-media accounts and Internet websites require users to provide their email account when registering for the accounts.  The social-media account providers and Internet providers then send the users various notifications regarding messages from other users, information accessed by users, information available by the websites, and other information.  These messages can provide evidence in cases involving material support offenses because they help in identifying what social media and Internet accounts were utilized by the subjects to communicate with other subjects.  In addition, the messages help in identifying the identities of other subjects.

51.     Also, as noted above, email providers maintain various subscriber and user information that its users provide when registering for its accounts.  Some email providers also require payment for certain services or features.  Such information is materially important in cases where online accounts are used in connection with attempting to provide material support to a foreign-terrorist organization, as this information can help in confirming the identity of the

individuals using the accounts and committing the offenses.  Email providers maintain various logs of IP addresses utilized to access the accounts.  The IP information is again materially important in material support investigations.  This information helps in identifying the subjects and the locations where their computer devices are located.

52.     Google has the ability to maintain information associated with the web and application history of its users and the location history of its users.  Such information is materially relevant in material support investigations, as it may help in identifying websites and applications used or accessed by subjects in relation to the offense, as well as locations involved in the offense.

53.     Google Android Backup provides users with the ability to backup data on their cellular telephones and other electronic devices.  Such data can be materially relevant in cases in which cellular telephones and other electronic devices are used to commit or in connection with material-support offenses, as this data may provide historical records of their criminal activities that are no longer saved on the devices.

## JURISDICTION

54.     This court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that—has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## PERTINENT FEDERAL STATUTES AND DESIGNATIONS

55.     Title 18, United States Code, Section 2339B, prohibits, in pertinent part, a person from knowingly providing "material support or resources to a foreign terrorist organization," or attempting or conspiring to do the same.

16

56.     The term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel..., and transportation, except medicine or religious materials." 18 U.S.C. Section 2339A(b)(1) and Section 2339B(g)(4).  Section 2339B(h) provides that "[n]o person may be prosecuted under this section in connection with the term 'personnel' unless that person has knowingly provided, attempted to provide, or conspired to provide a foreign terrorist organization with 1 or more individuals (who may be or include himself) to work under that terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct that operation of that organization.  Individuals who act entirely independent of the foreign terrorist organization to advance its goals or objectives shall not be considered to be working under the foreign terrorist organization's direction and control."

57.     On or about October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq ("AQI"), then known as Jam 'at al Tawid wa' al-Jahid, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive order 13224.

58.     On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name.  The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham ("ISIS"—which is how the FTO will be referenced herein), The Islamic State of Iraq and Syria, ad-Dawla

al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for

Media Production.  On September 21, 2015, the Secretary added the following aliases to the FTO

listing: Islamic State, ISIL, and ISIS.  To date, ISIS remains a designated FTO.

## BACKGROUND INFORMATION

### Definitions

59.     The following definitions apply to this Affidavit, including all attachments to the

Affidavit:

a.      "**Internet Service Providers**" or "**ISPs**" are commercial organizations that

provide individuals and businesses access to the Internet.  ISPs provide a range of

functions for their customers, including access to the Internet, web hosting, e-mail,

remote storage, and co-location of computers and other communications equipment.

ISPs can offer various means by which to access the Internet including telephone

based dial-up, broadband based access via a digital subscriber line (DSL) or cable

television, dedicated circuits, or satellite based subscription.  ISPs typically charge a

fee based upon the type of connection and volume of data, called bandwidth that the

connection supports.  Many ISPs assign each subscriber an account name such as a

user name or screen name, an e-mail address, and an e-mail mailbox, and the

subscriber typically creates a password for the account.  By using a computer

equipped with a telephone or cable modem, the subscriber can establish

communication with an ISP over a telephone line or through a cable system, and can

access the Internet by using his or her account name and password.

b.      An "**Internet Protocol address**", also referred to as an "**IP address**", is a unique

numeric address that computers or electronic devices use in order to communicate

with each other on a computer network utilizing the Internet Protocol (IP) standard. Every computer or device connected to the Internet is referenced by a unique IP address.  An IP address can be thought of as the equivalent to a street address or a phone number, just as each street address and phone number uniquely identifies a building or telephone.  IP addresses are composed of four sets of digits known as "octets," ranging in value from 0-255, separated by decimal points.  An example of an IP address is 192.168.10.102.  There are two types of IP addresses; static and dynamic.  A static address is permanently assigned to a particular device and as a practical matter never changes. A dynamic address provided by an Internet service provider to a client computer is valid only for the duration of the session that the client computer is connected to the Internet (or other network).

c.      "**Website**" consists of textual pages of information and associated graphic images.  The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

d.      "**Uniform Resource Locator**" or "**Universal Resource Locator**" or "**URL**" is the unique address for a file that is accessible on the Internet.  For example, a common way to get to a website is to enter the URL of the website's home page file in the Web browser's address line.  Additionally, any file within that website can be specified with a URL.  The URL contains the name of the protocol to be used to access the file resource, a domain name that identifies a specific computer on the Internet, and a pathname, a hierarchical description that specifies the location of a file in that computer.

19

Google Services

60.     Google LLC ("Google") is a multi-national corporation with its headquarters located in Mountain View, California.  The company specializes in Internet-related products and services, including an Internet search engine (www.google.com), productivity tools such as email service (gmail), and enterprise products such as Google Search Appliance.

61.     Google Photos is a photograph and video sharing and storage service provided by Google LLC, located at photos.google.com.  It allows users to back-up their photographs and videos so they can be accessed on any phone, tablet, or computer.  It also allows users to pool their photographs and videos together with others into shared albums.  Photographs and videos can be organized and searched by places and things in them.

62.     Google+ is a social networking and identity service website owned and operated by Google, located at www.plus.google.com.  Common features include the following:

   a.     Profiles:  Users can establish profile pages to maintain personal information, similar to the Facebook and MySpace social networking sites.

   b.     Circles:  Google+ allows users to establish "circles", which enables them to organize people into groups for sharing across various Google products and services.  This service replaces the typical "Friends" list function used by sites such as Facebook and MySpace.

   c.     Communities:  Communities allow users with common interests to communicate with each other.

   d.     Photos:  Google+ allows users to post, back-up, and share photographs.  Users can also make comments on photographs posted by other users.

   e.     Hangouts:  Hangouts are places used to facilitate group video chat.  Only Google+ users can join such chats.

   f.     Messenger:  Messenger is a feature available to Android, iPhone, and SMS devices for communicating through instant messaging within Circles.

63.     Google Web and App History is a feature of Google Search in which a user's

search queries and results and activities on other Google services are recorded.  The feature is only available for users logged into a Google account.  A user's Web and App History is used to personalize search results with the help of Google Personalized Search and Google Now.

64.     Google Play, formerly known as the Android Market, is the official applications store for Android smartphones and tablets.  Google makes software applications, music, movies, and books available for purchase and download through the store.  Google play allows users of Android devices to purchase, download, and install applications from Google and third-party developers.

65.     Location History is a feature on Google accounts that affects all devices.  When enabled, Location History allows Google to store a record of all location data from all devices connected to a Google account.

66.     Google Drive is a file storage and synchronization service provided by Google LLC, located at www.drive.google.com.  This service provides cloud storage,[6] file sharing, and collaborative editing capabilities.  It offers 15 GB of online storage space, which is usable across Google Drive, Gmail, and other Google services.

67.     Google Android Backup is a service provided by Google LLC to backup data connected to users' Google accounts.  The service allows users to restore data from any Google account that has been backed up in the event that the users' devices are replaced or erased.  Data that can be backed up includes Google Calendar settings, WiFi networks and passwords, home screen wallpapers, Gmail settings, applications installed through Google Play, display settings, language and input settings, date and time, and third party application settings and data.

---

[6] Cloud storage is a mechanism in which files can be saved to an off-site storage system maintained by a third party – i.e., files are saved to a remote database instead of the computer's hard drive.  The Internet provides the connection between the computer and the database for

68.     YouTube is a video-sharing website owned by Google, located at www.youtube.com.  The website allows users to upload, view, and share videos.  Most of the content on YouTube has been uploaded by individuals, although media corporations such as CBS and the BBC offer some of their material via the website.  Unregistered users can watch the videos, but only registered users can upload videos.  Registered users can also post comments about others' uploaded videos.

Email Accounts ("Gmail")

69.     Google allows subscribers to obtain e-mail accounts at the domain name gmail.com, like the account listed in Attachment A.  Subscribers obtain accounts by registering with Google LLC.  During the registration process, Google asks subscribers to provide basic personal information.  Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved e-mail for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, e-mail transaction information, and account application information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

70.     A Google subscriber can also store with the provider files in addition to e-mails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to e-mails), and other files, on servers maintained and/or owned by Google.  In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

saving and retrieving the files.

71.     E-mail providers generally ask their subscribers to provide certain personal identifying information when registering for an e-mail account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

72.     E-mail providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, e-mail providers often have records of the IP address used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

73.     In some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.  In my training and experience, such information may constitute evidence of

the crimes under investigation because the information can be used to identify the account's user or users.

## ELECTRONIC COMMUNICATIONS PRIVACY ACT

74.     I anticipate executing the requested warrant for the listed account under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrants to require Google to disclose to the government copies of the records and other information (including the contents of communications) particularly described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

75.     Based on my training and experience, and the facts as set forth in this affidavit, I submit that there is probable cause to believe that violations of 18 U.S.C. § 2339B (attempting to provide material support and resources to a foreign-terrorist organization) have been committed by **MCCORMICK**, and that there is probable cause to believe that the Subject Account, as described more particularly in Attachment A, has evidence, fruits, and instrumentalities of these violations, as described more particularly in Attachment B.

76.     Therefore, I respectfully request that the attached warrant be issued authorizing the search and seizure of the items listed in Attachment B.

77.     Because the warrant for the account described in Attachment A will be served on

Google, who will then compile the requested records at times convenient to that entity,

reasonable cause exists to permit the execution of the requested warrant at any time in the day or

night.

 

 

Special Agent Samuel Wharton
Federal Bureau of Investigation

 

SUBSCRIBED and SWORN before me this 3ʳᵈ day of December 2019.

/s/ Sarah A. L. Merriam, USMJ
SARAH A. L. MERRIAM
UNITED STATES MAGISTRATE JUDGE

25

## REQUEST FOR SEALING

I further request that the Court seal the underlying affidavit supporting the criminal complaint for 60 days from the date of the signed complaint.  My supporting affidavit details matters about the investigation that are not a matter of public information at this time, including the methods of investigation and sources of information.  The FBI is continuing to investigate active leads concerning the defendant's ties to others.   Accordingly, clear and convincing reasons to seal the affidavit because the premature disclosure of this investigation will jeopardize the FBI's efforts to pursue active leads in this investigation and jeopardize the ongoing investigation.

Respectfully submitted,

Special Agent Samuel Wharton
Federal Bureau of Investigation

Sworn to before me on the
3rd day of Deember, 2019.

/s/ Sarah A. L. Merriam, USMJ

SARAH A. L. MERRIAM
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

This warrant applies to information associated with **nutsack1919@gmail.com**, which is stored at premises controlled by Google LLC, a company that accepts service of legal process at 1600 Amphitheatre Parkway, Mountain View, California, 94043.

## ATTACHMENT B
### Particular Things to be Seized

I.     **Information to be disclosed by Google LLC (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is stored, held or maintained inside or outside of the United States, and including any emails, records, files, logs, or information that has been deleted, but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account, or identifier, for the limited timeframe of January 1, 2018, to the present, as listed in Attachment A:

1. The contents of all e-mails associated with the account, including stored or preserved copies of e-mails sent to and from the account, draft e-mails, the source and destination addresses associated with each e-mail, the date and time at which each e-mail was sent, and the size and length of each e-mail;

2. All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

3. The types of service used;

4. All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

5. All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken;

6. Subscriber registration information;

7. Sign-in IP addresses and associated time stamps;

8.      Video upload IP addresses and associated time stamps;

9.      Copies of private videos and associated video information, to include any deleted videos;

10.     Private message contents and comments, to include any deleted messages or comments;

11.     Public message contents and comments, to include any deleted messages or comments;

12.     YouTube search history;

13.     Information that refers or relates to subscriber and registration information;

14.     Information that refers or relates to internet history, including browser history, and app history, including app data;

15.     Informaton that refers or relates to IP logs associated with the internet history and app history;

16.     Google search history;

17.     Google browser activity (including activity on Google Chrome);

18.     Any available backup data for any electronic devices;

19.     Information that refers to Google change history and change information;

20.     Cellular device information, including IMEI/MEID, make and model, serial number, date and IP address of last access to Google, and a list of all accounts that have ever been active on the device;

21.     All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken; and

22.     For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored; and

23.     Any cookies-related information concerning the account.

24.     Google Play purchase history and transactional records, including payment method(s) and related billing information;

25.     All records pertaining to communications between the Provider and any person

regarding the account, including contacts with support services and records of actions taken;

26.     For all information required to be disclosed pursuant to this warrant, the physical location or locations where the information is stored;

27.     All records or other information stored at any time by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files; and

28.     Location history

Pursuant to the warrant, Google LLC shall disclose responsive data by sending it to the Federal Bureau of Investigation, or making the data available to the Federal Bureau of Investigation via Google LLC's electronic portal within **14 days** of the issuance of this warrant.

3

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of offenses involving providing, conspiring, or attempting to provide material support and resources to a foreign-terrorist organization, in violation of 18 U.S.C. § 2339B, involving the user of the account, and occurring from January 1, 2018, to the present, for each account or identifier listed on Attachment A, information referring, relating, or pertaining to the following:

a.  Email, text, and other messages, photos, videos, contacts and contact lists, addresses and address books, voicemail messages, location data, calendar, applications and application data, settings, location data, web-search history, YouTube search history, YouTube comments, and other related social-media platforms;

b.  Any photographs, videos, or other information referring or relating to firearms, or other weapons;

c.  Any communications, or other information, referring or relating to firearms, or other weapons;

d.  Any information referring, or relating, to ISIS, other terms associated with ISIS, or any other foreign terrorist organizations;

e.  Any information referring, or relating, to the provision, or attempted provision, of material support or resources to ISIS, or any other foreign terrorist organizations;

f.  Any information referring, or  relating, to travel, including travel plans, itineraries, reservations, bookings, tickets, and the means and sources of payment for travel;

g.  Any information referring, or relating, to plans to commit a terrorist attack, or to fight with ISIS, or any other foreign terrorist organizations, including, without limitation, funding, materials, maps, disguises, aliases, weapons, or other materials that may assist with an attack;

h.  Any information referring, or relating, to communications with others relating to ISIS, or any other foreign terrorist organizations, or potential terrorist attacks on the United States, or in other countries;

i.  Any information relating to the use of YouTube, Facebook, WhatsApp, and other forms of social media, use of the internet, and communication methods, including

4

private messaging, where such information refers or relates in anyway to ISIS, or any other foreign terrorist organizations;

j.  Any information referring, or relating, to videos or other content created, publicly posted, or viewed on the internet where such content concerns ISIS, or any other foreign terrorist organizations;

k.  Communications and any other information involving, referring, or relating to potential co-conspirators, accomplices, and associates, concerning ISIS, or any other foreign terrorist organizations, or relating to providing, or attempting to provide, material support or resources for such organizations;

l.  Identifying information and contact information of potential co-conspirators, accomplices, associates, and other individuals engaged, or otherwise involved, in providing, or attempting to provide, material support or resources to ISIS, or any other foreign terrorist organizations;

m.  The timing of communications among potential co-conspirators, accomplices, associates, and other individuals engaged, or otherwise involved, in providing, or attempting to provide, material support or resources to ISIS, or any other foreign-terrorist organizations;

n.  Any information referring, or relating to, the methods and techniques used in providing, or attempting to provide, material support or resources to a foreign-terrorist organization;

o.  The distribution of videos and photographs referring, or relating to, the work, accomplishments, or propaganda of a foreign-terrorist organization;

p.  Any information referring, or relating to, the recruitment of fighters, supporters, and financial support for a foreign-terrorist organization.

q.  Evidence indicating how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner;

r.  Any information indicating the account user's state of mind as it relates to the provision, or attempted provision, of material support or resources to ISIS, or other foreign terrorist organizations;

s.  Any information relating to Internet Protocol addresses used;

t.  Any information and records relating to Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

u.  The identity of the person(s) who created, used, or deleted the email account, including information that would help reveal the whereabouts of such person;

v.  The identity of any person(s) who communicated with the email account about matters relating to foreign-terrorist organizations, and any records related to the whereabouts of such persons;

w.  Any information and records indicating that data has been deleted by the account owner, potentially to hide evidence of a crime; and

x.  Any information relating to account history (including Terms of Service and any complaints) and billing records (including date, time, duration, and screen names used each time the accounts were activated).

y.  Evidence of user attribution showing who used, or owned, the account at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC BUSINESS RECORDS
## PURSUANT TO FEDERAL RULE OF EVIDENCE 902(11)

I, _____, attest, under penalties of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this declaration is true and correct. I am employed by Google LLC ("Google") and my official title is _____. I am a custodian of records for Google LLC. I state that each of the records attached hereto is the original record or a true duplicate of the original record in the custody of Google, and that I am the custodian of the attached records consisting of _____ (pages/CDs/kilobytes). I further state that:

    a.    all records attached to this certificate were made at or near the time of the occurrence of the matter set forth, by, or from information transmitted by, a person with knowledge of those matters;

    b.    such records were kept in the ordinary course of a regularly conducted business activity of Google; and

    c.    such records were made by Google as a regular practice.

I further state that this certification is intended to satisfy Rule 902(11) of the Federal Rules of Evidence.

_____      _____

Date                                 Signature

1