

**U.S. Department of Justice**

*United States Attorney*
*District of Connecticut*

*Connecticut Financial Center*
*157 Church Street, 25th Floor*
*New Haven, Connecticut 06510*

*(203)821-3700*
*Fax (203) 773-5376*
*www.justice.gov/usao/ct*

January 12, 2023

United States District Court
District of Connecticut
FILED AT BRIDGEPORT
1/12/23 20
Dinah Milton Kinney, Clerk
By [signature]
Deputy Clerk

Charles F. Willson, Esq.
Assistant Federal Defender
Federal Public Defender's Office
10 Columbus Blvd, 6th Floor
Hartford, Connecticut 06106-1976

Re: United States v. Kevin Iman McCormick
No. 3:19CR263 (KAD)

Dear Attorney Willson:

This letter confirms the plea agreement between your client, Kevin Iman McCormick (the "defendant"), and the United States Attorney's Office for the District of Connecticut (the "Government") in this criminal case.

**THE PLEA AND OFFENSE**

In consideration for the benefits offered under this agreement, the defendant agrees to plead guilty to Count One of a single count indictment charging a violation of 18 U.S.C. § 2339B(a)(1) (Attempting to Provide Material Support and Resources to Designated Foreign Terrorist Organization).

The defendant understands that, to be guilty of this offense, the following essential elements must be satisfied:

1. The defendant knowingly attempted to provide material support or resources, which, pursuant to 18 U.S.C. §§ 2339B(g)(4) and 2339A(b)(1), includes personnel, that is, one or more individuals (who may be or include the defendant) to work under the terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization, to a designated foreign terrorist organization;

2. The defendant knew that the organization was a designated terrorist organization, or that the organization had engaged or was engaging in terrorist activity or terrorism; and

3. The defendant is a national of the United States or the offense occurred in the United States.

**THE PENALTIES**

Imprisonment

This offense carries a maximum penalty of 20 years of imprisonment.

Supervised Release

In addition, the Court may impose a up to a life term of supervised release to begin after any term of imprisonment. 18 U.S.C. § 3583(j).

The defendant understands that, should he violate any condition of supervised release, he may be required to serve a further term of imprisonment of up to 2 years per violation pursuant to 18 U.S.C. § 3583(b)(3) with no credit for time already spent on supervised release.

Fine

This offense carries a maximum fine of $250,000. The defendant is also subject to the alternative fine provision of 18 U.S.C. § 3571. Under this section, the maximum fine that may be imposed on the defendant is the greatest of the following amounts: (1) twice the gross gain to the defendant resulting from the offense; (2) twice the gross loss resulting from the offense; or (3) $250,000.

Special Assessment

In addition, the defendant is obligated by 18 U.S.C. § 3013 to pay a special assessment of $100 on each count of conviction. The defendant agrees to pay the special assessment on or before the date of sentencing unless he establishes an inability to pay on or before the date of sentencing through the financial disclosure to the U.S. Probation Office as part of the presentence investigation and report, in which case the defendant agrees to pay it as soon as practicable.

Interest, penalties and fines

Unless otherwise ordered, should the Court impose a fine or restitution of more than $2,500 as part of the sentence, interest will be charged on the unpaid balance of the fine or

restitution not paid within 15 days after the judgment date. 18 U.S.C. § 3612(f). Other penalties and fines may be assessed on the unpaid balance of a fine or restitution pursuant to 18 U.S.C. § 3572(h), (*i*) and § 3612(g).

Forfeiture

Pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. §§ 981(a)(1)(G)(i)-(iv), and 28 U.S.C. § 2461(c), the defendant agrees to forfeit to the United States: (1) his assets, foreign or domestic (18 U.S.C. §§ 981(a)(1)(G)(i) and (iv) and 28 U.S.C. § 2461(c)); (2) all assets acquired or maintained by any person with the intent and for the purpose of supporting, planning, conducting, or concealing the offenses charged in in the indictment (18 U.S.C. § 981(a)(1)(G)(ii) and 28 U.S.C. § 2461(c)); (3) assets derived from, involved in, or used or intended to be used to commit the offenses charged in the indictment (18 U.S.C. § 981(a)(1)(G)(iii) and 28 U.S.C. § 2461(c)); and (4) any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses charged in the indictment (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)).

Such assets include, but are not limited to: (1) a black in color, Motorola brand, cell phone; (2) a white in color, Nokia brand, cell phone; (3) ½ of a broken "Simmons" binocular; and (4) $488.27 in U.S. currency. 18 U.S.C. § 981(a)(1)(G), 28 U.S.C. § 2461(c), and 21 U.S.C. § 853. The defendant agrees that by virtue of his plea of guilty he waives any rights or cause of action to claim that he is a "substantially prevailing party" for the purpose of recovery of attorney fees and other litigation costs in any related forfeiture proceeding pursuant to 28 U.S.C. § 2465(b)(1).

**THE SENTENCING GUIDELINES**

Applicability

The defendant understands that the Court is required to consider any applicable Sentencing Guidelines as well as other factors enumerated in 18 U.S.C. § 3553(a) to tailor an appropriate sentence in this case and is not bound by this plea agreement. The defendant agrees that the Sentencing Guideline determinations will be made by the Court, by a preponderance of the evidence, based upon input from the defendant, the Government, and the United States Probation Office. The defendant further understands that he has no right to withdraw his guilty plea if his sentence or the Guideline application is other than he anticipated, including if the sentence is outside any of the ranges set forth in this agreement.

Acceptance of Responsibility

At this time, the Government agrees to recommend that the Court reduce by two levels the defendant's adjusted offense level under § 3E1.1(a) of the Sentencing Guidelines, based on the defendant's prompt recognition and affirmative acceptance of personal responsibility for the

offense. Moreover, should the defendant qualify for a decrease under § 3E1.1(a) and his offense level determined prior to the operation of subsection (a) is level 16 or greater, the Government will file a motion with the Court pursuant to § 3E1.1(b) which recommends that the Court reduce the defendant's Adjusted Offense Level by one additional level based on his prompt notification of his intention to enter a plea of guilty. The defendant understands that the Court is not obligated to accept the Government's recommendations on the reductions.

The above-listed recommendations are conditioned upon the defendant's affirmative demonstration of acceptance of responsibility, by (1) truthfully admitting the conduct comprising the offense(s) of conviction and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 of the Sentencing Guidelines, and (2) disclosing to the United States Attorney's Office and the United States Probation Office a complete and truthful financial statement detailing the defendant's financial condition. The defendant expressly authorizes the United States Attorney's Office to obtain a credit report concerning the defendant.

In addition, the Government expressly reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant engages in any acts, unknown to the Government at the time of the signing of this agreement, which (1) indicate that the defendant has not terminated or withdrawn from criminal conduct or associations (§ 3E1.1 of the Sentencing Guidelines); (2) could provide a basis for an adjustment for obstructing or impeding the administration of justice (§ 3C1.1 of the Sentencing Guidelines); or (3) constitute a violation of any condition of release. Moreover, the Government reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant seeks to withdraw his guilty plea or takes a position at sentencing, or otherwise, which, in the Government's assessment, is inconsistent with affirmative acceptance of personal responsibility. The defendant understands that he may not withdraw his plea of guilty if, for the reasons explained above, the Government does not make one or both of the recommendations or seeks denial of the adjustment for acceptance of responsibility.

Stipulation

Pursuant to § 6B1.4 of the Sentencing Guidelines, the defendant and the Government have entered into the attached stipulation, which is a part of this plea agreement. The defendant understands that this stipulation does not set forth all of the relevant conduct and characteristics that may be considered by the Court for purposes of sentencing. The defendant understands that this stipulation is not binding on the Court. The defendant also understands that the Government and the United States Probation Office are obligated to advise the Court of any additional relevant facts that subsequently come to their attention.

Guideline Stipulation

The parties agree as follows:

The Guidelines Manual in effect on the date of sentencing is used to determine the applicable Guidelines range.

The defendant's base offense level under U.S.S.G. § 2M5.3(a) is 26. That level is increased by 2 levels under U.S.S.G. § 2M5.3(b)(1)(E) based on his provision of material support or resources with the intent, knowledge, or reason to believe they were to be used to commit or assist in the commission of a violent act. Because the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, that level is increased by 12 levels, U.S.S.G. § 3A1.4(a), resulting in an adjusted offense level of 40.

Three levels are subtracted under U.S.S.G. § 3E1.1 for acceptance of responsibility, as noted above, resulting in a total offense level of 37.

The parties agree that under U.S.S.G. § 3A1.4(b), the defendant's Criminal History is shall be Category VI.

A total offense level 37, assuming a Criminal History Category VI, would result in a range of 360 months to life imprisonment (sentencing table), but because the statutory maximum for the offense is 20 years of imprisonment, the applicable Guideline range is 240 months. U.S.S.G. § 5G1.1(a). The fine range is $40,000 to $400,000. U.S.S.G. § 5E1.2(c)(3). The defendant is also subject to a supervised release term of 1 year and up to a life term. U.S.S.G. § 5D1.2.

The Government and the defendant reserve their rights to seek a departure or a non-Guidelines sentence, and both sides reserve their right to object to a departure or a non-Guidelines sentence. With respect to this, the defendant intends to challenge the Guidelines as not a product of the Commission's traditional role, including that the Criminal History category does not reflect the defendant's criminal record.

Also, the parties acknowledge that the defendant's mental condition is relevant for purposes of U.S.S.G. § 5H1.3. The Government will request that the Court impose a life term of supervised release following his release from prison given the serious nature of the offense and the defendant's need for continued mental health treatment.

The defendant understands that the Court is not bound by this agreement on the Guideline ranges specified above. The defendant further understands that he will not be permitted to withdraw the guilty plea if the Court imposes a sentence outside any of the ranges set forth in this agreement.

In the event the United States Probation Office or the Court contemplates any sentencing calculations different from those stipulated by the parties, the parties reserve the right to respond to any inquiries and make appropriate legal arguments regarding the proposed alternate calculations. Moreover, the parties reserve the right to defend any sentencing determination, even if it differs from that stipulated by the parties, in any post-sentencing proceeding.

Information to the Court

The Government reserves its right to address the Court with respect to an appropriate sentence to be imposed in this case. Moreover, the Government will discuss the facts of this case, including information regarding the defendant's background and character, 18 U.S.C. § 3661, with the United States Probation Office and will provide the Probation Officer with access to material in its file, with the exception of grand jury material.

**WAIVER OF RIGHTS**

The defendant acknowledges and agrees that he is knowingly, intelligently, and voluntarily waiving the following rights:

Waiver of Trial Rights and Consequences of Guilty Plea

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him.

The defendant understands that he has the right to plead not guilty or to persist in that plea if it has already been made, the right to a public trial, the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against him, the right not to be compelled to incriminate himself, the right to testify and present evidence, and the right to compel the attendance of witnesses to testify in his defense. The defendant understands that by pleading guilty he waives those rights and that, if the plea of guilty is accepted by the Court, there will not be a further trial of any kind.

The defendant understands that, if he pleads guilty, the Court may ask him questions about each offense to which he pleads guilty, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making false statements.

Waiver of Statute of Limitations

The defendant agrees that, should the conviction following defendant's guilty plea be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this plea agreement (including any indictment or counts the Government has agreed to dismiss at sentencing pursuant to this plea agreement) may be

commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement or reinstatement of such prosecution. The defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date the plea agreement is signed.

Waiver of Right to Challenge Conviction

The defendant acknowledges that under certain circumstances he is entitled to challenge his conviction. By pleading guilty, the defendant waives his right to appeal or collaterally attack his conviction in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255 and/or § 2241. In addition to any other claims he might raise, the defendant waives his right to challenge his conviction based on (1) any non-jurisdictional defects in the proceedings before entry of this plea, (2) a claim that the statute(s) to which the defendant is pleading guilty is unconstitutional, and (3) a claim that the admitted conduct does not fall within the scope of the statute. This waiver does not preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

Waiver of Right to Appeal or Collaterally Attack Sentence

The defendant acknowledges that under certain circumstances, he is entitled to challenge his sentence. In consideration for the benefits offered under this agreement, the defendant agrees not to appeal or collaterally attack the sentence in any proceeding, including but not limited to a motion under 28 U.S.C. § 2255 and/or § 2241 if that sentence does not exceed 20 years imprisonment, a life term of supervised release, a $40,000 fine, a $100 special assessment, and forfeiture as explained even if the Court imposes such a sentence based on an analysis different from that specified above. The Government and the defendant agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with, in whole or in part, the undischarged portion of any other sentence that has been imposed on the defendant at the time of sentencing in this case. Furthermore, the parties agree that any challenge to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) this waiver. This waiver does not preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

Waiver of Challenge to Plea Based on Immigration Consequences

The defendant understands that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Under federal law, non-citizens are subject to removal for a broad range of crimes, including the offense(s) to which the defendant is pleading guilty. Likewise, if the defendant is a naturalized citizen of the United States, pleading guilty may result in denaturalization and removal. Removal, denaturalization, and other immigration consequences are the subject of a separate proceeding, however, and the

defendant understands that no one, including his attorney or the district court, can predict to a certainty the effect of his conviction on his immigration status. The defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his plea may entail, even if the consequence is automatic removal from the United States.

The defendant understands that he is bound by his guilty plea regardless of the immigration consequences of the plea. Accordingly, the defendant waives any and all challenges to his guilty plea and to his sentence based on those consequences, and agrees not to seek to withdraw his guilty plea, or to file a direct appeal or any kind of collateral attack challenging his guilty plea, conviction or sentence, based on the immigration consequences of his guilty plea, conviction or sentence. This waiver does not preclude the defendant from raising a claim of ineffective assistance of counsel in the appropriate forum.

## ACKNOWLEDGMENT OF GUILT AND VOLUNTARINESS OF PLEA

The defendant acknowledges that he is entering into this agreement and is pleading guilty freely and voluntarily because he is guilty. The defendant further acknowledges that he is entering into this agreement without reliance upon any discussions between the Government and him (other than those described in the plea agreement letter), without promise of benefit of any kind (other than the concessions contained in the plea agreement letter), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges his understanding of the nature of the offense to which he is pleading guilty, including the penalties provided by law. The defendant also acknowledges his complete satisfaction with the representation and advice received from his undersigned attorney. The defendant and his undersigned counsel are unaware of any conflict of interest concerning counsel's representation of the defendant in the case.

The defendant acknowledges that he is not a "prevailing party" within the meaning of Public Law 105-119, section 617 ("the Hyde Amendment") with respect to the count of conviction or any other count or charge that may be dismissed pursuant to this agreement. The defendant voluntarily, knowingly, and intelligently waives any rights he may have to seek attorney's fees and other litigation expenses under the Hyde Amendment.

## SCOPE OF THE AGREEMENT

The defendant acknowledges that this agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority. The defendant acknowledges that no representations have been made to him with respect to any civil or administrative consequences that may result from this plea of guilty because such matters are solely within the province and discretion of the specific administrative or governmental entity involved. Finally, the defendant acknowledges that this agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving him.

## COLLATERAL CONSEQUENCES

The defendant understands that he will be adjudicated guilty of each offense to which he has pleaded guilty and will be deprived of certain rights, such as the right to hold public office, to serve on a jury, to possess firearms and ammunition, and in some states, the right to vote. Further, the defendant understands that if he is not a citizen of the United States, a plea of guilty may result in removal from the United States, denial of citizenship, and denial of admission to the United States in the future. The defendant understands that pursuant to section 203(b) of the Justice For All Act, the Federal Bureau of Prisons or the United States Probation Office will collect a DNA sample from the defendant for analysis and indexing. Finally, the defendant understands that the Government reserves the right to notify any state or federal agency by which he is licensed, or with which he does business, as well as any current or future employer of the fact of his conviction.

## SATISFACTION OF FEDERAL CRIMINAL LIABILITY; BREACH

The defendant's guilty plea, if accepted by the Court, will satisfy the federal criminal liability of the defendant in the District of Connecticut as a result of his participation in the attempted provision of material support and resources to a designated foreign terrorist organization from in or about August 2019 through October 21, 2019, which forms the basis of Count One of the indictment in this case, as well as his threats to kill and harm Department of Homeland Security personnel and acquire firearms in October 2019.

The defendant understands that if, before sentencing, he violates any term or condition of this agreement, engages in any criminal activity, or fails to appear for sentencing, the Government may void all or part of this agreement. If the agreement is voided in whole or in part, the defendant will not be permitted to withdraw his guilty plea.

## NO OTHER PROMISES

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this plea agreement, and none will be entered into unless set forth in writing, signed by all the parties.

This letter shall be presented to the Court, in open court, and filed in this case.

Very truly yours,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

PETER S. JONGBLOED
ASSISTANT UNITED STATES ATTORNEY

JUSTIN SHER
JOHN CELLA
TRIAL ATTORNEYS
UNITED STATES DEPARTMENT OF JUSTICE

The defendant certifies that he has read this plea agreement letter and its attachment(s) or has had it read or translated to him, that he has had ample time to discuss this agreement and its attachment(s) with counsel and that he fully understands and accepts its terms.

KEVIN IMAN McCORMICK
The Defendant

1/12/23
Date

I have thoroughly read, reviewed and explained this plea agreement and its attachment(s) to my client who advises me that he understands and accepts its terms.

CHARLES F. WILLSON, ESQ.
ASSISTANT FEDERAL DEFENDER
Attorney for the Defendant

1.12.23
Date

**STIPULATION OF OFFENSE CONDUCT AND RELEVANT CONDUCT**

The defendant Kevin Iman McCormick and the Government stipulate to the following offense conduct and relevant conduct that give rise to the defendant's agreement to plead guilty to the indictment:

1. Starting in late summer of 2019 and continuing to his arrest in October 2019, in the District of Connecticut and elsewhere, Mr. McCormick knowingly attempted to provide material support and resources, as that term is defined in Title 18, United States Code, Section 2339A(b)(1), that is, personnel, namely himself, to the Islamic State of Iraq and al-Sham ("ISIS"), which at all relevant times was designated by the Secretary of State as a foreign terrorist organization pursuant to Section 219 of the Immigration and Nationality Act, knowing that ISIS was a designated foreign terrorist organization, and knowing that ISIS had engaged in, and was engaging in, terrorist activity and terrorism.[1]

2. Starting as early as August 2019, according to reports from others, Mr. McCormick vocalized his desire to support ISIS and/or to travel to the Middle East and fight for ISIS. For example, on or about August 24, 2019, members of the local Muslim community center in another State reported that Mr. McCormick said, "we should support ISIS" and "Jihad is the way to go." Also, on or about September 1, 2019, Mr. McCormick reportedly spoke with a person at an Islamic Center in yet another State and expressed his desire to travel to the Middle East to "fight for the sake of Allah." On or about September 4, 2019, Mr. McCormick's public Facebook page contained ISIS-related videos. The page also contained videos of him shooting what appeared to be a Glock pistol at a firearms range.

3. During a road trip for his job as a contract driver for a major retailer, on or about September 15, 2019, Mr. McCormick entered a large store in Washington State. While looking at and holding firearms and knives that were for sale, he talked with a sales clerk. Mr. McCormick behaved strangely. He did not purchase a firearm, knife, or ammunition.

[1] On or about October 15, 2004, the U.S. Secretary of State designated al Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act (the "INA") and as a Specially Designated Global Terrorist under section 1(b) of Executive Order 13224. On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the INA and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the FTO listing: the Islamic State of Iraq and al-Sham (i.e., "ISIS"—which is how the FTO will be referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

4. On or about October 12, 2019, Mr. McCormick attempted to board a flight from Bradley International Airport in Hartford, Connecticut, to Jamaica, where he was born and still had family. The Department of Homeland Security ("DHS"), however, prevented him from boarding the flight. In later conversations, Mr. McCormick spoke with a Confidential Human Source ("CHS-1") and said that he wanted to travel to Jamaica, and then answered "yes" about traveling onward to the Middle East in order to join ISIS. He told CHS-1 multiple times that he felt like he wanted to kill people, including people from DHS because DHS prevented him from boarding the flight to Jamaica. Mr. McCormick also stated he had friends who could get him a firearm.

5. On or about October 18, 2019, CHS-1 met with Mr. McCormick for the purpose of introducing CHS-2. On the way to meet CHS-2, as part of their conversation, Mr. McCormick told CHS-1, "N-n-no but it's like, it's like they're just – it's like they just want to stay like this, their little comfort zone. Bro, people are afraid to die bro. That's what they are, they're afraid to fight and die bro. I would, bro first of all, it's gonna be very hard to kill me bro. I'm telling you, it's gonna be very hard. If I have a weapon, if I have a rifle, and I have people with me, it's gonna be very hard to kill me, if I have – if I have like a army. Like."[2]

6. At the October 18, 2019 meeting, CHS-2 was introduced to Mr. McCormick as a person CHS-1 knew when CHS-1 fought overseas. CHS-2 asked Mr. McCormick about his background and where he wanted to go. Mr. McCormick told CHS-2, "I've been ready for quite a long time now, I just need help to get out of here. I just, if I could get to the Muslim country." CHS-2 asked where he wanted to go, and Mr. McCormick responded "I gotta fight bro, because those people, Abu Masa and ISIL, they fought for me bro, I know it, I can feel it, in my heart. So it's my time to fight . . . It just is what it is bro, it's just my – it's just my time to go bro." CHS-2 asked Mr. McCormick if he was sure that he wanted to travel to a Muslim country, and McCormick replied, "I have to go." Mr. McCormick further stated he traveled to Jamaica and spoke with people there in order to "see if I could find anybody there that was going over there so I could get some help to go over there." He also stated that there was one person there who "believed in jihad too." Mr. McCormick elaborated, "And then there was as [sic] guy in Trinidad who believes in Jihad too that had – and Trinidad had like an ISIS problem too so I was trying to make my way over there, but no one was trying to help bro." He continued, " No one was trying to help, I couldn't like I couldn't even believe it. Like no one even cared. I'm like – I'm like bro they killed one million people in Iraq bro like what are we doing bro? Two hundred and twenty thousand in Afghanistan and 80,000 in... like what are we doing?... And we're living in this horrible place, like I can't do it - I have to go fight. Because I got brothers dying, I can feel it like, you know the Prophet Muhammad PBUH said the ummah [Nation] is one. The true Muslims are one. I can like feel it in my arm, my heart, like because I know how well I can fight. You understand? So like I know that they need my help bro. I know I need to go over there, and if I die thanks to Allah like, whatever bro. It's not like – it's not like the end of the world."

[2] The quoted portions of the recorded conversations are from the current transcript versions.

7. During the October 18, 2019 conversations, CHS-2 asked Mr. McCormick to elaborate on where he would like to travel, and he responded, "I don't know bro – it's gotta be like Syria. Where – where ISIL is at." Mr. McCormick continued, "[W]hichever place is easiest, whatever place I can get there the fastest, the quickest, the easiest, and where I can have a rifle and I can have some people bro. That's what I need, I need a rifle and I need some people, I need Islamic law, I need, that's what I need, because if I have these things, it's gonna be very hard to kill me." Mr. McCormick later explained, "Killing someone for Allah, it – and the Quran and [UI] especially with a gun bro, with a gun, I could just 'pah!' And kill someone, it's so easy." During the conversation Mr. McCormick continued to express his support for ISIS: "I do like, I do like ISIS because Abu Musa was like my hero, I cry when I watch that video." He said that he had funds to travel. "I got like $700 and like $400 in my wallet … I can't even, oh my god. Bro, I'm ready bro, I'm so ready... I'm so ready, I – I don't know what to – you – you wonder what I wanna do? I wanna like cut my arm off and give it to you bro, so you can feel what I feel in my heart bro."

8. At the October 18, 2019 meeting, Mr. McCormick showed CHS-2 a video of him shooting a firearm at range. Also, CHS-2 provided Mr. McCormick with his UserID for a secure communications application, which charges a nominal download fee. CHS-2 told him to be patient and to only download the application if he has made the decision to fight jihad. Mr. McCormick told CHS-2 that "I already made my decision," but CHS-2 replied that CHS-2 would not accept his decision at that time. CHS-2 again stressed not to download the application while he was with CHS-1 in order to avoid influencing CHS-1 in his/her decision to fight jihad. CHS-2 told Mr. McCormick that if he decided he was ready, he should contact CHS-2 using the application by sending a message with Mr. McCormick's name and the phrase "I'm ready."

9. After CHS-2 departed the October 18 meeting, Mr. McCormick told CHS-1, "I'm more than ready bro, I don't even want to say it anymore, I don't want to talk about it anymore to be totally honest." "I'm gonna message him as soon as I get to the house. I don't even want to go back to the house, that's why I'm so upset like." Later that evening, Mr. McCormick contacted CHS-2 on the application. He created the username "ImanMadman^" and sent the following message to CHS-2:

- "Asalam Alaaykum Kevin Iman McCormick here"
- "I'm ready."

10. The next day, October 19, 2019, Mr. McCormick met with CHS-1 and CHS-2 and again stated. "I'm ready … right now." CHS-2 told Mr. McCormick the earliest they would be able to travel would be October 21, 2019. CHS-2 asked Mr. McCormick what his plan had been, and he responded, "My plan was to get to Jamaica" and then affirmed to CHS-2 that his plan had been to travel to the Middle East after arriving in Jamaica. CHS-2 explained to him that since he could not travel from the United States on his U.S. passport, he had contacts that could get Mr. McCormick out of the United States. CHS-2 told Mr. McCormick that he would need to purchase a ticket on a specific airline from Toronto, Canada, to either Istanbul, Turkey, Beirut,

Lebanon, or Amman, Jordan. CHS-2 told him, "If you cannot get the ticket, I cannot start anything," and Mr. McCormick offered to "get the ticket right now." Mr. McCormick brought up the website of the airlines and CHS-2 showed McCormick the process of searching for the airline ticket. CHS-2 told him to send him the airline ticket on the previously used application once he decided to purchase the ticket. CHS-2 began speaking with him about being kind to his parents, even though they are non-believers. Mr. McCormick responded that "I am nice bro, they're not nice" and "If I wasn't nice, I would have killed them already, … both of them." They discussed the meaning and purpose of bayat to the Islamic State. CHS-2 explained that it was a pledge, and that once bayat is given to ISIS, you cannot leave ISIS. Mr. McCormick decided that he would pledge bayat to "Baghdadi." Before making the pledge, Mr. McCormick asked why there were so many ISIS fighters in prison and, "Like why did they just give up?" Mr. McCormick went on, "Because brother what – what I'm – what I'm saying is that Allah willing, when I got a rifle…and I got a couple people with me, at least like a little army…I'm not gonna – I'm not gonna – they're not gonna bring me to prison bro. That's what I'm saying bro. I'm not going to jail bro. You know what I mean, like this country is different, like I don't have a weapon on me and you don't- you can't go anywhere….They, like why are so many – why are so many people in jail, why did so many people give up bro? Like where's their faith?" He continued, "[B]ut then we have guns now, I could – I could kill people from so far away … Bro, I can't give up … They gotta kill me bro."

11. During the October 19, 2019 meeting, CHS-2 asked Mr. McCormick if he wanted to make his pledge with his face covered with a scarf or uncovered. He decided to have his face showing during the pledge. CHS-2 asked Mr. McCormick if he knew what he was going to say, and Mr. McCormick explained, "And fight for the Sharia fight when he tells me to fight, and stop when he tells me to stop." CHS-2 asked, "And to establish what?" Mr. McCormick answered, "An Islamic state, and then implement the Sharia." CHS-2 asked for the name of the Khalifa, and McCormick responded "Baghdadi." Mr. McCormick also practiced the bayat pledge. CHS-2 recorded Mr. McCormick making his bayat pledge on Mr. McCormick's phone. Mr. McCormick said, "I pledge allegiance to Abu Bakr Al-Baghdadi, I pledge allegiance to the Islamic State, to fight for the Sunna, the Sharia, and the Quran." At Mr. McCormick's request, CHS-2 then videotaped Mr. McCormick's second bayat pledge. Mr. McCormick stated, "I pledge allegiance to Abu-Bakr al-Baghdadi the Islamic State, and I will fight for the Quran, the Sunna and the Sharia. Allah willing." The video was then played back, and Mr. McCormick stated, "it doesn't sound good in English." He then asked CHS-2 to do the video again so he could do it "in my native language." CHS-2 then recorded another bayat video from Mr. McCormick's phone where Mr. McCormick stated, "Me pledge allegiance to Baghdadi,and me pledge allegiance to ISIL, ISIS, and me gonna go fight for the Quran, the Sunna and the Sharia." This video was done in Patois—Mr. McCormick's native language. Mr. McCormick sent CHS-2 the two bayat videos via the secure communications application. Mr. McCormick then stated, " when I fight, Allah willing, I want them to come close. Like I need them to be close, like – because like – uh - because … I – I need them, I need them to come close… Like as close as possible. I want them to know like who it is… Yeah, but I want them to like send their best people, like… And I want – and – and if they want to, I'll fight them one on one with a sword."

Later that evening, he sent a picture of his ticket confirmation to CHS-2 on the secure communications application. The picture showed the airline confirmation and included details for the airline ticket. Mr. McCormick intended to fly from Connecticut to Toronto, Canada, where he would travel on the following flights: (1) from Lester B. Pearson International Airport to Cairo International Airport on October 22, 2019 (EgyptAir Flight MS 996) and (2) from Cairo International Airport to Queen Alia International Airport (Amman, Jordan) on October 22, 2019 (EgyptAir Flight MS 719). Mr. McCormick paid $504.76 for the ticket and received a reservation number. The ticket was issued to "Kevin Mccormick" and listed the Mr. McCormack's contact information (telephone number and email account).

12. Two days later on October 21, 2019, at approximately 3:35 a.m. in early morning hours, Mr. McCormick left his residence and traveled in a car service from his residence to the train station in New Haven, Connecticut. At approximately 6:00 a.m., Mr. McCormick met up with CHS-1 and CHS-2. Then the CHSs and Mr. McCormick traveled from the train station to local small private airport. McCormick then got out of the car and walked toward a plane. After walking through a gate that separated the tarmac from any buildings and roads, he continued walking with CHS-1 towards a plane outside a hanger appearing to be in predeparture routines. As Mr. McCormick and CHS-1 approached the plane, law-enforcement officers arrested him.

13. At various times, Mr. McCormack watched videos on his phone related to ISIS and other terrorist organizations.

14. Mr. McCormick told a relative and others that he wanted to go to Syria, marry a Muslim woman, and be where real Muslims are.

This written stipulation is part of the plea agreement. The defendant and the Government reserve their right to present additional offense conduct and relevant conduct to the Court in connection with sentencing.

KEVIN IMAN McCORMICK
The Defendant

CHARLES F. WILLSON, ESQ.
ASSISTANT FEDERAL DEFENDER
Attorney for the Defendant

PETER S. JONGBLOED
ASSISTANT UNITED STATES ATTORNEY

JUSTIN SHER
JOHN CELLA
TRIAL ATTORNEYS
UNITED STATES DEPARTMENT OF JUSTICE