UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

—————————————————————————————

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 3:19-cr-263-KAD |
| v. | ) | |
| | ) | |
| KEVIN McCORMICK | ) | December 11, 2023 |

—————————————————————————————

## DEFENDANT'S SENTENCING MEMORANDUM

On October 12, 2019, Kevin McCormick tried to get on a plane bound for Jamaica. Mr. McCormick had cherished memories of his past times in Jamaica. His father lived there, and Mr. McCormick thought often about his father's waterfront property, including learning to spearfish and the peace that he felt there. At the time of his trip, his relationship with his father was uncertain, but he wanted to leave the United States.

In contrast to his feelings about Jamaica, Mr. McCormick's life was becoming increasingly unpeaceful. He had been fired from his job as a truck driver. What felt like a life filled with conflict with his mother was offering no refuge. His glory as a Gold Gloves boxer felt long behind him. Everyone could see that he was struggling to get on the right path, although no one knew the depths of his chaos in his life and thinking.

Mr. McCormick's mental health was free-falling. In 2015, 2016, and April, 2019, Mr. McCormick had experienced psychotic breaks and other conditions resulting in hospitalization. The last had yielded a diagnosis that included bipolar disorder and schizophrenia. Mr. McCormick struggled with the prescribed medications, experiencing acute dystonia (involuntary and sometime painful contractions of muscles due to antipsychotic medication) and Parkinsonism (a slowing of motor function due to

antipsychotic medication).  In July, 2019, he returned to the hospital due to a severe

reaction to his antipsychotic medication.  In the emergency department, he was again

diagnosed with acute dystonia and was provided with pain control. His previous

antipsychotic medication was discontinued and his medications changed yet again.

Mr. McCormick stopped taking his medications, fearing their unpredictable and

painful side effects.  He reduced his contact with family members.  As noted, he lost his

job and did not make a concentrated effort to obtain new employment.

To cope over the years, and to attempt to address other interests, Mr. McCormick

had been seeking direction within the Muslim faith, but that led to going deeper and

deeper into online information he irrationally perceived as supporting his developing

faith and isolating and obsessing over perceived elevated tenets of the faith.

 became one of his most salient obsessions, beginning as early as Spring,

2016.  In November, 2016, his mother called the police after ███████████████████

███████████████.  In April, 2019, he reported at the hospital ███████████████

███████████████████████████.  En route to getting fired, he stopped ███████████

███████████████████████████████████████, ███████████████████████████

██████.  The obsession with the topic continued, however.[1]

Returning to October 12, 2019, airport officials denied Mr. McCormick

permission to board his flight.  He had been red flagged by the Department of Homeland

Security, possibly due to online activity involving ISIS videos.  A confidential human

source ("CHS") working with law enforcement awaited to drive him back home from the

airport, posing as a ride-service driver.

---

[1] Mr. McCormick continued to raise the topic repeatedly following his arrest.

Nine days later, law enforcement arrested Mr. McCormick at a small, local airport, where he had been led to believe that he would board a flight to Toronto and then onto the Middle East. The first CHS had led to a second one, and the two fueled Mr. McCormick's grandiosity and his belief that he could fly over and fight for ISIS in Syria. During conversations, Mr. McCormick also talked about needing to get a lawyer to assist with his no-fly status, ████████████████████████████████████████ ███████████████ ), not sleeping, getting a gym membership, and █████████████ ████████████████████. The CHSs kept him on task, including watching ISIS videos together, discrediting an Iman who Mr. McCormick perceived as attempting to ground him and keep him peaceful, and gathering admissions from Mr. McCormick that could prove that he wanted to aid terrorists and would take steps to do so.

The CHSs presented no alternative. There was no opportunity to consult with a lawyer about obtaining removal from the no-fly list.[2] There was no concern about him ████████████████████████████████████. There were no questions about romantic relationships when Mr. McCormick raised wanting to find a wife. And there certainly was no willingness to get him to Jamaica so that he could have the opportunity to see his father and make his own decisions from there.

Had any detour been available, or even had he been left to his own devices, Mr. McCormick likely never would have made his way anywhere noteworthy. He did not have the capacity to create viable plans to travel to a conflict-zone without assistance.

---

[2] On October 16, 2019, Mr. McCormick made reference to getting a lawyer to help with his flying status. When CHS1 told him about CHS2 and possibly another person coming to meet them, and that CHS2 was Iraqi, Mr. McCormick responded by asking how he could fly and repeating that he could not fly, CHS1 assured that CHS2 had connections with a lot of people, indicating that Mr. McCormick's flying bar would not be a problem.

Except for external assistance, there is a low likelihood he would have engaged in action on his own.

> Although Mr. McCormick has the capacity to take specific steps, he does not have the capacity to organize and follow through with a plan that requires multiple steps. His level of cognitive disorganization, emotional dysregulation, distraction veers him off a path. Because of his psychiatric disorder and his personality, the informants provided more than information, they provided structure that maintained his focus and they rewarded him with their attention and direction. In my opinion, Mr. McCormick may have continued to talk about fighting for ISIS, perhaps with blustery language, but he would not have been able to translate that into a plan. He would have lost interest in that idea when another connection emerged.

Baranoski Evaluation, at 17.

Instead of traveling, he has spent more than four years in prison, often in high security status, whether due to the pandemic, his mental health needs, or both. Mr. McCormick endured a competency restoration states away and to some degree cut off from family and supporters, only to return with greater focus but also with slowed speech and a different sense of instability. He endured changes in medication, forcible injection, the threat of further injection, and the roller coaster of medication "management" trying to assess what would work, a process that he, at times, argued against due to the side effects and continuing uncertainty that that process fueled. Inconsistent contact with counselors fueled distrust of those asking him even simple questions, such as "How are you doing today?" and those doing the asking.

Finally, after returning to Garner CI midway through this year, he started to improve. As was prior to his arrest in 2019, his psychiatrist at Garner reports that "Mr. McCormick initially resisted most medication combinations because of concerns about side effects and weight gain." Later, in August, 2023, with his medication adjusted, his

4

psychiatrist indicated he had become "[p]olite, very friendly, not hypomanic and not pressured." By mid-September, he had improved significantly.

Mr. McCormick's progress continues. Family and others outside the prison setting also have observed this progress. They are having regular conversations with him about day-to-day life and current events, without the proclamations based on a faith, but including observations that are more broad and open-minded.

With the improvements to his mental health, the key going forward is to continue that improvement. Maintaining a psychotropic regimen is critical for Mr. McCormick's prognosis and risk management. Dr. Prabhu further advises that Mr. McCormick would benefit from a supervised residential setting with mental health-trained staff, medication support/supervision, psychoeducation, and rehabilitative groups where he can learn basic life skills and develop interpersonal and social skills. At the point of release from confinement, a step-down approach to a less structured community setting would be reasonable, possibly including a brief psychiatric inpatient hospitalization to facilitate residential discharge planning before a group or independent living arrangement.

A further prison sentence runs afoul of protecting the progress made and is not otherwise necessary. Although recommending more prison time, the Guidelines recommendation is inconsistent with 18 U.S.C. § 3553(a), unless the Court were to grant a significant departure arising from Mr. McCormick's mental health and other considerations. Departures and/or variances are necessary to counter the Guidelines' punishment emphasis, a policy approach with which many courts have disagreed.

Ending Mr. McCormick's time in prison does not mean simply releasing him to the community, however. To start, the Court has discretion to impose a lifetime term of

supervised release. If the Court deems that necessary, there is no objection to a term of that length.

There also is no objection to the Court continuing the sentencing date, or imposition of the sentence, so as to secure an interim step in Mr. McCormick's transition. The Federal Defender's Office is investigating whether a placement could be made with a mental health treatment facility. Alternatively, the Court could order that Mr. McCormick spend an initial period at the halfway house in Bloomfield. Akin to a period of probation, and assuming there is agreement from the Government, the Court could even release Mr. McCormick pursuant to a bond with the condition that he reside at the halfway house, giving Mr. McCormick time to transition while knowing that the Court has discretion to return him to prison for a lengthy term if he does not stay consistent with his treatment needs or otherwise commits a serious violation of conditions.

The greater point is that while the Court may view this case as one that needs to come to an end, and the age of the case certainly supports that view, the work to be done with Mr. McCormick still is at an early stage. His family has a greater appreciation now of where things could go and how important monitoring Mr. McCormick can be. More importantly, Mr. McCormick has a far deeper understanding of the impact of his mental health on his well-being and the community around him. Given the circumstances of this case, further prison time only is warranted to ensure placement in the next available bed, not for punishment or deterrence. Casting him back into the BOP actually may undermine ensuring the continuity of his treatment as he would transfer from one facility to another, with no certainty of treatment and, especially, medication continuity. Given the time already served, the minimal impact of his offense conduct, and that protecting

his mental health is the key to protecting the public, deterring future crimes, and promoting rehabilitation, a sentence other than more prison time should suffice.

## ARGUMENT

## I. THE BASIC SENTENCING FRAMEWORK

Under § 3553(a)'s "parsimony clause," it is the sentencing court's duty to "impose a sentence sufficient, but not greater than necessary to comply with the specific purposes set forth" at 18 U.S.C. § 3553(a)(2). *United States v. Dorvee*, 604 F.3d 84, 93 (2d Cir. May 11, 2010) (citation omitted). Title 18, United States Code § 3553(a) provides a litany of factors for the Court to consider in making its determination of a sufficient sentence, of which the following are the most pertinent here:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed –

    A. to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    B. to afford adequate deterrence to criminal conduct;

    C. to protect the public from further crimes of the defendant; and

    D. to provide the defendant with needed education or vocation training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentence available;

(4) the kinds of sentence and sentencing range established for –

    A. the applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines

    B. .    .    .    .

(5) any pertinent policy statement –

A.      issued by the Sentencing Commission . . .

(6)      the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; . . .

In *United States v. Crosby*, the Second Circuit set out the following analysis for approaching sentencing.

> First, the Guidelines are no longer mandatory. Second, the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a). Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range, or <u>at least identification of the arguably applicable ranges</u>, and consideration of applicable policy statements. Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether (i) to impose the sentence that would have been imposed under the Guidelines, i.e., a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence. Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

*Crosby*, 397 F.3d 103, 113 (2005) (emphasis added).

## II.    SEVERAL FACTS IMPACT THE APPLICATION OF THE 3553(a) FACTORS IN DETERMINING A SUFFICIENT SENTENCE.

### A.    <u>"[T]he nature and circumstances of the offense"</u>

The first sentencing factor, 18 U.S.C. § 3553(a)(1), can be broken into several components of significance here, starting with "the nature and circumstances of the offense." Mr. McCormick pled guilty to attempting to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1). There is no mandatory minimum prison term, and the maximum term is 20 years. The Court has discretion to impose a lifetime term of supervised release.

Mr. McCormick had a vision of going to Syria or elsewhere in that area to fight for ISIS. He had the idea of traveling to Jamaica and then possibly Trinidad in route to

Syria, but he had no arrangements beyond his ticket to Jamaica. He was not in contact with anyone in Syria or anywhere in that region. He was not sending money, running a website, or soliciting others to make the trip with him.

Unable to board his flight due to a DHS red flag, but before he could regroup and reconsider matters at home, the Government introduced CHS 1 to him, posing as a ride-service driver who took him from Bradley Airport back to his home in New Haven County. During the days that followed, that CHS and a second one -- introduced as a man who had the experiences that Mr. McCormick was groomed to undertake -- provided guidance and encouragement for Mr. McCormick to make the journey. They steered him towards making travel arrangements that they assured would get him there. They talked about fighting and dying for the cause. Mr. McCormick, a former Gold Gloves boxer who had been willing to put on a show for everyone since his youth, dove head-first into the pool that the CHSs filled with lies and redirection.

The relatively short window of activity ended abruptly on October 21, 2019, when Mr. McCormick was arrested at a local airport, believing that he was about to board a flight to Toronto. No acts of violence had been committed. No money and no information had been sent overseas to any organization. Mr. McCormick bought the plane ticket as he had been told, and he made a pledge with the CHSs' guidance. In just nine days, the key conduct was done, with the only bang coming from the flash grenades used to apprehend him.

Meanwhile, Mr. McCormick had stopped taking his medication that he needed to have some semblance of control over his schizophrenia and bi-polar disorder. Painful and unpredictable side effects from medication had landed him in an emergency room as

recently as July, and he had been hospitalized in April – his third hospitalization for mental health breakdowns. ████████████████████████████████

████████████████████████████████████████████████████████

████████████████, after having made strange comments at a firearms counter in a Walmart. This is the person who the CHSs helped commit the offense conduct.

**B.** **"[T]he history and characteristics of the defendant" Impact The Calculation Significantly.**

The second component of the first sentencing factor, 18 U.S.C. § 3553(a)(1), requires that the Court, to the extent possible, take a close examination of who the defendant is, apart from the conduct at issue in the case at hand. Several considerations impact the analysis here, with the most salient likely being Mr. McCormick's mental health, his upbringing, his community support, his employability, and his minimal criminal record.

> **1.** **Mr. McCormick's significant mental health needs impacted his involvement in the offense and likely are the most significant consideration in assessing the need for further incarceration, including the unsuitability of further punishment and the opportunity to reduce risk by means other than incarceration.**

- Based on the cognitive testing, Mr. McCormick meets criteria for schizoaffective behavior, bipolar type. He shows both psychosis and manic symptoms and both impair his cognitive function, problem solving, and judgment.

- His dependence is related to low self-esteem and fear of failure. It is also related to his inability to organize and follow-through without the guidance and direction of others. His dependence has been shaped by his significant psychotic and bipolar disorder that began at the end of high school and disrupted his attaining and sustaining adult independence.

- Obsessive characteristics are evident in Mr. McCormick's rigid thinking and reliance on ineffective strategies. █████████████████████████ ███████████████████████ and acceptance. These concerns are magnified when he is manic and experiences emotional

dyscontrol. The extent to which Mr. McCormick' personality characteristics influence his behavior is uncertain since at the time of the evaluation and at the time of his arrest, his mania and psychosis were the primary drivers of his behavior.

- Mr. McCormick meets criteria for schizoaffective disorder, bipolar type. This disorder and schizophrenia, his prior diagnosis, both reflect severe psychiatric disorders that impair rational thinking, judgment, and planning. Mr. McCormick also shows a significant mood disorder that meets criteria for Bipolar I, a disorder marked by episodes of mania.

- Mr. McCormick has a chronic psychiatric disorder that began near the end of high school, a usual time for the onset of a psychotic disorder. The bipolar disorder began earlier and was identified as attention deficit in high school. His successful academic achievement and stellar athletic performance in middle school and most of high school was disrupted by decline in school performance and impulsive behavior. Since high school, Mr. McCormick has foundered. He has not settled into a career, stable and independent living, and the formation of an intimate relationship. His greatest success was in boxing, but that came at a cost, and he did not continue.

- Mr. McCormick's cognitive strengths and weaknesses and his bipolar and psychotic disorder are related to his arrest. His strength in verbal expression and deficits in attention, concentration, and tangible problem-solving result in Mr. McCormick talking about more than he can do. Bipolar symptoms of grandiosity, expansive affect, pressured and over productive speech magnify the effect of "all talk and no action."  It is not that Mr. McCormick does not act; rather his action is disorganized, without follow-through, disrupted by impulsivity and disinhibition, and easily diverted.

The foregoing are excerpts from an evaluation of Mr. McCormick, by Dr. Madelon Baranoski of Yale's Law & Psychiatry Division, and a second one should be filed with the Court before sentencing.  The evaluations make clear what many have suspected.  Mr. McCormick's involvement in the offense was not grounded in rational thinking.  Though the offense involves a subject matter that is one of the most sacrosanct in the United States in the last 25 years, any concern here regarding ensuring that Mr. McCormick does not broach this conduct again is not justly resolved by a longer term of

incarceration, it is addressed by ensuring that he has the supports in place that he needs and is adequately supervised.

        **2.**        **Mr. McCormick's unstable, trauma-filled childhood also contributed to his engagement in the offense and present considerations that mitigate the need for a higher sentence.**

As discussed *infra* concerning the Guidelines, the courts and the experts have recognized that childhood experiences can impair a person's mental and emotional conditions to the point that this background contributes to the defendant's commission of the offense.[3] Studies inform that assessing someone is no longer just looking at a person's immediate circumstances and the decisions made in a particular moment.[4]

---

[3] *See*, *e.g., United States v. Rivera*, 192 F.3d 81, 84 (2d Cir. 1999); *see also United States v. Floyd*, 945 F.2d 1096 (9th Cir. 1991) (affirming departure from guideline range of 30 years to 17 years because of defendant's abandonment by his parents and lack of guidance as a youth, rendering defendant less culpable). Even without a finding that a defendant's mental or emotional conditions are impaired, courts have recognized that a defendant's tragic personal history may warrant a departure. *See United States v. Lopez*, 938 F.2d 1293, 1297-99 (D.C. Cir. 1991) (remanding for consideration of departure where defendant was exposed to significant violence as a youth, including his mother being murdered by his stepfather, and grew in slums).

[4]       Although genetic variability clearly plays a role in stress reactivity, early experiences and environmental influences can have considerable impact. Beginning as early as the prenatal period, both animal and human studies suggest that fetal exposure to maternal stress can influence later stress responsiveness. In animals, this effect has been demonstrated not only in the offspring of the studied pregnancy but also in subsequent generations. The precise biological mechanisms that explain these findings remain to be elucidated, but epigenetic modifications of DNA appear likely to play a role.

       Early postnatal experiences with adversity are also thought to affect future reactivity to stress, perhaps by altering the developing neural circuits controlling these neuroendocrine responses. Although much research remains to be performed in this area, there is a strong scientific consensus that the ecological context modulates the expression of one's genotype. It is as if experiences confer a "signature" on the genome to authorize certain characteristics and behaviors and to prohibit others. This concept underscores the need for greater understanding of how stress "gets under the skin," as well as the importance of determining what

Likewise, past assumptions that children will, in essence, "grow out of it" are not supportable.[5]

---

external and internal factors can be mobilized to prevent that embedding process or protect against the consequences of its activation.
Jack P. Shonkoff, MD, et al, *Technical Report, The Lifelong Effects of Early Childhood Adversity and Toxic Stress*, AMERICAN ACADEMY OF PEDIATRICS (2012), at e235 (emphasis added).

5      Within this same context, the health dimension of early childhood policy has focused largely on the traditional components of primary pediatric care, such as immunizations, early identification of sensory impairments and developmental delays, and the prompt diagnosis and treatment of medical problems. That said, as advances in the biomedical sciences have generated growing evidence linking biological disruptions associated with adverse childhood experiences (ACE) to greater risk for a variety of chronic diseases well into the adult years, the need to reconceptualize the health dimension of early childhood policy has become increasingly clear. Stated simply, the time has come to expand the public's understanding of brain development and shine a bright light on its relation to the early childhood roots of adult disease and to examine the compelling implications of this growing knowledge base for the future of pediatric practice.

The potential consequences of toxic stress in early childhood for the pathogenesis of adult disease are considerable. At the behavioral level, there is extensive evidence of a strong link between early adversity and a wide range of health-threatening behaviors. At the biological level, there is growing documentation of the extent to which both the cumulative burden of stress over time (eg, from chronic maltreatment) and the timing of specific environmental insults during sensitive developmental periods (e.g., from first trimester rubella or prenatal alcohol exposure) can create structural and functional disruptions that lead to a wide range of physical and mental illnesses later in adult life. A selective overview of this extensive scientific literature is provided below. The association between ACE and unhealthy adult lifestyles has been well documented. Adolescents with a history of multiple risk factors are more likely to initiate drinking alcohol at a younger age and are more likely to use alcohol as a means of coping with stress than for social reasons. The adoption of unhealthy lifestyles as a coping mechanism might also explain why higher ACE exposures are associated with tobacco use, illicit drug abuse, obesity, and promiscuity, as well as why the risk of pathologic gambling is increased in adults who were maltreated as children.

Adolescents and adults who manifest higher rates of risktaking behaviors are also more likely to have trouble maintaining supportive social networks and are at higher risk of school failure, gang membership, unemployment, poverty, homelessness, violent crime, incarceration, and becoming single parents.

Mr. McCormick presents at times with robust enthusiasm and optimism, but he also presents at times with what is more often seen in adults who, as children, suffered from abuse and neglect. See Allan V. Horwitz et al, *The Impact of Child Abuse and Neglect on Adult Mental Health: A Prospective Study*, J. HEALTH & SOCIAL BEHAV. (June 2001), at 184 (citation omitted) ("Few associations in the mental health literature are as well established as the relationship between child abuse and neglect and adverse psychological consequences among adults. Adults who report experiences of abuse and neglect as children, compared to those who do not, also report considerably higher rates of virtually every type of psychopathology, including depression, anxiety, drug and alcohol disorders, personality disorders, and generalized distress."). Mr. McCormick experienced abuse, both as a recipient and a witness. As demonstrated in the letters of support, Mr. McCormick found support outside the home, but a stable, secure life inside the home clearly was lacking.

The abuse and trauma to which he has been exposed will not be adequately addressed by more prison time. Instead, more prison time for Mr. McCormick is simply that – more prison time – plus the added risk of the prison system failing to meet his treatment needs. There are additional considerations beyond ensuring his medications are properly administered, including his need to address his history, including events in his childhood and as an adult, in therapy. While consistent, correct medication deserves

---

Furthermore, adults in this high-risk group who become parents themselves are less likely to be able to provide the kind of stable and supportive relationships that are needed to protect their children from the damages of toxic stress. This intergenerational cycle of significant adversity, with its predictable repetition of limited educational achievement and poor health, is mediated, at least in part, by the social inequalities and disrupted social networks that contribute to fragile families and parenting difficulties.

*See supra*, n.7 at e237.

significant credit for him recent improvement, so do the two Yale doctors who took the time to travel to Garner and meet with Mr. McCormick, often for well more than an hour. Building trusting relationships with professionals has yielded improvement, including in Mr. McCormick's relationships with DOC mental health staff.  The roots of many answers to the questions that Mr. McCormick has about his life likely lie, to at least some extent, in his childhood and later life experiences. [6]  More prison time may create temporal distance from those roots, but the issues presented here are not ones that time alone will conquer.

      **3.**      **Mr. McCormick has a network of support that has been awakened by these events.**

Outside his relationship with his parents, Mr. McCormick benefits from having a network of people who care about him.  Many of those people have submitted letters that are filed with the Court for consideration in determining Mr. McCormick's sentence. They recount his positive experiences, character traits, and actions.  They talk of a boy and then a man who seemingly is not the person who was arrested in October, 2019.  The

---

[6] The Sentencing Guidelines generally are dismissive of the concept of disadvantage youth being worthy of consideration in sentencing, see U.S.S.G. § 5H1.12, which serves as another discrete manner by which the poor are kept down.

> Decades of research continue to confirm the obvious; poverty is bad for children. As evidenced by a 2015 report from the Urban Institute, the more time children spend living in poverty, the worse their outcomes are across nearly every domain. Compared to their peers who are never poor, the nearly 40 percent of children who experience poverty at some point during their childhood fare worse in educational achievement and employment, teen births, and even involvement with the criminal justice system.  When we fail to alleviate generational poverty we prevent our children – and our society as a whole – from reaching their fullest potential.

Merrill Gay, *Child poverty in Connecticut hurts us all:  We have a system that requires people to work without allowing them to prosper*, CT Mɪʀʀᴏʀ, Apr. 8, 2019, available at https://ctmirror.org/category/ct-viewpoints/child-poverty-in-connecticut-hurts-us-all/.

person they knew before then and the person who they have witnessed change in prison, especially more recently, has their support now and in the future.

Perhaps most significant, a number of letters address the importance of supporting Mr. McCormick going forward, even if that means contacting law enforcement. They have worked in the past to help Mr. McCormick address his mental health needs. This case has been a lesson in what can happen when a person with a condition as serious an Mr. McCormick's is able to disconnect from the broader circles of support in their life. Mr. McCormick's circle has learned that lesson and is ready to tighten the circle around him, including contacting his treatment providers and even the police if needed.

4.      **Mr. McCormick has pro-social skills, including some education, a history of employment, employable skills, and a gregarious, curious nature that bodes well if steered in a positive direction.**

Not all is negative or unstable. With proper guidance and influence, Mr. McCormick has shown that he can accomplish so much. He won a boxing championship.[7] He obtained his CDL and drove trucks long distances.

His family and friends write about a gifted athlete, a person interested in the world, and concerned about the treatment of others. He seeks out friendship. Although he has had a number of tickets while in prison, he also makes efforts to talk with fellow inmates and corrections officers alike.

In short, Mr. McCormick has been and can be successful. He can have success again.

---

[7] Markeisha Ricks, *In Dixwell Gym, Eyes Open*, NEW HAVEN INDEPENDENT (Feb. 27, 2015) ("Kevin McCormick (pictured), for one, hopes the sport will take him far. The 21-year-old is this year's Western New England Golden Glove heavyweight champion."), available at In Dixwell Gym, Eyes Open | New Haven Independent.

**C.     The Goals And Purposes Of Sentencing Require Balancing All Factors And Not Just Focusing On Punishment and Deterrence.**

In 18 U.S.C. § 3553(a)(2), Congress set forth an array of policy goals to be implemented in sentencing.  First, this subsection lists "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  This factor requires that the Court consider punishment and other purposes that may favor longer prison terms, but with the overarching principle that the Court must not impose a prison term that is one day longer than necessary.

Mr. McCormick already has been punished.  He has been in custody his since his arrest in October, 2019.  His conditions of confinement have been exceptionally punitive due to the pandemic, his need for evaluation and restoration at Butner FMC, and his time in DOC settings, especially while having higher mental health scoring and as a federal detainee.

After he is released, he will remain under court supervision for a lengthy period, even as long as the remainder of his life.  Any violation can result in a return to prison for as much as two years.  While supervised release is intended to promote rehabilitation, there also are aspects that serve to deter, protect the public, and even punish.[8]

---

[8] As the Supreme Court explained in the context of probation, which is akin to supervised release,

> Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty.  *See United States v. Knights,* 534 U.S. 112, 119, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled' " (quoting *Griffin v. Wisconsin,* 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987); internal quotation marks omitted)).  Probationers may not leave the judicial district,  move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits

In satisfying the purpose of rehabilitation, the core issue is addressing his significant mental health needs. Those needs are better met outside the prison setting.[9] Meeting those needs also are the best course for protecting the public, deterring Mr. McCormick further, and reducing recidivism. If Mr. McCormick is healthy, his next trip outside the United States, hopefully, will be one to reunite with his father and work on that relationship.

to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. USSG § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court.

*Gall v. United States*, 552 U.S. 38, 48 (2007) (footnote omitted); *see also id.* at n. 4 (citing 1 N. Cohen, The Law of Probation and Parole § 7:9 (2d ed. 1999) ("[T]he probation or parole conditions imposed on an individual can have a significant impact on both that person and society .... Often these conditions comprehensively regulate significant facets of their day-to-day lives. . . ").

[9] Federal law acknowledges that prison is not really designed for rehabilitation. See 18 U.S.C. § 3582 ("The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation."); *see United States v. Pallowick*, 364 F. Supp. 2d 923 (E.D. Wisc. 2005) (departing from 70-87 months to 46 months where defendant was convicted of six armed bank robberies because, *inter alia*, lengthy incarceration would inhibit rehabilitation).

Indeed, prisons provide "a mismatch between what the client needs and what the systems are able to provide." *See* United States Sentencing Commission, *Symposium on Alternatives to Incarceration*, at 34 (2008). The best approach requires a broad framework of substance abuse counseling and treatment along with "job skill development, life skills training, [and] mental health assessment and treatment." Doug McVay, *et al.*, Justice Policy Institute Policy Report, *Treatment or Incarceration: National and State Findings on the Efficacy of Cost Savings of Drug Treatment Versus Imprisonment*, at 18 (2004). Indeed, while "the rate of recidivism is less for drug offenders who receive treatment while in prison or jail," it is "still less for those treated outside of a prison setting." *United States v. Perella*, 273 F. Supp. 2d 162, 164 (D. Mass. 2003) (citing Lisa Rosenblum, *Mandating Effective Treatment for Drug Offenders,* 53 HASTINGS L.J. 1217, 1220 (2002)); *see* Elizabeth Drake, *et al.*, *Washington State Institute of Public Policy, Evidence-Based Public Policy Options to Reduce Crime and Criminal Justice Costs: Implications in Washington State* (2009) (treatment-oriented programs under supervision reduce recidivism by 17.9%; community drug treatment reduces recidivism by 8.3%; prison drug treatment reduces recidivism by 6.4%).

**D.    In Considering 18 U.S.C. 3553(a)(4), The Court Should Not Be Influenced By The Guidelines Range Advised in the PSR.**

As detailed below, the applicable Guidelines calculations and resulting range also are unreliable advice in determining a sentence that is sufficient, but not greater than necessary. The sentencing guidelines range in this case initially results in 360 months to life, but the statutory maximum is 20 years. Consequently, and providing no real recognition for pleading guilty, 240 months becomes the operative sentencing guidelines range. The guidelines reach that preliminary range due to the 12-level enhancement found in U.S.S.G. § 3A1.4, and the criminal history category boost to VI.

These enhancements operate much like the career offender guideline. They inflate both a defendant's offense level and criminal history score, but do so without any basis in empirical research or other data and, unlike career offenders, with no requirement of a prior conviction of any gravity. These deficits in reason or rationality render the advice unreliable and inconsistent with any purpose of sentencing other than punishment. The Court, therefore, has broad discretion to depart or vary. *See, e.g., United States v. Stewart,* 590 F.3d 93, 154 (2d Cir. 2009) (Calabresi, J., concurring) ("When a Guidelines recommendation has such dramatic consequences and yet covers a multitude of sins, unusually broad sentencing discretion in the district court is essential.").

If the Court seeks to cabin the analysis of sentencing to the Guidelines, significant departures or variances are warranted.[10] Mr. McCormick's untreated mental health needs

---

[10] The JSIN numbers provided likely evidence a consistent rejection of the Guidelines calculation providing a sentencing recommendation that is consistent with the parsimony clause. That said, while the JSIN information provided is not disputed for its accuracy, see PSR, ¶¶ 108-09, the broad numbers likely do not recognize factors present here or, if they do, to the degree present here. Cases from across the country indicate that the sentences can be roughly the same or even can be lower than the time already served by

clearly played a significant role in his conduct, and his progress, especially more recently, constitutes significant – if not extraordinary – rehabilitation.  Mr. McCormick also has strong family support and other favorable considerations that weigh against the Court using the Guideline recommendation resulting from solely his offense level and the automatic Category VI.

---

Mr. McCormick, which is years below the average and median sentences noted. As of the December 21st sentencing, Mr. McCormick will already have served 50 months.  When good conduct time of 54 days per year is considered, his 50 months served is roughly equivalent to a sentence of 58 months.  Here are points of comparison.

- *Mohammed Khan*, 14-cr-564 (N.D. Ill.) – 40 months.  Khan, who was actually recruited by ISIS and had direct contact with the organization, was arrested boarding a flight to Turkey to join ISIS.
- *Akba Jordan*, 14-cr-58 (E.D.N.C.) – 18 months.  Jordan provided weapons training to Avin Brown and told an FBI informant that he wished to fight nonbelievers both in America and overseas. When police searched his home, they found a bulletproof vest, an AK-47, swords, and other weapons.
- *Abdullahi Yusuf*, 15-cr-46 (D. Minn.) – Time served (approx. 12 mos.).  Yusuf planned to travel overseas to support ISIS.
- *Darren Jackson & Dayne Christian*, 16-cr-80107 (S.D. Fla) – 63 months.  Both provided weapons training to Gregory Hubbard and an FBI informant who planned on travelling to Syria to join ISIS.
- *Islam Natsheh*, 16-cr-166 (N.D. Cal.) – 60 months.  Natsheh came to FBI's attention sharing ISIS propaganda online. He was interviewed, and claimed he no longer had those views. The FBI discovered that he had purchased a plane ticket to Turkey and police arrested him in San Francisco as he was boarding a plane to Turkey.
- *Asher Khan*, 15-cr-263 (S.D. Tex.) – 18 months.  Attempted to travel to Syria to join ISIS. Khan actually travelled to Turkey but returned to the United States before crossing into Syria.
- *Daniela Greene*, 14-cr-230 (D.C.) – 24 months.  Greene was an FBI linguist assigned to investigate Denis Cuspert, a German rapper who became a recruiter for ISIS. Greene flew to Turkey and then went to Syria, where she married Cuspert. Regretting her decision, she returned to the United States.
- *Shannon Conley*, 14-cr-163 (D. Colo.) -- 48 months.  Conley planned to travel to Syria to work as a nurse in an ISIS camp. She was arrested after boarding a plane to Turkey on her way to Syria.

### 1.    The Offense Level calculation is correct but offers unreliable advice that is inconsistent with Section 3553(a).

U.S.S.G. § 3A1.4 is not a product of the Commission's traditional role.  For example, Section 3A1.4 fails to discern among the conduct committed.  The 12-level increase applies alike in cases where there was actual violence resulting in death and in cases where there were only non-violent actions.  Likewise, the Guidelines treats a person who collects $1000 for a terrorist organization but has no contact with the organization the same as someone who maintained direct and continuing contact with a high-ranking member of a that organization and offered the use of his house as a haven for the organization's fighters and to store bombs and other weapons.

Mr. McCormick clearly is not a member of that latter group or any group comparable.  He had no actual contact with a terrorist group.  Without help from the CHSs, he likely could not even have reached an airport gate for a plane bound for another continent.  His delusions of grandeur and bold talk were driven by his mental health shortfalls and his handlers, two CHSs working for law enforcement.  That his conduct warrants the same skyrocketing offense level increase as the person who gets on the plane, reaches the destination, and fires a weapon, or who sits at a computer and sends secret information or financial support, is illogical and unsupportable.[11]  *See Gall v. United States*, 552 U.S. 38, 55 (2007) (affirming sentence where "it is perfectly clear that the District Judge considered the need to avoid unwarranted disparities, but also considered the need to avoid unwarranted *similarities* among other co-conspirators who

---

[11] By comparison, offense level increases for egregious conduct in other areas of the Guidelines are not nearly as high, including where a firearm is used in furtherance of a dangerous felony or where a child predator has sexual contact with a child of pre-school age.

were not similarly situated"). The calculation here, therefore, would only serve to perpetuate the problem that occurs where "adherence to the Guidelines results in virtually no distinction between sentences for the most dangerous offenders" and someone like Mr. McCormick who did not commit any violent criminal acts or do anything on his own warranting the consequences the Guidelines *advise.*" *United States v. Dorvee*, 616 F.3d at 174, 187 (2010). Accordingly, the Court should depart or vary here.

>    **2.    The Criminal History Category also does not reflect anything other than a pro-punishment outcome.**

The Criminal History Category determination is likewise flawed, further contributing to the virtual certainty of a Guidelines range above the statutory maximum penalty and causing the Guidelines to grossly misrepresent who defendants are, their degree of threat to society, and their amenability to deterrence from having had contact with the criminal justice system. The Guidelines direct that the criminal history category is increased to VI even if the instant case represents the first time that the defendant has been arrested for anything. Clearly this jump does not comport with judicial guidance on incremental punishment or consideration of first-time offenders.

The Guidelines provide an avenue to address this issue. See *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) ("[a] judge determining that § 3A1.4(b) over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' always has the discretion under § 4A1.3 to depart downward in sentencing."). The Court may depart downward in the circumstances that exist here: "[R]eliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes[.]" USSG § 4A1.3(b)(1).

The Guidelines were created in part to bring "proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity." U.S.S.G. Ch. 1, Pt. A. That goal is not met here. The Court should, therefore, vary from the Guidelines range calculated in the PSR.

> ### 3. The impact of Mr. McCormick's mental health on his participation on the offense and the need to ensure proper treatment going forward warrant a significant departure or variance.

Sentencing Guideline § 5H1.3 states that "[m]ental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines." Mr. McCormick's mental condition distinguishes this case from a typical case covered by the Guidelines and provides a factual basis for granting a downward departure. As discussed in Dr. Baranoski's report, Mr. McCormick lives with significant disorders that contributed to his involvement in the offense conduct. His conditions and their impact on his participation in the offense are not the typical case covered by the guidelines. The Court should recognize these circumstances with a significant departure, assuming that the Court seeks to impose a Guidelines sentence.

> ### 4. Other considerations inadequately addressed by the Guidelines also collectively further warrant a departure or variance.

Under 5K2.0, the Court has further discretion to depart to recognize factors not otherwise adequately recognized, whether individually or in combination. The Court's discretion to do so arguably is even more broad here due to the presumptively above-maximum ranges compelled by the offense level and criminal history calculations

discussed above.  These enhancements, especially the jump to Category VI, indicate that this offense in particular does not account for aspects of a person's history and characteristics.  To address this defect and its conflict with the factors set forth in 18 U.S.C. § 3553(a), including the parsimony clause, the Court should employ greater discretion, which 5K2.0 affords.

In so doing, the Court should recognize the commitment of Mr. McCormick's supporters, as evident in the letters submitted with this memorandum.  Family members have agreed to serve as an additional set of eyes and contact law enforcement, if necessary.  They have seen that Mr. McCormick's mental health needs require support beyond his immediate family.  They recognize the need to work with resources in the community and are looking forward to having contact information for Mr. McCormick's supervising probation officer.

The Court should recognize that with adherence to treatment in place, Mr. McCormick has the potential to be law-abiding and contribute to his society.  He has a high school education, has obtained training (CDL), and worked full time.  He has come to recognize that maintaining physical activity is a critical part of his life and ensuring his overall well-being.  If given the opportunity, he would make an excellent coach, whether that is in boxing, baseball, or virtually any area where his enthusiasm and positivity can help others.

At the core, though, clearly is the need for ongoing treatment and medication.  The Sentencing Guidelines note that "in certain cases a downward departure may be appropriate to accomplish a specific treatment purpose." USSG § 5H1.4.  Rather than pile on more punishment and risk that Mr. McCormick's medication regimen is delayed while

in transit or adjusted out of a facility's convenience, the Court should impose a sentence in a manner that maximizes continuity.

4.      **Mr. McCormick's objects to the late recommendation that the Court deny acceptance of responsibility.**

The second disclosure of the PSR recommends denial of acceptance of responsibility on two grounds, Mr. McCormick's arrest for allegedly assaulting a DOC corrections officer and the contents of a letter he previously addressed to the Court. The PSR's assumption of guilt about Mr. McCormick's arrest in May appears to arise exclusively from a police report. See PSR, ¶ 45. Video footage from the event depicts Mr. McCormick backing away from the aggressor, a corrections officer, who then punches Mr. McCormick in the head. The officer then appears to attempt to punch Mr. McCormick again, before Mr. McCormick has taken so much as one swing. The PSR, therefore, fails to accurately report the event and the pending charge, for which Mr. McCormick remains presumed innocent. That arrest should not serve as the basis for a denial of acceptance.

At least two points undermine the conclusion that acceptance is not warranted by the letter. First, Mr. McCormick's mental health in February was unstable. He was undergoing medication changes, eventually leading to his transfer to the Administrative Segregation unit at Walker Correctional in May, 2023. In his mental health assessment prior to his disciplinary review for the assault, a clinician concluded, "He has not been compliant with psychiatric medication since January and this has been discussed with him. Treating staff at [Garner] were consulted about possible decompensation while not taking medication but their determination was that his presentation is primarily due to a personality disorder and medication did not make a significant difference." His

medication compliance rate was only 2%. The PSR's view on the significance of the February letter does not account for the foregoing.

Nor does the PSR's view account for the influence of the CHSs on Mr. McCormick's conduct, including buying an airline ticket, making a video pledge, and going to the airport that morning. Mr. McCormick pled guilty, but that does not equate with absolving the CHSs of their influence in the situation. Similarly, Mr. McCormick need not forgo arguments that people working with law enforcement created this scenario between meeting Mr. McCormick on October 12 and arresting him on October 21, 2019.

In the end, given the approach of the Guidelines to this offense as discussed above, acceptance does little to make the Guidelines somehow more reasonable. The additional three level reduction would bring his total offense level to 37. A total offense level of 37 in Category VI still produces a range of 360-life.

## CONCLUSION

Mr. McCormick's time in prison should come to an end. Further punishment is not warranted, and imposing a term that causes him to transfer to the BOP only serves to risk the progress that has been made. More prison time for someone with Mr. McCormick's mental health needs and having been in the midst of a breakdown at the time of the offense does not promote respect for the law or serve to deter anyone.

That said, Mr. McCormick does not expect to walk out of the courthouse on December 21, 2023. He has no objection if the Court needs him to wait for the Probation Office to secure a halfway house placement and for the U.S. Marshal's Service and the Probation Office to work with Garner CI's discharge planner to make certain that Mr. McCormick makes a smooth transition with the necessary medications in place.

Alternatively, Mr. McCormick understands that the Court may want the Federal Defender's Office to have more time to determine whether a temporary placement in a treatment facility is possible before Mr. McCormick is fully returned to the community.

The parsimony clause requires that the Court impose the sentence that is sufficient but not greater than necessary. To do so and meet all the purposes of sentencing, this case requires focusing on Mr. McCormick's mental health, especially since he already has served multiple years in prison in extremely difficult conditions. More prison time only would serve to elevate punishment about all other considerations, which would be unjust in the circumstances presented here.

Respectfully submitted,
Kevin McCormick

/s/Charles F. Willson/s/_____
By Charles F. Willson (# ct24129)
FEDERAL PUBLIC DEFENDER'S OFFICE
10 Columbus Boulevard, 6th Floor
Hartford, CT 06106
Tel:    (860) 493-6260
Fax:    (860) 493-6269
email: Charles_Willson@fd.org



## CERTIFICATE OF SERVICE

This is to certify that on December 11, 2023, a copy of the foregoing was filed electronically via the Court's CM/ECF system, and by that system, counsel for the Government has been provided with a copy of the foregoing.

/s/Charles F. Willson/s/_____ ____
Charles F. Willson