UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No.  3:19-cr-263 (KAD) |
| | : | |
| v. | : | |
| | : | |
| KEVIN IMAN MCCORMICK | : | December 18, 2023 |

## UNITED STATES'S SENTENCING MEMORANDUM

The United States of America (the "Government") respectfully submits this memorandum in aid of sentencing in the above-captioned case.

## I.     INTRODUCTION

From late August 2019 through October 2019, the defendant, Kevin Iman McCormick, knowingly attempted to provide material support and resources, namely himself, as personnel, to the Islamic State of Iraq and al-Sham ("ISIS"), a designated foreign terrorist organization. Mr. McCormick pledged his allegiance to ISIS, boasted about fighting and killing for ISIS, and then attempted to board a plane to travel from Connecticut, to Toronto, and on to the Middle East to fight for ISIS. He was arrested before boarding the plane. This was not his first attempt to travel to fight for ISIS. He had previously traveled to Jamaica to find help getting to the Middle East, and less than two weeks before his arrest, he attempted another trip to Jamaica with plans to travel onward to the Middle East to fight for ISIS, but he was prevented from boarding at the airport by the Department of Homeland Security ("DHS"). And it was clear that Mr. McCormick was contemplating carrying out violent, armed attacks during this same period. Indeed, less than a month before his first attempt to travel to the Middle East, he had attempted to purchase a firearm and high-capacity magazines, telling a Walmart sales employee that he had "multiple targets."

As the agreed Guidelines calculation in this case reflects, "terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal, and thus that terrorists *and their supporters* should be incapacitated for a longer period of time." *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) (emphasis added). "[E]ven terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *Id.* These principles should also guide the application of the 3553(a) factors in determining the sentence to be imposed in this case.

The Government recognizes that Mr. McCormick has some significant mental health issues, which the Court will need to consider, and as the defendant argues, Mr. McCormick does not have a significant criminal history. This, however, does not make his conduct any less serious or make him any less of a danger to the public. In fact, his mental health conditions—and his history of refusal to take prescribed medication for those conditions—makes him more of a danger. Mr. McCormick was determined to fight for ISIS and had taken steps to travel to ISIS-held territory in the Middle East and acquire a firearm while still in the United States. But for the intervention of law enforcement, he may have succeeded. While in custody, he has had numerous infractions, including for physical violence. In a February 2023 letter to the Court—after nearly three and a half years in custody and just weeks after his guilty plea—he referred to himself as the "Mujahideen"[1] and claimed the charges against him were falsified. In addition, he does not fully appreciate his own mental health issues. In fact, just a few months ago, in August 2023, during his

---

[1] In the context in which Mr. McCormick used the term, "mujahideen" means "Muslim guerilla warriors engaged in a jihad." *See United States v. Mehanna*, 735 F.3d 32, 46 (1st Cir. 2013), citing The American Heritage Dictionary of the English Language 1153 (4th ed. 2000). As indicated below, Mr. McCormick also used the term "jihad" in a context indicating that he was referring to engaging in violence as part of "a struggle against the enemies of Islam." *See United States v. Stewart*, 590 F.3d 93, 101 (2d Cir. 2009); *United States v. Abu-Jihaad*, 630 F.3d 102, 109 n.1 (2d Cir. 2010) (defining "jihad" as "a religious war of Muslims against unbelievers in Islam…" when "the concept has been invoked to support terrorist acts against the United States.").

psychological evaluation sessions, he repeatedly stated he was not mentally ill and did not need medication, despite professional medical diagnoses to the contrary. All of these facts together portray a defendant, who, after 50 months of pre-trial incarceration, has not disavowed his conduct or renounced his support of ISIS, poses a significant risk of recidivism, and remains a danger to the public.

Accordingly, the Government believes a Guidelines sentence of 20 years of imprisonment, followed by a life term of supervised release, is warranted in this case. The Government does not make this recommendation lightly, but as explained more fully below, the Government believes this sentence is appropriate and necessary after consideration of the 3553(a) factors.

## II.  FACTUAL BACKGROUND

The Government agrees with the description of the relevant conduct set forth in the Pre-Sentence Report ("PSR"). PSR ¶¶ 6-21. In summary, starting in late summer of 2019 and continuing to his arrest in October 2019, Mr. McCormick—who was 26 years old at the time—knowingly attempted to provide material support and resources to ISIS, a designated foreign terrorist organization. *Id.* Specifically, Mr. McCormick planned to travel to the Middle East to fight for ISIS. At the time, Mr. McCormick knew that ISIS was engaging in terrorist activity and terrorism. PSR ¶ 7.

Based on reports from other individuals, Mr. McCormick had voiced his support for ISIS going back to at least August 2019. PSR ¶ 8. For example, on August 24, 2019, members of the local Muslim community center in another state reported that Mr. McCormick said, "we should support ISIS" and "Jihad is the way to go." *Id.* Then, on September 1, 2019, Mr. McCormick reportedly spoke with a person at an Islamic center in Utah and expressed his desire to travel to the Middle East to "fight for the sake of Allah." *Id.*

Around this time, Mr. McCormick's public Facebook page contained ISIS-related videos and alarming posts regarding Islamic leanings. PSR ¶ 9. Mr. McCormick was also watching videos on his phone related to ISIS and other terrorist organizations. *Id.*

By mid-September 2019, Mr. McCormick was looking to buy a firearm and high-capacity magazines. PSR ¶ 10. On September 15, 2019, he entered a Walmart store in the state of Washington and asked to view several firearms. *Id.* He inquired about the stopping power of high-capacity magazines and an AK-47, and he told a store employee, "I will have multiple targets" and "I can see myself shooting someone with this." *Id.* He did not purchase the firearm or any ammunition from the Walmart that day. *Id.* But his public Facebook page on September 4, 2019, did contain videos of Mr. McCormick shooting what appeared to be a Glock pistol at a firearms range in Washington. PSR ¶ 9.

In October 2019, Mr. McCormick attempted to travel outside the United States on two occasions with plans to go to the Middle East to fight for ISIS. First, on October 12, 2019, he went to the Bradley International Airport in Hartford and attempted to board a flight to Jamaica, where he was born and had family. PSR ¶ 11. He was flagged and prevented from boarding by the Department of Homeland Security. *Id.* In later conversations on October 18 and 19, 2019, with two individuals (who unbeknownst to Mr. McCormick were confidential human sources), Mr. McCormick confirmed that his plan had been to travel to Jamaica and then onward to the Middle East to join ISIS. PSR ¶¶ 11, 17. He told one source multiple times that he felt like he wanted to kill people, including people from DHS. PSR ¶ 11. He told the second source that he had traveled to Jamaica in the past and had sought to find someone to help him get to a Muslim country because "I gotta fight bro." PSR ¶ 13. He told the source he knew of two individuals in Jamaica and Trinidad who "believe[] in jihad too." *Id.*

Mr. McCormick continued talking to that second source about going to the Middle East to fight for ISIS. He stated, "I've been ready for quite a long time now" and "I can feel it, in my heart. So, it's my time to fight." *Id.* He stated, "I know that they need my help bro. I know I need to go over there, and if I die thanks to Allah like, whatever bro. It's not like - it's not like the end of the world." *Id.* He told the source he wanted to go to "whatever place I can get there the fastest, the quickest, the easiest, and where I can have a rifle and I can have some people." PSR ¶ 14. He talked about "[k]illing someone for Allah" with a gun and explained "I could just 'pah!' And kill someone, it's so easy." *Id.* He also told the source that Abu Musa, a known ISIS member, was his hero. *Id.*

On October 19, 2019, Mr. McCormick told the second source that he was ready to purchase a plane ticket to the Middle East, and after Mr. McCormick brought up the airline website, the source showed him how to search for a ticket. PSR ¶ 17. Then, with the second source's assistance, Mr. McCormick made three videos (two in English and one in his native language of Patois) pledging his allegiance to ISIS and its then-leader, Abu Bakr Al-Baghdadi, and expressing his desire to fight in the name of ISIS's extremist Islamic ideology. PSR ¶ 19.

That evening, Mr. McCormick purchased an airline ticket to travel on October 21, 2019, from Connecticut, to Toronto, and then onward to Jordan. PSR ¶ 20. On the morning of October 21, Mr. McCormick met the two sources and they traveled together to a small private airport. PSR ¶ 21. As Mr. McCormick approached the plane, he was arrested by law enforcement. *Id.*

# III. PROCEDURAL BACKGROUND AND PRE-SENTENCE REPORT

On October 21, 2019, Mr. McCormick was arrested on a federal criminal complaint charging him with attempting to provide material support and resources to a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1). Doc. No. 1. On October 30, 2019, a federal grand jury in Connecticut returned a one-count indictment charging Mr. McCormick with the same offense. Doc. No. 15. Mr. McCormick has been detained since his arrest.

After the indictment was returned, Mr. McCormick underwent a competency evaluation and was found incompetent to stand trial. His competency was subsequently restored at the Bureau of Prisons. Doc No. 135.

On January 12, 2023, Mr. McCormick entered a plea of guilty to the one-count indictment. He faces the following maximum penalties: a term of imprisonment of 20 years, a life term of supervised release, a $250,000 fine, and a $100 mandatory special assessment. In the plea agreement, Mr. McCormick agreed to waive his right to appeal any sentence that does not exceed 20 years of imprisonment. *See* Plea Agreement at 7; PSR ¶ 114. He also agreed that his offense involved, or was intended to promote, a federal crime of terrorism and that the application of the Guidelines resulted in an adjusted offense level and Criminal History Category pursuant to U.S.S.G. § 3A1.4(a) & (b). *See* Plea Agreement at 5. He also agreed to forfeit his interest in certain items listed in the plea agreement.[2] *See* Plea Agreement at 3; PSR ¶¶ 114, 125.

The PSR calculated Mr. McCormick's offense level and Criminal History Category under the Federal Sentencing Guidelines as follows, *see* PSR ¶¶ 27-36: The defendant's base offense level under U.S.S.G. § 2M5.3(a) is 26. Two levels are added under U.S.S.G. § 2M5.3(b)(1). The PSR included the application of U.S.S.G. § 3A1.4, which added 12 offense levels and

---

[2] The Government filed a separate motion for forfeiture of these items on February 26, 2023. Doc. No. 164.

automatically placed him in Criminal History Category VI. As a result, the PSR concluded that Mr. McCormick faces a total offense level of 40, which results in a Guidelines range of 360 months to life imprisonment, but because of the statutory maximum, the Guidelines range becomes 20 years (or 240 months) of imprisonment. *Id.*; PSR ¶ 108. He also faces a Guidelines fine range of $50,000 to $250,000, and a Guidelines term of supervised release of 1 year to life. PSR ¶¶ 116, 121.

The total offense level calculated in the PSR differs from the total offense level the parties calculated in the plea agreement because the PSR does not recommend a three-level reduction under U.S.S.G. § 3E1.1 for acceptance of responsibility. PSR ¶¶ 24-26, 35, 112. As noted in the PSR, following his guilty plea, Mr. McCormick was arrested on May 8, 2023, for first-degree assault of a Connecticut Department of Corrections Officer while in custody where he was being housed. PSR ¶ 45. In addition, on February 21, 2023—just three weeks after his guilty plea—the Court received a letter from Mr. McCormick in which he stated that his instant federal offense was a "setup" and the charges were "falsified." PSR ¶ 25. In light of these facts, the PSR does not recommend the three-level reduction for acceptance of responsibility. In the plea agreement, the parties had included the three-level reduction, resulting in a total offense level of 37. Plea Agreement at 5; PSR ¶ 112. However, the resulting Guidelines range in both the PSR and the Plea Agreement remains the same: 360 months to life, which by operation of the statutory maximum sentence, results in a Guidelines range of 20 years of imprisonment.

At this time, the Government still recommends the three-level reduction for acceptance of responsibility. While the Government agrees that any new criminal conduct following a guilty plea and before sentencing is a valid basis for declining to recommend acceptance of responsibility, the assault charges here are still pending in state court and remain unresolved. As such, the

Government does not intend to use his pending charges as basis to withhold points for acceptance of responsibility.

Mr. McCormick's letter to the Court presents a closer call. By claiming the charges were falsified, Mr. McCormick appears to be taking a position inconsistent with acceptance of responsibility. However, Mr. McCormick wrote that letter several months ago, well before the upcoming sentencing hearing. His counsel indicates he was not compliant with his medications at the time. Mr. McCormick has not repeated his claim since then, and he appears ready to proceed to sentencing. Accordingly, while the letter should be considered in the Court's analysis of the 3553(a) factors, unless Mr. McCormick reiterates those claims at sentencing, or otherwise takes a position at the hearing that is inconsistent with acceptance of responsibility, the Government intends to recommend the three-level reduction for acceptance of responsibility, as set forth in the plea agreement.

The Government notes that regardless of whether the three levels for acceptance of responsibility are awarded or not awarded, the resulting Guidelines range is the same in either case: 20 years of imprisonment.

## IV.     DISCUSSION OF SENTENCING AND 3553(a) FACTORS

As noted above, the Government respectfully requests that the Court impose a Guidelines sentence of 20 years (or 240 months) of imprisonment and a life term of supervised release. Such a sentence reflects the nature, circumstances, and seriousness of the offense, promotes respect for the law, and provides just punishment for the offense, while also protecting the public and affording adequate deterrence to future criminal conduct, and it will take into account Mr. McCormick's history and characteristics, including his mental health issues, and any mitigating circumstances. *See* 18 U.S.C. § 3553(a).

A.    **The Sentencing Guidelines**

In the plea agreement, the parties agreed that the Guidelines calculation included application of U.S.S.G. § 3A1.4, resulting in a Guidelines range of 20 years. *See* Plea Agreement at 5.

Notwithstanding Mr. McCormick's agreement that the application of U.S.S.G. § 3A1.4 is technically correct, he argues that the Guidelines are unreliable and asks the Court to depart or vary downward because, in his view, U.S.S.G. § 3A1.4, is flawed and inconsistent with the purposes of sentencing. *See* Def.'s Mem. at 19-23. Mr. McCormick's arguments are without merit.

U.S.S.G. § 3A1.4 is not unreliable or flawed. The Second Circuit has considered the reasoning behind U.S.S.G. § 3A1.4 and has held that "Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) ("the Guidelines are in no way irrational in setting the default for criminal history at a very high level, with downward departures permitted in exceptional cases."). This is true even if a defendant could not ultimately achieve his goal of fighting for ISIS abroad. As the Second Circuit more recently explained:

> We conclude by underscoring that the Guidelines, while only advisory appropriately reflect Congress's considered judgment that terrorism is different from other crimes. Terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal. Moreover, when it comes to sentencing terrorism, Congress and the United States Sentencing Commission plainly intended for the punishment of crimes of terrorism to be significantly enhanced without regard to whether, due to events beyond the defendant's control, the defendant's conduct failed to achieve its intended deadly consequences. Thus, in determining what constitutes a sufficient sentence for a terrorist defendant whose conduct did not result in death or physical injury, a sentence at the high end of the applicable range may plainly be reasonable if supported by the balance of § 3553(a) factors.

*United States v. Mumuni Saleh*, 946 F.3d 97, 112–13 (2d Cir. 2019) (internal quotations, citations, and alterations omitted).

Here, although Mr. McCormick has only one other offense in his criminal history, his desire to fight for a violent foreign terrorist organization and kill people, and his multiple attempts to travel to the Middle East to carry out that desire, show that he poses a grave threat. Moreover, he has never disavowed or renounced his support for ISIS, and his more recent post-guilty plea statements referring to himself as the "Mujahideen" and that the charges against him were falsified, show that he has not been rehabilitated. And while the letters of support accompanying his sentencing memorandum describe a person who has changed since he began medication for his mental health illnesses, in his recent August 2023 sessions with Dr. Baranoski for his psychological evaluation, he claimed he is not mentally ill and does not need medication. *See* Doc. No. 194 at 8, 10, 13 (Report of Dr. Madelon Baranoski, PhD, dated Dec. 11, 2023 ("Baranoski Report")). Dr. Prabhu, who prepared a psychiatric evaluation of Mr. McCormick, further noted Mr. McCormick's reluctance to remain on medication since being in custody, described many instances where he had to be involuntary medicated by prison doctors, and observed that Mr. McCormick "continues to have limited insight into having a serious mental illness." See Doc. No. 199-1 at 14-20, 23, 33 (Report of Dr. Maya Prabhu, MD, LLC, dated Dec. 16, 2023 ("Prabhu Report")). Those facts, coupled with his numerous infractions while incarcerated, demonstrate a significant risk of future criminal conduct. Consistent with the Second Circuit's guidance, a Guidelines sentence consistent with the application of U.S.S.G. § 3A1.4 is appropriate here given "the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *Meskini*, 319 F.3d at 92. Moreover, as explained below, a Guidelines sentence in this case is "supported by the balance of § 3553(a) factors." *See Mumuni Saleh*, 946 F.3d at 113.

**B.** **The 3553(a) Factors**

1. Nature and Circumstances of the Offense

The nature and circumstances of Mr. McCormick's offense are extremely serious and alarming. He pledged his allegiance to ISIS, a foreign terrorist organization that has carried out thousands of attacks and killed thousands of people. *See* Annex of Statistical Information Country Reports on Terrorism 2021, Development Services Group, Inc. for U.S. Department of State (Sep. 30, 2022), *available at* https://www.state.gov/wp-content/uploads/2023/02/2021_Statistical_Annex_Final-508-compliant.pdf (last visited Dec. 16, 2023). Mr. McCormick was determined to fight for ISIS, expressed a desire to kill people to further its cause, and attempted to travel to the Middle East to carry out his plans at least two times. The seriousness of Mr. McCormick's offense could not be more serious, short of him succeeding with his plan and actually fighting for ISIS. The nature of the offense alone warrants a significant sentence of imprisonment. *See Meskini*, 319 F.3d at 92.

In his sentencing memorandum, Mr. McCormick accuses law enforcement of creating the scenario that led to his arrest and blames the confidential human sources for guiding and encouraging him to make arrangements to travel to the Middle East to fight for ISIS. *See* Def.'s Sentencing Mem. at 9, 26. His arguments are unavailing. Mr. McCormick was determined to fight for ISIS well before he met the two confidential human sources. It was Mr. McCormick who openly voiced support for ISIS. It was Mr. McCormick who posted ISIS-related videos on Facebook. It was Mr. McCormick who told others in an Islamic community center "we should support ISIS" and "Jihad is the way to go." It was Mr. McCormick who told others in another Islamic center that he wanted to travel to the Middle East to "fight for the sake of Allah." Mr. McCormick did all of that before he began talking to the confidential human sources.

Mr. McCormick needed no encouragement from law enforcement or the confidential human sources to take steps towards that goal. Prior to meeting them, he had already traveled once to Jamaica with the hopes of going onward to the Middle East. He attempted to go a second time but was stopped at the airport by DHS. It was *after* this second attempt that the confidential human sources began meeting and communicating with Mr. McCormick, and he attempted to travel a third time, resulting in his arrest. Had it not been for the involvement of the confidential human sources, he may have found other means to travel to the Middle East to fight for ISIS, as he was already determined to do.

The fact that confidential human sources got involved before he attempted another trip does not mitigate the seriousness of his offense. Had he been talking to a true ISIS facilitator, rather than a confidential human source, he may have succeeded in his attempts to travel to the Middle East to fight for ISIS. The seriousness of his conduct should not be diminished because he was thwarted in his attempts. *See Mumuni Saleh*, 946 F.3d at 13 ("Congress and the United States Sentencing Commission plainly intended for the punishment of crimes of terrorism to be significantly enhanced without regard to whether, due to events beyond the defendant's control, the defendant's conduct failed to achieve its intended deadly consequences."); *United States v. Abu Ali*, 528 F.3d 210, 264–65 (4th Cir. 2008) ("[W]e cannot wait until there are victims of terrorist attacks to fully enforce the nation's criminal laws against terrorism. . . . [T]he lack of completion in this case should not be taken to indicate any change of heart by the defendant. . . . Thus, the defendant should not benefit simply because his plans were disrupted by [] officials before he could see them through." (internal quotations omitted)).

## 2. Mr. McCormick's History and Characteristics

Mr. McCormick's history and characteristics reveal that he is a dangerous and violent person who shows a lack of respect for law and authority, even after pleading guilty. In 2012, he was arrested for assaulting his mother, although the disposition of that arrest is unknown. PSR ¶ 46. In 2016, he was convicted for assault after punching a relative several times in the head. PSR ¶ 40. While incarcerated, he incurred four discipline reports for flagrant disobedience, assault, threats, and causing a disruption. *See id.* After he was arrested and detained in this case, he committed numerous violations, including for fighting, assaults, threats, interfering with security, and otherwise failing to follow the rules. PSR ¶¶ 4, 5, 45. In one of those incidents, he reportedly assaulted a department of corrections officer, resulting in the officer's hospitalization, and Mr. McCormick was subsequently arrested for first degree assault. PSR ¶ 45. Although Mr. McCormick argues in his sentencing memorandum that the officer was the aggressor, the incident began because Mr. McCormick had failed to comply with the officer's verbal instructions, showing a lack of respect for authority. *Id.*

The Court should, of course, consider Mr. McCormick's mental health issues under the 3553(a) factors. In fact, in the plea agreement, the Government agreed that Mr. McCormick's mental health condition is relevant for purposes of "determining whether a departure is warranted" under U.S.S.G. § 5H1.3. *See* Plea Agreement at 5; PSR ¶ 113. The Government submits, however, that a departure is not warranted, and his mental health does not warrant a sentence below the Guidelines.

The Second Circuit has noted that "5H1.3 expressly disfavors departures based upon mental and emotional conditions" and departures are available only in the most "extraordinary circumstances." *See United States v. Brady*, 417 F.3d 326, 333 (2d Cir. 2005). Moreover, for purposes of U.S.S.G. § 5H1.3, the Second Circuit has adopted a "causation" requirement that

requires the defendant to prove that the mental condition led to or caused the commission of the crime before granting a downward departure. *See id.* at 333-35; *United States v. Reinoso*, 350 F.3d 51, 58 (2d Cir. 2003).

Here, the psychological and psychiatric evaluations conducted by Dr. Baranoski and Dr. Prabhu do not explain how Mr. McCormick's mental health condition led to or caused his desire to support ISIS and kill others, as opposed to engaging in other non-violent conduct. It is not clear from their reports how much experience, if any, they have had interviewing and evaluating terrorist fighters. Moreover, although Dr. Baranoski writes in her report that Mr. McCormick's interest in fighting for ISIS stemmed from sexual issues and a desire for approval from others, and not from violent, political, or cultural ideology, *see* Baranoski Report at 17, his own words and actions speak otherwise. As noted above and in the PSR, he expressly spoke about violent jihad and killing people. In his conversations with the confidential human sources, he suggested he was going to fight for ISIS to seek retribution for the deaths of others, not because of sexual issues. *See* PSR ¶ 13 ("I'm like bro they killed one million people in Iraq bro like what are we doing bro? Two hundred and twenty thousand in Afghanistan and 80,000 in . . . like what are we doing? . . . I have to go fight. Because I got brothers dying."). Dr. Baranoski simply brushes this away as rambling and disjointed references that result from his mania and desire to be accepted. She notes that Mr. McCormick was not threatening or aggressive towards her, *see* Baranoski Report at 9, 14, but she only interacted with him for 10 hours over three sessions, *see id.* at 2. In any event, Mr. McCormick's conduct here was more than just words. As discussed, Mr. McCormick acted on his words. He, on his own, entered a Walmart looking to purchase firearms and high-capacity magazines. He looked down the scope of a rifle and told a store employee he "will have multiple

targets." And on at least two occasions he attempted to travel to join ISIS, including before he began communicating with the confidential human sources.

Dr. Baranoski trivializes his offense conduct by opining that even though Mr. McCormick expressed a desire to fight for ISIS, he could not have sustained a focused interest and followed an organized plan to reach Syria without a step-by-step plan directed by others. *See id.* at 15. However, she ignores that he had sufficient focus and clarity of mind to travel once before, to Jamaica with the hopes of going to the Middle East, and he attempted to do so a second time. She also ignores the prospect that if he had not communicated with the confidential human sources, which took place just days after that second attempted trip, he may have met or found others to provide him with a step-by-step plan to get to Syria. In fact, he had already attempted to find likeminded individuals at two Islamic centers in August and September 2019. Fortunately, they alerted law enforcement because of their concerns. He also found two individuals in Jamaica and Trinidad who believed in violent jihad. Mr. McCormick had a sustained focus on traveling to fight for ISIS for at least two months, well before he met the confidential human sources. If Mr. McCormick had not communicated with them, he may have reached out to others to help him achieve his goal of fighting for ISIS.

Indeed, Mr. McCormick's history in the years leading up to his arrest shows that he was able to maintain focus for long periods of time. For two years, from 2017 until September 15, 2019, Mr. McCormick was a long-haul commercial truck driver, driving across the country. PSR ¶¶ 94-96. He was earning 50 cents a mile and averaging $1,000 per week, *see* PSR ¶ 94, meaning he drove a commercial truck, across the country, 2,000 miles a week, notwithstanding his mental health issues. In addition, he admitted he previously traveled to Jamaica to go to the Middle East, and he knew of others in Jamaica and Trinidad who spoke about jihad. He was able to do all of

that without the involvement of any confidential human sources. While he may not have known anyone in Syria, with time he could have found someone, either in person or through social media or the internet, to help him travel to Syria to join ISIS, as he had desired.

The record also shows that, although Mr. McCormick suffers from mental health issues, these issues were not so severe as to leave Mr. McCormick incapable of rational thought or behavior. The record shows that he obtained a high school degree. PSR ¶ 90. Since 2016, he has mastered Arabic. PSR ¶ 91. In 2017 he obtained a commercial driver's license. PSR ¶ 89. And as noted above, for nearly two years, he drove a commercial truck across the country for over 2,000 miles each week. In short, Mr. McCormick was certainly capable of rational thought and behavior, and his mental health issues are not so extraordinary as to warrant a departure under U.S.S.G. § 5H1.3.

While causation is not a requirement for a court to consider a defendant's mental health for a variance under the 3553(a) factors (as opposed to a ground for U.S.S.G. § 5H1.3 departure under the Guidelines), a court can, in its discretion, look for a causal connection in determining how much weight to put on a defendant's mental health condition. Here, as discussed above, the reports by Dr. Baranoski and Dr. Prabhu do little to show or meaningfully explain how Mr. McCormick's mental health condition led to his desire to kill others on behalf of ISIS.

Nor do the conclusions by Dr. Baranoski and Dr. Prabhu that Mr. McCormick's steps toward joining ISIS were the result of his susceptibility to the influence of the confidential human sources, *see* Baranoski Report at 16-17, Prabhu Report at 29, support a departure or a variance. As an initial matter, neither Dr. Baranoski or Dr. Prabhu indicate that they have any professional experience evaluating confidential human sources or the susceptibility of individuals to influence from such sources. Both Dr. Baranoski and Dr. Prabhu offer their own characterizations of the

recorded interactions between Mr. McCormick and the confidential human sources but neither is qualified to offer opinions concerning that evidence of Mr. McCormick's conduct in this case. To the extent their opinions about the impact of Mr. McCormick's mental health conditions on his offense and his risk of recidivism rely on their interpretations of Mr. McCormack's recorded interactions with the confidential human sources, their opinions should not be credited by the Court.

Moreover, both doctors mischaracterize the recorded conversations between Mr. McCormick and the confidential human sources. They take selected excerpts from the conversations and present them out of context. A review of the recordings in their entirety reveals that Mr. McCormick was not rambling or disjointed in his conversations with the sources.[3] Rather, he was passionate and adamant about traveling overseas to fight for ISIS. Nor did the sources steer him to traveling overseas, as the doctors suggest. For example, on October 18, 2019, when Mr. McCormick asked a source which country the source recommended to go to in order to fight for ISIS, the source declined to provide such a recommendation, responding instead that Mr. McCormick had to decide what he wanted to do and where he wanted to go. When Mr. McCormick settled on the destination of Syria, the source tried to dissuade him by pointing out the training he would have to endure, issues with food and water, and other adjustments he would have to make in his lifestyle. The source repeatedly told Mr. McCormick to go home and think about his decision before letting the source know if he wanted to proceed. Mr. McCormick repeated over and over again that he had already made the decision to proceed, but the source would not accept his answer. Each time, the source insisted that Mr. McCormick needed to go home and think about

---

[3] If the Court would like to listen to the recordings prior to or at sentencing, the Government can make them available. They are quite lengthy. Two of the more substantive recordings (one from October 18, 2019 and one from October 19, 2019) are each over one hour in length.

his decision, and then contact the source later from home once Mr. McCormick thought it over and decided he was ready. Later that evening, Mr. McCormick texted the source that he was ready.

The next day the source met with Mr. McCormick and provided him travel instructions. In their reports, Drs. Baranoski and Prabhu claim there is no indication that Mr. McCormick could have made the travel arrangements to reach Syria on his own without the assistance of the confidential human sources. But that ignores that Mr. McCormick communicated with the sources in an effort to obtain such assistance, as part of his effort to avoid being stopped by DHS once again. So of course Mr. McCormick needed to rely on the expertise of the second source, who represented that he had relevant knowledge and experience. It was only after Mr. McCormick had repeatedly expressed his commitment to traveling that the second source provided him with instructions on the airline to use, the clothes to wear, how much baggage to bring, and the travel route, which, as the source explained, was designed to avoid him being stopped again.[4]

In any event, even if Drs. Baranoski and Prabhu are correct that Mr. McCormick's mental health condition makes him susceptible to the influence of others, including those purporting to recruit fighters for ISIS, that susceptibility makes him *more* dangerous, not less.

Finally, to the extent that Dr. Prabhu's risk assessments for Mr. McCormick are based on Mr. McCormick's actual history rather than unvalidated, subjective judgments of McCormick's self-reported beliefs, those assessments indicate that Mr. McCormick has a high risk of recidivism.

---

[4] That an individual without experience traveling in the Middle East would need detailed instructions on how to get to Syria to fight for ISIS is not unusual and is to be expected. But that does not make such an individual any less dangerous once receiving the travel assistance he seeks. Indeed, in a recent case from the Eastern District of New York, an ISIS recruiter named Mirsad Kandic was prosecuted for, among other things, recruiting an 18-year-old individual named Jake Bilardi of Australia to become an ISIS fighter. As described in the DOJ press release, Bilardi "contacted [Kandic] in June 2014 for assistance in traveling to Syria to join ISIS. Kandic provided Bilardi—who had just turned 18 years old and had never traveled internationally before—with instructions and guidance for reaching Istanbul, Turkey. Kandic then arranged for Bilardi to be picked up at the airport in Istanbul and smuggled him into Syria. Kandic maintained contact with Bilardi as he became an ISIS fighter and ISIS suicide bomber. Bilardi went on to commit a suicide truck attack with fellow ISIS members on March 11, 2015, in Ramadi Iraq, killing himself, more than 30 Iraqi soldiers, and an Iraqi policeman." DOJ Press Release, available at https://www.justice.gov/usao-edny/pr/high-level-member-isis-sentenced-life-prison-material-support-foreign-terrorist (last visited Dec. 17, 2023).

*See* Prabhu Report at 30-32. Specifically, Dr. Prabhu conducted two tests, the Violent Extremism Risk Assessment (referred to as the VERA-2R) and the HCR-20. *See id.* With respect to the VERA-2R, Mr. McCormick scored low on several items in the category of "beliefs, attitudes and ideology" and "history, action and capacity," but medium and high on others associated with "commitment and motivation" and "protection and risk mitigating." However, the VERA-2R has significant limitations and has been criticized because it was not developed based on statistical analyses or evidence, but rather on literature reviews and selected case histories of convicted terrorists. There also has been no prospective validation of the VERA-2R test. *See* Melissa Hamilton, *A Threat Assessment Framework for Lone-Actor Terrorists*, 70 Fla. L. Rev. 1319, 1337 (2018) (discussing flaws with the VERA-2R assessment). With respect to the HCR-20, an assessment based on Mr. McCormick's actual documented history of violence, substance abuse, mental health illness, and other historical factors, Mr. McCormick scored in the high ranges, *see* Prabhu Report at 31-32, indicating there is a very real risk of recidivism.

Accordingly, Mr. McCormick's history and characteristics indicates that a significant sentence of imprisonment and life term of supervised release is necessary in this case.

3. <u>Protecting the Public and Affording Adequate Deterrence to Future Criminal Conduct</u>

In light of the above, there is a strong need to protect the public from Mr. McCormick and deter him from future criminal conduct, especially since he has yet to disavow his conduct or renounce his support of ISIS. Even after his plea, he continued to refer to himself as the "Mujahideen" in a letter to the Court, and he claimed the charges against him were falsified. Thus, Mr. McCormick is far from rehabilitated, and as noted above, he poses a significant risk of recidivism.

Defense counsel attributes Mr. McCormick's February 21, 2023, letter to a lapse in medication. *See* Def.'s Sentencing Mem. at 25. Mr. McCormick apparently had not been taking his medication since January 2023. *See id.* This was not the first time he failed to take his prescribed medication. The Bureau of Prisons competency restoration report describes several instances where Mr. McCormick had to be involuntarily medicated because he was refusing to take medication for his mental illnesses. PSR ¶ 83. And Dr. Baranoski's Report notes that during her recent sessions with him in August 2023, Mr. McCormick repeatedly stated he was not mentally ill and did not need medication. Baranoski Report at 8, 10, 13. As Dr. Baranoski concluded, "[t]he most effective means of reducing Mr. McCormick's risk of recidivism and his risk of involvement in terrorism will be treatment of his psychiatric disorders." Id. at 19. Dr. Prabhu similarly concluded that "[t]he single most important step to reduce his risk of both violent behavior and extremism will be ongoing treatment of Mr. McCormick's major mental illness." Prahbu Report at 32. The negative inference of these conclusions is that if Mr. McCormick refuses treatment, then his risk of recidivism will be higher. Thus, his demonstrated lack of commitment to ongoing treatment poses an increased risk of recidivism and makes the need for protection of the public and specific deterrence even stronger through a lengthy sentence of imprisonment and life term of supervised release.

In addition to protecting the public and specific deterrence, a Guidelines sentence here is necessary to deter others from choosing to fight alongside terrorists or otherwise supporting terrorist organizations. *See United States v. Babafemi*, No. 13-CR-0109 (BMC), 2021 WL 1210313, at *6 (E.D.N.Y. Mar. 31, 2021) ("General deterrence is essential here so that the severe consequences of choosing terrorism are apparent to all who might consider it."); *United States v. Bell*, 81 F. Supp. 3d 1301, 1320 (M.D. Fla. 2015) ("the Court agrees that general deterrence of

others from taking the first step along the path to radicalization is an important component of Bell's sentence").

    4.  <u>The Need to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment, and to Avoid Unwanted Sentencing Disparities</u>

Mr. McCormick's offense could not be more serious, short of succeeding with his plan to fight and kill for ISIS. A Guidelines sentence here satisfies the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. In other cases involving defendants who traveled or attempted to travel to fight for foreign terrorist organizations, courts around the country have imposed significant sentences of imprisonment. Below is a sample of sentences imposed in a number of other terrorism cases:[5]

| Case | Count(s) of Conviction | Sentencing Date | Sentence |
|------|------------------------|-----------------|----------|
| *United States v. Shelton Thomas Bell CR 13-00141(TJC) (MDFL)* | 18 U.S.C. § 2339A | 1/14/2015 | 240 months' imprisonment; lifetime supervised release; $17,000 restitution |
| *United States v. Mufid Elfgeeh CR 14-06147(EAW) (WDNY)* | 18 U.S.C. § 2339B (two counts) | 3/22/2016 | 270 months' imprisonment 330 months' supervised release |
| *United States v. Adam Dandach CR 14-00109(JVS) (CDCA)* | 18 U.S.C. § 2339B; 18 U.S.C. § 1542 | 7/25/2016 | 180 months' imprisonment; lifetime supervised release |
| *United States v. Hamza Naj Ahmed CR 15-00049(MJD) (DMN)* | 18 U.S.C. § 2339B; 20 U.S.C. § 1097 | 11/15/2016 | 180 months' imprisonment; 240 months' supervised release |

---

[5] For cases charged prior to June 2015, the maximum penalty for a single count of 18 U.S.C. § 2339B was 15 years of imprisonment. In June 2015, the maximum penalty increased to 20 years of imprisonment.

| | | | |
|---|---|---|---|
| *United States v. Abdulrasul Juraboev a/k/a Abdulloh Ibn Hasan* CR 15-00095(WFK) (EDNY) | 18 U.S.C. § 2339B | 10/27/2017 | 180 months' imprisonment; deportation upon completion of sentence |
| *United States v. Akhor Saidakhmetov* CR 15-00095(WFK) (EDNY) | 18 U.S.C. § 2339B(a)(1) | 12/20/2017 | 180 months' imprisonment; deportation upon completion of sentence |
| *United States v. Leon Nathan Davis a/k/a Abdul Wakil Khalil* CR 15-00059(JRH) (SDGA) | 18 U.S.C. § 2339B | 7/28/2015 | 180 months' imprisonment; lifetime supervised release |
| *United States v. Emanuel Lutchman* CR 16-06071(FPG) (WDNY) | 18 U.S.C. § 2339B(a)(1) | 1/26/2017 | 240 months' imprisonment; 600 months' supervised release |
| *United States v. Omar Faraj Saeed Al Hardan* CR 16-00003(LNH) (SDTX) | 18 U.S.C. § 2339B | 12/18/2017 | 192 months' imprisonment' lifetime supervised release |

In Mr. McCormick's sentencing memorandum, he cites eight cases with significantly lower sentences that he claims are factually similar. *See* Def.'s Sentencing Mem. at 19-20 n.10. These cases, however, are factually distinguishable, and in some cases, the sentences listed in his memorandum are incorrect:

- Mohammed Khan, Case No. 14-cr-562 (N.D. Ill.): Although the defendant received a sentence of 40 months, he was only 19 years old at the time he attempted to travel to Syria to join ISIS. The statutory maximum at the time was 180 months. Unlike Mr. McCormick, the defendant rejected ISIS following his arrest and cooperated in two active criminal investigations of two ISIS recruiters, and his cooperation also benefitted an important U.S. foreign partner. *See United States v. Khan*, Case No. 14-cr-562 (N.D. Ill.) (Doc. Nos. 95, 103).

- Akba Jordan, 14-cr-58 (E.D.N.C.): The defendant, who was approximately 21 or 22 years old at the time of the offense, received a sentence of 108 months for conspiring to provide material support of terrorism. The statutory maximum at the time was 180 months. The defendant had weapons and showed his co-conspirator how to dismantle an AK-47, but the defendant never attempted to board a plane. *See* DOJ Press Release, https://www.justice.gov/usao-ednc/pr/raleigh-men-sentenced-conspiracy-provide-material-support-terrorist (last accessed Dec. 17, 2023).

- Abdullahi Yusuf, 15-cr-46 (D. Minn.): Although the defendant received a sentence of 20 months and 22 days (not 12 months as indicated in Mr. McCormick's sentencing memorandum), he was still in high school and only 18 years old at the time of the offense. The statutory maximum at the time was 180 months. Unlike Mr. McCormick, the defendant cooperated and provided testimony at the trial of three co-conspirators. *See United States v. Abdullahi Yusuf*, Case No. 15-cr-46 (D. Minn.) (Doc. No. 109).

- Darren Jackson & Dayne Christian, 16-cr-80107 (S.D. Fla): Christian was sentenced to 8 years, and Jackson was sentenced to 4 years. However, unlike Mr. McCormick, both defendants provided significant cooperation to the government and received downward departures under U.S.S.G. § 5K1.1. *See* DOJ Press Release, https://www.justice.gov/opa/pr/three-florida-men-sentenced-conspiring-provide-material-support-isis (last accessed Dec. 17, 2023).

- Islam Natsheh, 16-cr-166 (N.D. Cal.): Although the defendant was sentenced to 60 months, he was 20 years old at the time of the offense. *See United States v. Natsheh*, Case No. 16-cr-1666 (N.D. Cal.) (Doc. Nos. 22 & 23).

- Asher Khan, 15-cr-263 (S.D. Tex.): The defendant, who was 20 years old at the time of the offense, received a sentence of 144 months (not 18 months as indicated in the defendant's sentencing memorandum) for attempting to travel to Syria to join ISIS. Although he was originally sentenced to 18 months, the government successfully appealed this sentence as substantively unreasonable, and he was sentenced to 144 months on remand. The statutory maximum at the time was 180 months. *See* DOJ Press Release, https://www.justice.gov/usao-sdtx/pr/texan-resentenced-following-terrorism-conviction-and-appeal (last accessed Dec. 17, 2023).

- Daniela Greene, 14-cr-230 (D.D.C.): Unlike Mr. McCormick, the defendant was not charged with material support of terrorism. She was charged with making false statements involving international terrorism, which has a statutory maximum of 8 years. She cooperated and received a downward departure under U.S.S.G. § 5K1.1. *See United States v. Daniela Greene*, Case No. 14-cr-230 (D. D.C.) (Doc. No. 57).

- Shannon Conley, 14-cr-163 (D. Colo.): Although the defendant received a sentence of 48 months, she was only 19 years old at the time of the offense. She pleaded pre-indictment to a § 371 conspiracy, which has a five-year statutory maximum, and unlike Mr. McCormick, she cooperated and received a downward departure under U.S.S.G. §

5K1.1. *See United States v. Shannon Conley*, Case No. 14-cr-163 (D. Colo.) (Doc. No. 81).

Unlike most of the defendants in the cases cited by the defense for comparison, Mr. McCormick was older and did not cooperate against others. Thus, those sentences do not provide a helpful basis for comparison.

\*       \*       \*

In summary, Mr. McCormick—who has stated his desire to engage in acts of terrorism, has engaged in conduct consistent with his desires, has questioned the legitimacy of the charges against him, has ongoing issues with violent conduct in prison, has a history of refusing treatment for his mental health conditions, and has shown a lack of respect for law and authority—poses a serious and ongoing risk to others. There could be significant consequences if Mr. McCormick carries out his desired conduct—which he has not wholly disavowed or renounced—making incapacitation a serious need in this case. As indicated above, there is also a need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and deter Mr. McCormick and others.

Accordingly, the Government respectfully recommends a sentence of 20 years of imprisonment. The Government also recommends a life term of supervised release, with the special conditions recommended in the PSR, in order to adequately protect the public from this ISIS supporter. While the Government hopes that Mr. McCormick will be rehabilitated, renounce his commitment to ISIS and waging jihad, and recognize his need for mental health care, those goals will be enhanced by a requirement of lifetime supervised release where his conduct and treatment can be closely monitored.

## V. __CONCLUSION__

For the reasons discussed above, the Government respectfully requests that the Court impose a Guidelines sentence of 20 years of imprisonment, followed by a life term of supervised release.

Respectfully submitted,

VANESSA ROBERTS AVERY
UNITED STATES ATTORNEY

*/s/ Neeraj N. Patel*

_____

NEERAJ N. PATEL
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv04499
157 Church Street, 25th Floor
New Haven, CT  06510
Tel.:    (203) 821-3700
Email: neeraj.patel@usdoj.gov


JUSTIN SHER
JOHN CELLA
Trial Attorneys
National Security Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20004
Tel:     (202) 353-3909
Email: justin.sher@usdoj.gov
Email: john.cella@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 18, 2023, a copy of the foregoing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Neeraj N. Patel*

_____
Neeraj N. Patel
Assistant United States Attorney