UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) No. 3:19-cr-263-KAD |
| v. | ) |
| | ) |
| KEVIN McCORMICK | ) December 20, 2023 |

**DEFENDANT'S REPLY MEMORANDUM**

The Court should reject the Government's request for a 20-year prison term. Other than aligning with the Guidelines policy-driven – not fact-driven – advice, the Government's request largely ignores the purposes of sentencing. Mr. McCormick admits his guilt, recognizes that the acts discussed were serious, and does not support ISIS. His conduct, especially given his mental health at the time and the guidance from the CHSs, removes him far from the most egregious offenders of the statute of conviction. A maximum sentence would not make America safer in any justifiable manner.

    **I.**    **Mr. McCormick's Mental Health Disorders Impacted His Culpability And, When Combined With BOP's Record Of Mental Health Treatment, Clearly Warrants A Lesser Sentence.**

The Government acknowledges that Mr. McCormick has a mental health disorder but uses his inconsistent medication history as a basis not to ensure that his mental health needs are addressed but as a justification for a *20*-year prison term. The incongruity of that analysis already has been rejected by experts and courts alike.[1] Prison is not an

---

[1] *See, e.g.*, *United States v. Pallowick*, 364 F. Supp. 2d 923 (E.D. Wisc. 2005) (departing from 70-87 months to 46 months where defendant was convicted of six armed bank robberies because, *inter alia*, lengthy incarceration would inhibit rehabilitation).

appropriate place for mental health treatment and imprisonment is not an appropriate means of promoting rehabilitation.  Pursuant to 18 U.S.C. § 3582(a):

> The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that <u>imprisonment is not an appropriate means of promoting correction and rehabilitation.</u>

(emphasis supplied).  In addition, according to 28 U.S.C. § 994(k), the Guidelines reflect "the inappropriateness of imposing a sentence to a term of imprisonment for the purposes of rehabilitating the defendant or providing the defendant with needed . . . medical care, or other correctional treatment."

The psychological effects of incarceration are well documented.  Constant guard supervision and the accompanying lack of privacy are "psychologically debilitating," and there is a growing consensus that incarceration itself is a source of trauma.[2]  United States prison services for the mentally ill are "woefully deficient."[3]  Seriously, mentally ill offenders are often neglected and isolated.[4]  Some commit suicide while awaiting treatment.[5]

Inadequate mental health treatment in prison also leads to increased disciplinary tickets among mentally ill prisoners.  "[I]nmates with mental health problems are much

---

[2] *See, e.g.*, Mika'il DeVeaux, *The Trauma of the Incarceration Experience*, 48 HARV. C.R.-C.L. L. REV. 257, 258-59 (2013); Marieke Liem & Maarten Kunst, *Is There a Recognizable Post-incarceration Syndrome Among Released "Lifers"?,* 36 INT'L J. L. & PSYCHIATRY 333-37 (2013) (suggesting that there may be a Post-Incarceration Syndrome that shares characteristics with PTSD, but that is caused by prolonged incarceration); Human Rights Watch, *Ill Equipped: U.S. Prisons and Offenders with Mental Illness*, 53 (2003).
[3] *See* Christine Sarteschi, Mentally Ill Offenders Involved with the U.S. Criminal Justice System at 5 (July 16, 2013).
[4] *Id.*
[5] *Id.*

2

more likely to be charged with breaking facility rules or verbally or physically assaulting correctional staff when compared with nonmentally ill populations."[6] They are also more likely to be vulnerable to attacks by other inmates.[7] For many inmates, the only exposure they will have to the prison's psychology department will be their admission interview. Reduced funding within the BOP has pared psychology programs down to the bare minimum.[8]

The idea that the BOP can be relied upon to consistently address Mr. McCormick's mental health needs is unsupported by BOP's history in this area. A November 2018 report jointly published by The Washington Post and The Marshall Project details remarkably inadequate access to inmate mental health services in federal prisons. The authors found that even though 23% of federal inmates have been diagnosed with a mental illness, the Bureau of Prisons classifies only 3% of inmates as having a mental illness serious enough to require regular treatment.[9] A BOP policy promising better care and oversight for inmates with mental-health issues resulted not in the expansion of treatment, but instead, in the lowering of the number of inmates designated for higher care levels by more than 35 percent.[10]

---

[6] *Id.* at 6.
[7] *Id.* at 7.
[8] *See* Christopher Zoukis, Psychology Services in the Federal Bureau of Prisons, http://prisonlawblog.com (Aug 8, 2013).
[9] Christie Thompson & Taylor Elizabeth Eldridge, No One to Talk You Down': Inside federal prisons' dangerous failure to treat inmates with mental-health disorders, The Washington Post (Nov. 21, 2018), https://www.washingtonpost.com/news/national/wp/2018/11/21/feature/federal-prisons-were-told-to-improve-inmates-access-to-mental-health-care-theyve-failed-miserably/?utm_term=.cdbabefcb5f3.
[10] *Id.*

"A review of court documents and inmates' medical records, along with interviews of former prison psychologists, revealed that although the Bureau of Prisons changed its rules, officials did not add the resources needed to implement them, creating an incentive for employees to downgrade inmates to lower care levels."[11] Specifically, data shows that at the high-security penitentiary near Hazelton, "the number of inmates receiving regular mental-health care has dropped by 80 percent since May 2014."[12] The report explains how "[u]ntreated mental illness can also contribute to prison violence."[13] In 2015, at the penitentiary near Lewisburg, one inmate allegedly strangled his cellmate with a bedsheet. The BOP previously flagged the inmate as being mentally ill, but he received no treatment at Lewisburg.[14]

Other reports similarly confirm inadequate access to inmate mental health services. According to the only known report conducted by the Department of Justice regarding mental health treatment in the Bureau of Prisons, 24% of prisoners in the federal system "received treatment after admission," but only 15% had "professional mental health therapy."[15] The "treatment other than therapy" includes medication and an overnight hospital stay.[16] According to the Report, "[t]aking a prescribed medication for a mental health problem was the most common type of treatment inmates who had a mental health problem had received since admission to prison or jail."[17] These figures stand in stark contrast to the number of inmates who need mental health treatment.

---

[11] *Id.*
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *See* U.S. Dep't of Justice, Bureau of Justice Statistics, *Mental Health Problems of Prison and Jail Inmates*, at 9 (Sept. 2006).
[16] *Id.*
[17] *Id.*

According to the Report, 44.8% of inmates in federal prison have a mental health problem defined as recent history of symptoms of a mental health problem having occurred in the 12 months prior to incarceration.[18] Many BOP facilities include only one or two psychologists, resulting in caseloads of well over 300 inmates per psychologist. This is simply untenable as a means of providing effective and intensive mental health therapy.

Individuals with mental illness such as Mr. McCormick have more difficulty adapting to prison when compared with the rest of the population.[19] While prison causes inmates "who have never suffered a significant psychiatric disturbance in the past [to] report worrisome psychiatric symptoms for the first time," experts acknowledge that prison is even more difficult for individuals with serious mental illnesses.[20] For this reason, mental illness often predisposes prisoners to engage in the type of erratic or destructive behavior that leads to solitary confinement, a punishment proven to trigger and exacerbate preexisting mental disease.[21] Even if inmates with mental illness manage to adapt to prison life, however, they must still face the realities of a system ill-equipped to address their needs.

The American Psychiatric Association (APA) has noted that timely and effective access to mental health treatment is "the hallmark of adequate mental health care."[22]

---

[18] *Id.* at 1.
[19] Jamie Fellner, *A Corrections Quandary: Mental Illness and Prison Rules*, 41 HARV. C.R.-C.L. L. REV. 391, 396 (2006).
[20] TERRY KUPERS, PRISON MADNESS: THE MENTAL HEALTH CRISIS BEHIND BARS AND WHAT WE MUST DO ABOUT IT 48 (1999).
[21] Human Rights Watch, *supra*, at 282-83.
[22] Am. Psychiatric Ass'n, *Position Statement on Psychiatric Services in Jails and Prisons* (1989, reaffirmed 2007).

Prisons do not meet this standard.[23] Mentally ill prisoners report having to wait days, weeks, and even months to see mental health staff after they request a meeting or to have their medications altered.[24] This conforms with the APA's findings that inmate access to mental health care is unacceptably hindered by delays in transmitting requests for care, unreasonable delays before patients are seen by mental health staff or outside consultants, and the imposition of fees that prevent or deter prisoners from seeking care.[25]

Mr. McCormick is working to cope with psychiatric disorders that have increasingly plagued him over the years leading to his arrest. Disrupting his access to professional treatment and transitioning him to the low standards of the BOP will risk his progress, landing him in an environment that mental-health experts describe as "toxic" for individuals with mental illness.[26] Mr. McCormick already has experienced multiple forms of trauma in his life, from physical abuse by his mother to being the subject of a gang-related shooting when younger, to having been a target with the prison system, PSR, ¶¶ 56, 58. Adding years of incarceration would not only risk denial of needed help, it likely will worsen his condition long term.

The idea that the criminal justice system works both as a tool for mass incarceration and a one-size-fits-all solution for meeting inmates' needs plainly is a fallacy. Rather than addressing the roots of Mr. McCormick's behavior, incarceration will make it worse. Mr. McCormick needs consistent and intensive mental health

---

[23] *See, e.g.*, U.S. Dep't of Justice, Bureau of Justice Statistics, *Mental Health Problems of Prison and Jail Inmates*, 9 tbl. 14 (2006) (indicating that less than a quarter of federal inmates who had a mental health problem had received treatment since becoming incarcerated); *see generally* Fellner, *supra.*
[24] Human Rights Watch, *supra* at 103.
[25] APA, *Position Statement, supra.*
[26] Human Rights Watch, *supra*, at 53.

treatment accurately professionally tailored to his needs. Only then can the Court be assured that the root cause of this offense is being treated and the issues of recidivism, deterrence, and protecting the public are addressed. If properly treated, Mr. McCormick will not be a danger to himself or anyone else.

Here, the conclusion that a 20-year sentence is warranted also plainly runs afoul of the analyses by Dr. Baranoski and Dr. Prabhu. The Government's rejection of the conclusions of these two professionals ignores that decent care that took years to get right not only can but already has made a difference for Mr. McCormick. Mr. McCormick has documented psychological and socio-cognitive challenges that stem principally from underlying mental health disorders. This documentation goes beyond the experts offered here, including Butner providers, DOC treaters, and professionals in the community. His mental health issues are a root cause of his offense, and they unquestionably must be addressed. Mr. McCormick had worked to address these disorders previously, engaging in medication treatment, only to have devastating physical consequences.

More recently, though, his providers at Garner CI appear to have found an effective regimen. The Government demonstrates no real concern for ensuring that proper medication and treatment continues but instead assumes that the instability will continue, a point that probably is best supported by the prospect of relegating Mr. McCormick to a lengthy term in the BOP. That Mr. McCormick's medication treatment has found a regimen that appears to be working clearly undercuts the Government's position, which should be rejected.

The Government's characterization of Mr. McCormick's condition also is inconsistent with the facts of his history. The Government points to Mr. McCormick

7

having graduated from high school and worked as a truck driver to show that he could have put his vague plans of joining ISIS into effect. That ignores that he had special assistance in high school, which he completed years prior; that he could not hold any one job for particularly long; and that his hospitalizations occurred after high school and interspersed with work, including just months before the offense. The Government highlights Mr. McCormick's statements in his initial meetings with Drs. Baranoski and Prabhu, but seemingly ignores the progress that he made recently, which warranted DOC mental health professionals concluding that he no longer needed to have an order in place enabling forcible medication delivery. In short, the Government's assessment of Mr. McCormick's mental health, its impact on his participation in the offense (including his susceptibility to influence), the importance of medication continuity, and his current state all are belied by the facts and expert analysis. The Government's request for a 20-year term should, therefore, be rejected.

> II. **Even Putting Aside Mr. McCormick's Mental Health, Application of 18 U.S.C. § 3553(a), With The Parsimony Clause As Its Overarching Principle Compels A Sentence Well Below 20 Years.**

The Government's request for 20 years also ignores that 20 years is a sentence for conduct far more serious than at issue here.[27] While each party has their list of cases, and

---

[27] . The Government correctly points out that older cases on which counsel relied either were not updated for later case developments or inaccurately relayed case information, a regrettable, unintentional error made while swimming in the sea of reported and unreported decisions in this area. The Government's list of cases suffers from the same defect. Specifically, the Government points to *United States v. Naj Ahmed* as resulting in a sentence of 180 months for Mr. Ahmed. See Gov't Memo at 21. The judgment in the case indicates a total effective sentence of 120 months, comprised of concurrent 120- and 60-month terms. See Judgment, *United States v. Naj Ahmed*, filed herewith.

An subsequently-filed opinion relays important facts not present here. The Judge wrote: "Each member of the conspiracy took affirmative steps to travel overseas to join and fight with ISIL. Some of the conspirators successfully traveled to Syria and joined

seemingly every case can be distinguished in some manner from the circumstances present here, that does not undermine the broader point – 20 years is not the automatic sentence when the sentencing analysis steps outsides the Guidelines Manual, and wide-ranging sentencing results reflect as much.[28]

These disparities in sentencing are rooted in many points of distinction, with considerations about the offense conduct necessarily playing a role. Yes, anything involving terrorism is serious, but not all acts are the same, just as not all perpetrators are the same. There are reasons beyond cooperation as to why courts do not rubber stamp the Government's demands for 20 years. Here is another sample set.

As far back as pre-*Booker*, one court of appeals vacated a 140-month prison term and remanded for resentencing where the district court had attempted to fashion a three-level reduction for inchoate offenses and the defendant had engaged with FBI cooperators over months, and eventually admitted post-arrest that admitted he was planning to blow up electrical sites and then demand the release of Muslim prisoners and changes to the U.S. Middle East policy. *See United States v. Mandhai*, 375 F.3d 1243, 1249 (11th Cir.

---

ISIL; most of whom have since been killed." Sentencing Memorandum & Opinion, ECF No. 820, at 3. The defendant provided support via social media to people he believed were fighting and eventually made travel plans to go to Spain and then reach Syria, only to be detained at JFK airport. *Id.* at 10-11. He lied during interviews with the FBI in New York and in a second one back in Minnesota. *Id.* at 11.

[28] *See, e.g.*, *United States v. Warsame*, 651 F. Supp. 2d 978 (D. Minn. 2009) (determining that below guidelines sentence of 92 months was appropriate penalty for defendant's conviction, upon guilty plea, to single count of providing material support to designated terrorist organization; even though defendant admittedly trained at two terrorist training camps and had access to al Qaeda leadership, there was nothing that demonstrated that defendant was a part of a specific plot against the United States and very little that suggested he was especially useful to al Qaeda either during his training in the Middle East or upon his return to North America, and defendant's conditions of confinement were significantly more onerous than the conditions faced by the ordinary pretrial detainee).

2004) (disapproving of 3-level automatic reduction but keeping final sentence open while "agree[ing] with the district court . . . that the 12 level increase to Mandhai's offense level required by the terrorism enhancement prevents the penalty from fitting the crime, based on the facts of this record. The totality of the circumstances in this record, along with other factors that might not have been brought to the Court's attention because he granted a downward departure, may be sufficient to remove the case from the Guidelines 'heartland.'"). A somewhat more factually similar case occurred in *United States v. Ludke*, for which the sentencing transcript was provided earlier today. There, the defendant's criminal history category was VI, even without the increase compelled by the terrorism Guideline. He had prior convictions for robbery, sexual assault, and threatening to kill a judicial official. Like Mr. McCormick, he had no contact with a terrorism organization, yet he made a video with the help of an FBI undercover employee. Unlike Mr. McCormick, later, post-arrest, Mr. Ludke attempted to solicit the murder of an FBI agent. He actually had traveled towards Mexico with vague plans to get to the Middle East. Ludke had suffered from significant neglect and abuse as a child, and he discovered Islam while experiencing deterioration of his mental health. He received an 84-month sentence.

      Courts simultaneously acknowledge the seriousness of the conduct and the societal interests but also lament over the unhelpfulness of the Guidelines, leading to lesser prison terms.

> Defendant Waheba Dais pleaded guilty to attempting to provide material support or resources to a foreign terrorist organization, contrary to 18 U.S.C. § 2339B(a)(1). The case was unlike other material support cases prosecuted in this district and cited by the parties in their submissions, which involved defendants who either provided/solicited funds for terrorist groups or who traveled

10

seeking to offer themselves up as supporters of the terrorist group. This defendant engaged in an array of online activity, which included providing advice on how to make explosive devices and poison, prepare for an attack, and select targets. Fortunately, she was discovered before anyone she inspired and assisted actually completed an attack; nevertheless, her actions did place the community in danger.

Stressing the seriousness of the offense, the government sought a sentence of 20 years in prison, the statutory maximum, followed by life on supervised release. Citing her mental health issues and history of abuse, defendant asked for a sentence of time served (a little over two years). Determining an appropriate sentence was challenging, given the unhelpfulness of the sentencing guidelines in terrorism cases and the absence of comparable cases. For the reasons that follow and those stated on the record at the sentencing hearing, I imposed a sentence of 90 months in prison followed by three years of supervised release.

!                                *     *     *

U.S.S.G. § 3A1.4 resembles the child pornography guideline, U.S.S.G. § 2G2.2, which has been roundly criticized by the courts, in that it recommends sentences near or above the statutory maximum even in mine run cases. This is contrary to the purposes of sentencing in 18 U.S.C. § 3553(a), including the notion that sentences should be individualized and proportionate, and that we should distinguish between the worst offenders and those who are less dangerous. *See United States v. Dorvee*, 616 F.3d 174, 186-87 (2d Cir. 2010).

It is also contrary to the theory behind the guidelines: that the offense level will reflect the seriousness of the offense, increasing incrementally based on specific aggravating facts, and the criminal history category will reflect the risk to the public, based on the defendant's prior record. As Judge Breyer has noted, the terrorism enhancement "takes a wrecking ball" to this construct. *See United States v. Alhaggagi*, 372 F. Supp. 3d 1005, 1013 (N.D. Cal. 2019). Terrorism cases are undoubtedly serious, but automatically increasing a defendant's criminal history to reflect the seriousness

11

> of the charged offense seems misguided. *Id*. at 1014. Further, as Judge Kane has noted, material support cases can involve a wide range of conduct, yet § 3A1.4 frequently results in guideline ranges that equal or exceed the maximum statutory sentence, without differentiating between various levels of conduct. *See United States v. Jumaev*, No. 12-cr-00033, 2018 WL 3490886, at *10-11, 2018 U.S. Dist. LEXIS 119916, at *28-29 (D. Colo. July 18, 2018). Finally, as both Judges have noted, this guideline was enacted pursuant to a congressional directive and absent empirical evidence. *See Alhaggagi*, 372 F. Supp. 3d at 1014-15. Such guidelines do not exemplify the Sentencing Commission's exercise of its characteristic institutional role, *see Kimbrough v. United States*, 552 U.S. 85, 109, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007), and are generally entitled to less respect. *See United States v. Reyes-Hernandez*, 624 F.3d 405, 418 (7th Cir. 2010).

*United States v. Dais*, 482 F. Supp. 3d 800, 802–03 (E.D. Wis. 2020)

Parsing through all of the cases illustrates the basic principle that more serious conduct yields longer sentences, and less serious conduct yields lesser sentences -- hardly an original concept in sentencing, even where the Guidelines and the Government push for longer terms. For example, where a defendant did not connect with a terrorist organization, actually travel, or promote the terrorism causes beyond postings on one's individual social media platform, the sentences are lower. Yet another is that where a defendant acted under the direction or with the assistance of undercover law enforcement or informants, as compared to a defendant who acted alone or with non-undercover confederates, the sentences are lesser. Where actual support is provided in the form of money, weapons, active recruitment efforts, attempting to obtain and share information

that is classified and/or could be used to harm civilians or Government interests – none of which occurred here – the sentences are longer.[29]

The defendants' characteristics also impact the outcomes. The Government points to the young ages of those defendants in the listed cases in Defendant's Memo. See Gov't Memo at 22-23. Mr. McCormick was only 25 at the time of his deterioration in April-July, 2019, and 26 at the offense, hardly old enough to be matured by a full set

---

[29] The following case results in a longer sentence, but the defendant sought to recruit others and pressed the matter to trial.

> Muhtorov's codefendant, Bakhtiyor Jumaev, was also found guilty of (1) conspiring and (2) attempting to provide material support in the form of $300 to the IJU. A little over a month ago, I sentenced Jumaev to the 76 months and 3 days he had already spent in detention. *See United States v. Jumaev*, No. 12-cr-00033-JLK, 2018 WL 3490886, at *21 (D. Colo. Jul. 18, 2018). In doing so, I stressed that Jumaev's conduct placed him among the least culpable offenders who have been convicted under the material support statute. *See id.* That is not the case with Muhtorov, however. Muhtorov was calculated and at times devious. He encouraged others, including Jumaev, to support the IJU and terrorist ideals generally. He also swore his allegiance to the IJU and told his daughter to pray that he become a martyr. Still, Muhtorov's actions do not come close to the severity of those of the most culpable offenders. Like Jumaev, he did not plot to commit specific acts of violence, nor did he engage in planning acts of violence in the United States. Nor does the evidence reveal any concrete path known to or established by Muhtorov to achieve his intended goal of supporting the IJU. Indeed, he was a self-described braggart who craved attention and admiration from others, making the resoluteness of his actions and intentions questionable.

*United States v. Muhtorov*, 329 F. Supp. 3d 1289, 1292 (D. Colo. 2018) (imposing 132-month sentence where defendant was convicted on three counts at trial)

13

of life experiences, and possibly within the window of time commonly recognized as the period in which brain development is ongoing.[30]

Additional history and characteristics of the defendant impact the analysis. For example, defendants who have significant criminal records get longer sentences.[31] Defendants who simultaneously committed other offenses, such as unlawful weapons possession or violation of immigration laws, also received more severe penalties.

Simply put, not everyone gets 20 years, a sentence which should be reserved for active offenders who demonstrate both an interest and the wherewithal to carry out their plans. Overt acts like buying a plane ticket or recording a pledge done without the encouragement and guidance of law enforcement or its agents clearly are different than the ineffectual acts of a person like Mr. McCormick, who could not even get it together on his own so as to acquire a firearm or get a medical procedure over which he long obsessed; the idea that he could reach Syria without the CHSs literally providing a

---

[30] The Supreme Court has observed the following.
> Immaturity at the time of the offense conduct is not an inconsequential consideration. Recent studies on the development of the human brain conclude that human brain development may not become complete until the age of twenty-five. . . . [T]he recent [National Institutes of Health] report confirms that there is no bold line demarcating at what age a person reaches full maturity. While age does not excuse behavior, a sentencing court should account for age when inquiring into the conduct of a defendant.

*Gall v. United States*, 128 S. Ct. 586, 601 (2007).

[31] *See, e.g.*, *United States v. Van Haften*, 881 F.3d 543 (7th Cir. 2018) (affirming application of terrorism enhancement where defendant was apprehended in Turkey in route to Syria to join ISIS and defendant's writings on social networking website and in various private notes reflected a hatred of the U.S. government, arising from government's treatment of Muslims in general and specifically its treatment of defendant as a designated sex offender, which caused him to want to go to Syria so he could "join[ ] my brothers" in a foreign terrorist organization "for the war against American liars," and so he could "kill me some American soldier boys," all leading to sentence of 120 months).

runway is inconsistent with Mr. McCormick's history of shortfalls and his obvious mental health needs.

With a relatively minor criminal record, the need for a longer prison term is further undermined.[32]  The involvement of his family also bodes well, especially given their willingness to contact treatment providers or even law enforcement.  While isolation as a truck driver for long periods may not be suitable for Mr. McCormick, he is not unwilling to work.  All of these considerations warrant a lesser sentence.

### III. The Concerns Regarding The Impact Of The CHSs Is Not A Unique Issue.

Mr. McCormick has not moved to withdraw his plea.  Mr. McCormick's trip to Jamaica more likely would have led him back to the Jamaican hospital than anywhere beyond the island; the Government's emphasis on that trip attempt is undermined by the experts' analyses and Mr. McCormick's history.  Regardless of the dispute over facts and inferences, Mr. McCormick made the pledge; he bought the airplane ticket; he made many statements.  He stands by his plea.  That is not inapposite with Mr. McCormick having been susceptible to influence in October, 2019.

Nor is that inapposite with the CHSs having had an influential role in his actions, a law enforcement tactic that has raised concerns.

> [T]here is something decidedly troubling about the Government's behavior vis a vis [defendant] Cromitie, for three reasons.

---

[32] The Government emphasizes Mr. McCormick's prison disciplinary record as warranting the 20 year sentence.  Disciplinary tickets may warrant some consideration at a sentencing, but the Government points to no case where a court justified a maximum prison term based on prison tickets.  Also, a significant portion of the tickets were incurred from April to May, 2023, when records indicate Mr. McCormick was not regularly taking medication and in 2020 and 2021, during which Mr. McCormick was not competent to participate in his defense.

15

> First, this is not a situation in which a Government agent, working undercover, pretended to be engaged in criminal activity "to detect criminal conspiracies." *Rahman, supra,* 189 F.3d at 131. Hussain did not infiltrate some pre-existing criminal enterprise; there was no criminal activity for him to detect until he helped Cromitie put such activity together. Indeed, after reviewing the record yet again, I am left with the firm conviction that if the Government had simply kept an eye on Cromitie, and moved on to other investigations, nothing like the events of May 9, 2009 would ever have occurred. The Government protests that Cromitie might have succumbed to the blandishments of some real terrorist at some unspecified time in the future, but I am constrained to agree with the FBI's assessment, delivered to the officials at Stewart Air Force Base, that "Cromitie was unlikely to commit an act without the support of the FBI source...." (3501–188).
>
> Nor was this an instance where the Government's agent had only "limited participation" in the criminal activity. *United States v. Russell,* 411 U.S. at 432, 93 S.Ct. 1637. [undercover] Hussain was the prime mover and instigator of all the criminal activity that occurred, right up until the last moments of the conspiracy, when he had to stop the car he was driving and "arm" the "explosive device" because the utterly inept Cromitie could not figure out how to do it.

!
*United States v. Cromitie*, 781 F. Supp. 2d 211, 225–26 (S.D.N.Y. 2011).  That is not to say that Mr. McCormick was entrapped,[33] but the CHSs were not passive.  They opened the door to getting to a plane when Mr. McCormick believed he needed the help of a lawyer.  They made certain Mr. McCormick took a pledge.

---

[33] The *Cromitie* Court denied the defendant's motion to dismiss, reasoning that the Government's conduct was not outrageous or coercive, and noting that the defendant ultimately participated in the conspiracy after a break of several months, but the Court ultimately recognized the conduct of the undercover agent in granting motions for compassionate release this summer.  *See United States v. Williams*, 2023 WL 4785286 (S.D.N.Y. July 27, 2023) ("the Government . . . used an unscrupulous operative to inveigle four impoverished men . . . ").

They also kept him on task. When Mr. McCormick strayed to other topics, the conversation always came back to their mission, *i.e.*, reinforcing Mr. McCormick's interests and ideas to the extent that they indicated a support of terrorism. They did not support him finding a wife, reaching a holy site, or engaging in other rituals that Mr. McCormick attributed to his deepening faith. They made certain he would reach *their* destination for him by convincing him that he could reach his and that they were providing him with the tools for doing so. That is far different than someone acting alone, or with similarly-situated co-conspirators. Given Mr. McCormick's mental health needs at the time, their role was critical to the outcome.

## CONCLUSION

The Court should balance all of the sentencing factors and prioritize recognized expert analysis over adversarial rhetoric to reach an outcome that is consistent with the parsimony clause. The goal of incremental punishment has been satisfied. The sentencing approaches sought in the Opening Memo recognizes that protecting the public, promoting respect for the law, deterring Mr. McCormick, and reducing recidivism are served by a sentence that recognizes that Mr. McCormick's conduct could have been prevented rather than exacerbated, punishment already has been served, and addressing his mental health needs is critical to ensuring a just sentencing. The Court should reject the Government's request accordingly.

Respectfully submitted,
Kevin McCormick

/s/Charles F. Willson/s/_____
By Charles F. Willson (# ct24129)
FEDERAL PUBLIC DEFENDER'S OFFICE

17

10 Columbus Boulevard, 6th Floor<br>
Hartford, CT 06106<br>
Tel:    (860) 493-6260<br>
Fax:   (860) 493-6269<br>
email: Charles_Willson@fd.org

## **CERTIFICATE OF SERVICE**

This is to certify that on December 20, 2023, a copy of the foregoing was filed electronically via the Court's CM/ECF system, and by that system, counsel for the Government has been provided with a copy of the foregoing.

/s/Charles F. Willson/s/_____
Charles F. Willson